## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FRANTZ BERNARD, et al.,** | : | |
| | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | **3:09-CV-00525** |
| | : | **(JUDGE MARIANI)** |
| **EAST STROUDSBURG** | : | |
| **UNIVERSITY, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM OPINION

## I. PROCEDURAL HISTORY

On February 13, 2009, Plaintiffs, Frantz Bernard, Timotheus Homas, Anthony Ross,

William Brown, Jerry Salter and Dejean Murray brought this action in the Court of Common

Pleas of Monroe County alleging violations of Title IX of the Education Amendments Act of

1972, 20 U.S.C. § 1681, et seq., as well as violations by Defendants, East Stroudsburg

University, the East Stroudsburg University Board of Trustees and individual Trustees,

Robert J. Dillman, Isaac W. Sanders, Kenneth Borland and Victoria L. Sanders[1], pursuant to

42 U.S.C. § 1983 and 42 U.S.C. § 1985. Further, the Plaintiffs alleged violations by

Defendants, East Stroudsburg University Trustees, Dillman, Borland and V. Sanders, under

42 U.S.C. § 1986. (Doc. 1).

---

[1] Isaac Sanders and Victoria Sanders are not related.

An Amended Complaint was filed by the Plaintiffs on April 7, 2009 (Doc. 4) and a
Second Amended Complaint was filed on July 14, 2009. (Doc. 28).

This Court previously granted the Motion to Dismiss of the Defendants named above
with respect to the claims of Plaintiffs William Brown, Dejean Murray and Jerry Salter, who
have been dismissed by this Court because their claims were untimely. (Doc. 48).

Prior to this, counsel for the plaintiffs and defendants stipulated to the dismissal
without prejudice of the members of the Board of Trustees of East Stroudsburg University,
Defendants Darell T. Covington, Amy Schaeffer Welch, Trudi Q. Delinger, Harry F. Lee,
Hussain G. Malick, Nancy V. Perretta, L. Patrick Ross, David M. Sanko, Robert H. Willever,
and Eli Berman. (Doc. 7).

Defendants, East Stroudsburg University, Robert J. Dillman, Kenneth Borland and
Victoria L. Sanders (collectively hereinafter University Defendants) have moved for
summary judgment on the remaining Plaintiffs' claims. (Doc. 93). I. Sanders has also
moved for summary judgment on the remaining Plaintiffs' claims. (Doc. 128). The Court
will address I. Sanders' motion in a separate opinion. The issues have been fully briefed
and the parties have submitted extensive documentary evidence in support of their
respective positions.

For the reasons that follow, summary judgment will be entered in favor of
Defendants, East Stroudsburg University, Robert J. Dillman, Kenneth Borland and Victoria
L. Sanders, with respect to all claims of the Plaintiffs.

2

## II. THE UNDISPUTED FACTS OF RECORD

In accordance with Local Rule 56.1, the University Defendants have submitted a
Statement of Material Facts as to which they submit there is no genuine issue for trial.
(Doc. 94).  Plaintiffs have submitted their response to the University Defendants' Statement
of Material Facts (Doc. 109) with the result that many of the numbered paragraphs of
University Defendants' Statement of Material Facts have been admitted by the plaintiffs. In
addition, there are other assertions of fact made by the University Defendants which, though
responded to by the plaintiffs with a qualified denial, contain additional statements by
Plaintiffs which are in substance admissions of the University Defendants' asserted facts.

The following facts have been admitted except specifically noted:

East Stroudsburg University is a public university of higher education and one of the
14 Pennsylvania state system of higher education universities. (Doc. 94, ¶ 1).

Defendant, Robert J. Dillman (Dillman), was the President of East Stroudsburg from
1996 to 2012. (Doc. 94, ¶ 2).

Dillman, in the beginning of 2007, began to make plans to take a sabbatical and left
East Stroudsburg University on sabbatical in January, 2008. He remained on sabbatical for
18 weeks and returned in May of 2008. (Doc. 94, ¶¶ 3, 4).

Defendant, Kenneth Borland (Borland), was the Provost and Vice-President for
Academic Affairs of East Stroudsburg University in 2007 and 2008 and was Acting
President while Dillman was on sabbatical. (Doc. 94, ¶ 5).

In 2007, Defendant, Victoria L. Sanders (V. Sanders), was the Associate Vice-President for Special Projects and also the Assistant to the President for ESU. (Doc. 94, ¶ 6²).

Isaac Sanders (I. Sanders), another Defendant in this case against whom Plaintiffs have alleged claims of sexual assault and harassment, was the Vice-President for Advancement at ESU as well as the head of the Advancement Office and the Chief Executive Officer of the East Stroudsburg University Foundation. (Doc. 94, ¶ 7). Isaac Sanders reported to two people, the Chair of the University Foundation Executive Committee, and Dillman. (Doc. 94, ¶ 8).

The employment of Isaac Sanders with ESU was suspended on July 1, 2008. Thereafter, Isaac Sanders was terminated for cause on October 22, 2008, effective December 21, 2008. (Doc. 94, ¶ 9³).

Plaintiffs Bernard, Homas and Ross are former students of ESU. Bernard was enrolled at ESU as an undergraduate from the Fall Semester of 2006 through the Fall Semester of 2011 and graduated on December 16, 2011. Plaintiff Homas attended ESU as an undergraduate student from the Summer Session of 2000 to the Summer Session of 2004 and graduated in August, 2004. Homas then attended ESU as a graduate student

---

² This statement of fact presents an example of the plaintiffs initially denying the asserted fact with the statement, "[d]enied as stated," and then admitting the statement in a following sentence: "It is admitted that, in 2007, Victoria Sanders ("V. Sanders") was the Director of Diversity and an Associate Vice-President as well as an Assistant to the President."

from the Fall Semester of 2004 to the Spring Semester of 2005 and from the Summer

Session of 2006 to the Fall Semester of 2007. Homas was awarded a Masters Degree from

ESU in 2008.  Plaintiff Ross attended ESU as an undergraduate from the Fall Semester of

2003 to the Summer Session of 2006 and graduated on May 9, 2008. (Doc. 94, ¶¶ 10-13).

The Advancement Office, of which Isaac Sanders was head, raised funds for ESU.

(Doc. 94, ¶¶ 7, 14).

The East Stroudsburg University Foundation, of which Sanders was the Chief

Executive Officer, is a private, non-profit corporation. (Doc. 94, ¶¶ 7, 15). In 2007 and 2008,

the East Stroudsburg University Foundation was staffed by ESU employees who worked in

the Advancement Office. (Doc. 94, ¶ 16).

ESU maintained a policy enacted on November 3, 1997 prohibiting discrimination

and harassment. (Doc. 94, ¶ 17).

The policy expressly provided that:

> No student or employee of the University, or contractor/vendor conducting
> business with the University, may engage in illegally harassing conduct which
> creates a hostile learning or work environment for other students or
> employees of the University.

(Doc. 94, ¶ 18).

---

[3] Here again, the plaintiffs, in initially responding to Defendants' Statement of Fact, do so by responding,
"Denied as stated."  But, the very next sentence in Plaintiffs' Response is: "It is admitted I. Sanders was
terminated for cause on October 22, 2008 effective December 21, 2008."

The policy defines harassment as "including unwelcome conduct based on gender; clearly offensive conduct; verbal, visual or physical behavior that is targeted at an individual adversely affect [sic] the learning environment; and criminal harassment." (Doc. 94, ¶ 19). ESU employees were required to take a course in sexual harassment. (Doc. 94, ¶ 20).

The University's policy prohibiting discrimination and harassment provided for a procedure for the submission and investigation of complaints of discrimination and harassment. (Doc. 94, ¶ 21). Arthur Breese, the University's Director of Diversity in Campus Mediation, believed that, in 2007, ESU was in compliance with its discrimination policy. (Doc. 94, ¶ 22).

In August of 2007, Plaintiff Bernard, Margaret Omwenga, an ESU graduate student, and Micah Ash, an ESU student, contacted Attorney Albert R. Murray, Jr. for the first time regarding Bernard's allegations that he had been sexually harassed and assaulted by Isaac Sanders between May, 2007 and August, 2007 while working as a work-study student in the Advancement Office. (Doc. 94, ¶ 23). Plaintiffs, in their Answer to this statement deny that "ESU [sic] first notice of allegations of inappropriate conduct by defendant Sanders occurred in August 2007," and further assert that "employees and officials of ESU knew of I. Sanders' improper conduct with students prior to Bernard's complaint, and had an obligation to report same." (Doc. 109, ¶ 23).

Omwenga was Plaintiff Bernard's girlfriend during the summer of 2007 and Bernard frequently lived with her. (Doc. 94, ¶ 25). Plaintiffs admit that "initially Omwenga and Ash

6

introduced Bernard to I. Sanders and had nothing negative to say about him." (Doc. 94, ¶ 26).

On or about August 23, 2007, Attorney Murray reached out to his friend and ESU professor, Dr. Donna Hodge, to set up a meeting for Bernard to report his allegations regarding Isaac Sanders to ESU. (Doc. 94, ¶ 27). That evening, Hodge called Victoria Sanders and informed her about the meeting with Bernard and asked her to attend. That conversation was the first time Victoria Sanders had heard of Bernard's complaint. (Doc. 94, ¶ 28). Plaintiffs, while admitting the above, further state in their answer: "It was well known on campus that I. Sanders repeatedly engaged in improper sexual conduct with ESU students." (Doc. 109, ¶ 28).

University Defendants assert that before her conversation with Hodge, Victoria Sanders had not been aware of any student complaints of sexual harassment by Isaac Sanders. (Doc. 94, ¶ 29). Plaintiffs respond with, "Denied as stated." Plaintiffs then assert that "Plaintiff, Anthony Ross, states that Victoria Sanders' son, Lorenzo Sanders, who was a student at the University *probably* knew what was going on since he was friendly with another victim, Dejean Murray." (Italics added). (Doc. 109, ¶ 29). Plaintiffs further state: "In addition, it was well known on campus that I. Sanders repeatedly engaged in improper sexual conduct with ESU students." (*Id.*). These statements do not present a proper and sufficient denial of the University Defendants' assertion that Victoria Sanders, before she

spoke with Professor Hodge, had not been aware of any student complaints of sexual harassment by Isaac Sanders.

On August 24, 2007, Professor Hodge, Victoria Sanders, Plaintiff Bernard and Attorney Murray met at Hodge's home where Bernard informed Victoria Sanders of the specifics of his allegations against Isaac Sanders. (Doc. 94, ¶ 30).

This meeting was the first time that Plaintiff Bernard had put the University on notice of what had occurred with Isaac Sanders. (Doc. 94, ¶ 31). The Plaintiffs respond to this asserted statement of fact with "[d]enied as stated," and further state that "[p]rior to his complaint, Frantz Bernard notified Maggie Omwenga (Omwenga) about the incident with I. Sanders in the car. While Ms. Omwenga was a student at the time, she was also employed by ESU but did not report the improper activities of I. Sanders' reported to her by Bernard." Nonetheless, Plaintiff Bernard, in his Deposition (Doc. 95-1), admits that his meeting on August 24, 2007 at the home of Professor Hodge, at which Defendant, Victoria Sanders, was present with Plaintiff Bernard and his counsel, was the first time that he put the University on notice of what had occurred with Dr. Isaac Sanders:

Q.      August 24, 2007, that Friday meeting at the home of Professor Hodge with Dr. Sanders present, your lawyer outside in the car, is that the first notice that you gave to the University about what had occurred with Dr. Sanders?

A.      Well, I didn't say he was outside in the car. I don't know where he was.

Q.      I thought you did. The record can bear me out. I thought you did say that?

A.      No. I said he was outside the house.

8

Q.      I thought he was outside in the car, pardon me for me. Was Professor
Hodge her house, Dr. Sanders present, your lawyer outside not in a car, was
that the first time that you put the University on notice of what occurred with
Dr. Sanders?

A.      Yes."

(Doc. 95-1; 96, lines 21-25; 97, lines 1-13).

Defendant, Victoria Sanders, referred Plaintiff Bernard to the University's Office of

Diversity to file a complaint. (Doc. 94, ¶ 32). Plaintiffs deny, "as stated" that Victoria

Sanders also told Bernard that he needed to change his work-study assignment and,

instead, state that "Bernard left his position at the Advancement Office after an incident in

which I. Sanders attempted to touch his stomach and genitals." (Doc. 109, ¶ 32).

Immediately after the meeting of August 24, 2007, Victoria Sanders called University

counsel, Andrew C. Lehman, and told him about Bernard's allegations against Isaac

Sanders. (Doc. 94, ¶ 34).

Two days later, on Sunday, August 26, 2007, Victoria Sanders phoned Defendant

Dillman and informed him of Bernard's allegations. (Doc. 94, ¶ 35.)

University Defendants then assert that Dillman, prior to the phone call from Victoria

Sanders, had never been made aware of any student complaints against Isaac Sanders.

(Doc. 94, ¶ 36). Plaintiffs deny this statement of material fact and state in support of their

denial:

9

In further response, as early as 2006, Dillman was told by numerous individuals, including Senior Staff members Bolt and Robert Kelly ("Kelly"), and then head of Human Resources Susan McGarry ("McGarry") that I. Sanders was hiring unqualified young African American males outside of University guidelines . . . . [and] [a]s early as 2006, there were also stories circulating in the Advancement Office that I. Sanders was running a 'sex ring' involving international students going back to 2003. Teresa Werkheiser, who was told the story in 2006 by Vicky Cooke, I. Sanders' former assistant, reported the information to Bolt, but that information was never investigated.

(Deposition citations omitted.) (Doc. 109, ¶ 36).

Plaintiffs further state "[i]n addition, it was generally known around campus that I. Sanders was engaging in inappropriate sexual relationships with students he employed in the Advancement Office, including Homas." [Deposition citations omitted]. (*Id.*)

For the reasons explained later in this Opinion, these statements do not present a sufficient denial of the University Defendants' assertion that Dillman had never been made aware of any student complaints against Isaac Sanders prior to the phone call by Victoria Sanders. The assertion by Plaintiffs that Dillman was told that Sanders was "hiring unqualified young African-American males outside of University guidelines," is not a statement that Dillman was told of any acts of sexual harassment, inappropriate sexual relationships with students, or sexual assaults of students by I. Sanders. The assertion that "there were also stories circulating in the Advancement Office with respect to I. Sanders running a 'sex ring'" presents unsubstantiated hearsay with no indication that these "stories" were ever presented to Dillman. Likewise, the assertion that it was "generally known around campus" that I. Sanders was engaging in inappropriate sexual relationships with students

does not present a sufficient denial of Dillman's lack of awareness of student complaints against Isaac Sanders prior to his phone call from Victoria Sanders on August 26, 2007.

On August 27, 2007, Plaintiff Bernard filed a complaint against Isaac Sanders with the Office of Diversity and Equal Opportunity. (Doc. 94, ¶ 37). Arthur Breese was the Director of Diversity in Campus Mediation at ESU at that time and he reported to Victoria Sanders, who was his immediate supervisor. (Doc. 94, ¶¶ 38, 39). One of Breese's duties as Director of Diversity in Campus Mediation was to investigate complaints of sexual or other type of harassment and to prepare a report and send that report to the ESU vice-president of the department where the accused ESU employee worked or to the President of ESU if the harassment allegation was made against a vice-president. (Doc. 94, ¶ 40).

Plaintiff Bernard had already stopped working in the Advancement Office before he first reported his allegations against Isaac Sanders to ESU on August 24, 2007. Bernard stopped working at the Advancement Office when Isaac Sanders tried to touch him in the Advancement Office kitchen some time in August, 2007. (Doc. 94, ¶ 41).

At the beginning of the Fall Semester, approximately one week after Bernard met with Victoria Sanders and Hodge on August 24, 2007, ESU moved Bernard to a work-study position in the Media Communications Department. Arthur Breese gave Bernard a list of work-study positions and Bernard chose the Media Communications Department position. (Doc. 94, ¶ 42).

11

The hours and wages for Bernard's new position at the Media Communications Department were the same as those Bernard received when he had worked in the Advancement Office so that Bernard lost no income by the move to the new job. (Doc. 94, ¶ 44).

After Bernard filed his formal complaint on August 27, 2007, I. Sanders did not attempt to harass him further. (Doc. 94, ¶ 45).

Plaintiffs, however, assert that Defendant I. Sanders attempted to intimidate Plaintiff Bernard. They assert that in November of 2007 "upon seeing Bernard from a distance on the ESU campus, I. Sanders made a disgruntled gesture toward Bernard, throwing up his hands and looking over his glasses in apparent protest of Bernard's complaint against him." (Doc. 109, ¶ 45).

Bernard further asserts that he was "harassed on campus by persons associated with I. Sanders in an attempt to prevent Bernard from following through with his complaint, including Defendant Dillman, who glared at Bernard when he saw Bernard in a campus store during the investigation." (Id.)

Finally, Plaintiffs assert that in July of 2008, Bernard received a death threat on his cell phone "from what sounded like an African-American man with an accident [sic]." Plaintiffs further assert that Bernard "believed the threat was coming from I. Sanders, [Vincent] Dent's daughter or someone else connected with the case." (Doc. 109, ¶ 45).

In addition to notifying ESU of his allegations on August 24, 2007, Bernard, about that same time, reported his allegations against Isaac Sanders to the Monroe County District Attorney. (Doc. 94, ¶ 46). This resulted in the Monroe County District Attorney, David Christine, making a phone call to ESU counsel Lehman and to Jeffrey Cooper, then Chief Counsel for the State System of Higher Education, about the Bernard case. (Doc. 94, ¶ 47).

Arthur Breese, in accordance with instructions he received from ESU counsel Lehman, wrote to Bernard and told him that DA Christine wanted to talk with him about his allegations against Isaac Sanders. Breese provided Plaintiff Bernard with both the location and phone number of the District Attorney's Office. (Doc. 94, ¶¶ 47, 48).

ESU's Discrimination and Harassment Policy provides that: "If the initial complaint of a violation of this Policy is received by any employee of the University other than in the Office of Diversity and Equal Opportunity, the person contacted shall refer the complaint to the Office of Diversity and Equal Opportunity." (Doc. 94, ¶ 49).

As Director of the Office of Diversity and Equal Opportunity, Arthur Breese would handle a complaint as follows: the employee would come into his office and fill out a form; Breese would review the complaint and send out a letter to both the complainant and the alleged offender; once the letter was sent out, Breese would interview the complainant, the alleged offender, and witnesses from each of the two individuals; Breese would then prepare a report during which he would consult with both counsel for the University and his

13

Supervisor, Victoria Sanders; once the report was prepared, Breese would send it out to both the complainant and the respondent, who could then submit comments on the report; at that point, the report would be sent to the appropriate vice-president. If the respondent were a vice-president, the report went to the President. (Doc. 94, ¶ 50). The parties agreed that Breese conducted 20 to 25 investigations at ESU. (Doc. 94, ¶ 51).

In this case, Breese interviewed Bernard on August 28, 2007 and wrote a summary of Bernard's allegations against Isaac Sanders. (Doc. 94, ¶ 52). Bernard also provided Breese with a written statement that he had prepared. (Doc. 94, ¶ 53).

In his statement, Bernard alleged that between May 26, 2007 and August 26, 2007, Isaac Sanders acted inappropriately with Bernard on several occasions while Bernard was a work-study student in the Advancement Office. The statement alleged an off-campus sexual assault, two instances of attempted unwanted touching on campus, and several on and off campus unwelcomed comments. The statement also alleged that Isaac Sanders obtained a job for Bernard at the Alumni Center, secured financial aid for his summer courses and gave Bernard several personal gifts that included money. (Doc. 94, ¶ 54).

In addition to the gifts and financial assistance which Isaac Sanders gave to Bernard, Bernard later acknowledged to Breese that, two days after the off-campus sexual assault, Bernard telephoned Sanders for help in locating a place for Bernard to stay because he had an argument with Omwenga and did not want to stay with her. (Doc. 94, ¶ 55).

At the August 28, 2007 meeting between Breese and Bernard, Breese told Bernard who he was and what he was going to do. Breese told Bernard he would investigate the situation by looking at Bernard's statement and then contacting Isaac Sanders to let him know about the allegations against him. (Doc. 94, ¶ 56).

Breese also asked Bernard if he had witnesses. Bernard identified Micah Ash and Margaret Omwenga. Bernard told Breese that he had informed both Ash and Omwenga about the incidents with Isaac Sanders. Breese asked about other witnesses and Bernard could not give any other names other than what he had already provided.[4]

In early September of 2007, Breese received two written responses from Isaac Sanders to Bernard's written allegations against Isaac Sanders. Breese told Bernard that he had notified Isaac Sanders of Bernard's allegations against him and informed Isaac Sanders that he would have a chance to respond to those allegations. (Doc. 94, ¶ 58).

At or about this same time, at Breese's request, Isaac Sanders identified Vincent Dent, who worked in the Advancement Office, as a witness. (Doc. 94, ¶ 59).

Later in September of 2007, Bernard and Breese met again. During the second meeting with Breese, Bernard was shown Isaac Sanders' written response to Bernard's allegations. Bernard was given the opportunity to comment on the response and identified

---

[4] Plaintiffs admit these facts but assert further that it was "the responsibility of Breese to do a thorough investigation and generate witnesses, documents and other evidence from Bernard's allegations." Plaintiffs further allege that "Breese did not interview any persons in the Advancement Office, former work study students and others that might have corroborated Bernard's claims because he was directed not to by Victoria Sanders and Lehman." (Doc. 109, ¶ 57). These statements do not present a denial of the facts asserted by the University Defendants in Paragraph 57 of the Statement of Material Facts.

what was true and false in the statements of Isaac Sanders and Dent. (Doc. 94, ¶ 60). Bernard submitted two written statements to Breese for consideration as part of Breese's investigation. (Doc. 94, ¶ 61).

From late October of 2007 to mid-November, 2007, Breese interviewed Micah Ash, Isaac Sanders and Vincent Dent. (Doc. 94, ¶ 63). The interviews were recorded except for the interview with Plaintiff Bernard, who refused to be recorded. (Doc. 94, ¶ 64). Breese attempted to schedule an interview with Margaret Omwenga, but she refused in part because she had consulted with her attorney and was advised not to get involved. Breese wrote this in an e-mail to ESU counsel Lehman on October 18, 2007. (Doc. 94, ¶ 65).

There were no known eyewitnesses to the improper conduct alleged by Bernard against Isaac Sanders aside from Bernard and Isaac Sanders. (Doc. 94, ¶ 66).

Isaac Sanders disputed Bernard's allegations of sexual harassment and assault but did not dispute most of Bernard's allegations concerning his assistance and gifts to Bernard. (Doc. 94, ¶ 67).

Isaac Sanders admitted that he processed a grant so that Bernard could enroll in classes for the summer and also told Breese that he secured a work-study position for Bernard in the Advancement Office. He further told Breese that he had helped Bernard with purchases, including prescription glasses. (Doc. 94, ¶ 68).

Bernard's written statements that he gave to Breese acknowledged that Bernard accepted assistance and gifts from I. Sanders after the date that Bernard alleged I. Sanders

16

sexually assaulted him off-campus. (Doc. 94, ¶ 69). In admitting the above statement to be

true, Plaintiffs further responded that Isaac Sanders provided these items, which were

unsolicited by Bernard, to "groom and exploit Bernard." Plaintiffs further assert that "Bernard

in fact rejected a gift of underwear that I. Sanders attempted to give him once he found the

gift was from I. Sanders." (Doc. 109, ¶ 69).

On November 28, 2007, after having concluded his investigation, Breese sent a copy

of his draft report to ESU counsel Lehman for review. (Doc. 94, ¶ 75).

Breese, in a cover memorandum to Lehman, wrote:

Here is the summary of the final report. As the neutral investigator, it is
difficult to ascertain if anything happened. Please review and advise. I would
like to allow Bernard and Sanders to come in next week to review the report
and, if they choose, to respond in writing to the written report. Thanks."

(Doc. 95-19, 61:11-13)

When asked at his deposition what he meant by the above-quoted statement,

Breese testified:

A.      Well, like I said, I was the neutral investigator, so I never assigned any
blame or any guilt. It would be up to whoever – the vice-president of that
department to really make that determination and ascertain if there was
anything indicated.

Q.      But aren't you saying that it was difficult – based upon what you see it
was difficult to determine whether anything happened?

A.      Well, from the way I – as facts as presented by that – you know, it was
one person's word against another.

Q.      He said/he said?

A.    Exactly."

(Id., 61:18-25; 63:1-5).

Plaintiffs, in response to University Defendants' statement of fact with respect to

Breese's deposition testimony quoted above, begin with a qualified denial. ("Denied as

stated."). Further, Plaintiffs admit that Breese made these comments but assert that he

made them "initially" before the completion of the investigation.

Given Breese's deposition testimony quoted above as to his cover memorandum

and its meaning, there is no issue of material fact as to the content of Breese's statements.

ESU counsel Lehman made "some minor grammatical edits to Breese's report."

(Doc. 94, ¶ 78).

Thereafter, Breese informed Bernard and Isaac Sanders that his report was

available for review and Breese allowed them to review the report and comment on it. (Doc.

94, ¶ 79). Both Bernard and Isaac Sanders reviewed the report and submitted comments

which Breese incorporated into the final report that he ultimately submitted to Dillman. (Doc.

94, ¶ 80).

Breese, in his deposition testimony, acknowledged that Victoria Sanders did not give

him her opinion as to the merits of the case initially when Plaintiff Bernard was about to file

his complaint. (Doc. 94, ¶ 81; Doc. 109, ¶ 81).

Plaintiffs go beyond this admission in paragraph 81, asserting that Victoria Sanders

directed Breese to only investigate the sexual harassment issue and not to inquire into the

financial aspects of the case. Plaintiffs further assert that Victoria Sanders and Lehman directed Breese only to interview Bernard, Isaac Sanders, and any witnesses those two individuals specifically identified. They further assert that as a result, Breese was "unable to interview other employees or students in the Advancement Office." Lastly, Plaintiffs assert that Victoria Sanders and Lehman "strictly limited the scope of Breese's investigation into the specific allegations in Bernard's complaint, causing him to omit relevant evidence from the investigation, including the e-mail of the stick figure with a gas pump inserted in his rectum." Breese testified that Victoria Sanders turned over to him an e-mail from Isaac Sanders which she described as a "stick figure with a gasoline pump up someone's rectum." (Doc. 95-19; 37:4-18). Breese testified that the picture described above had been taken from Isaac Sanders' computer and given to him by Victoria Sanders. He testified that Victoria Sanders said that the e-mail was "inappropriate." (*Id.,* 2-19).

Breese testified at his deposition that ESU counsel Lehman never hindered or prevented him from performing his investigation:

Q.   Did he ever hinder or prevent you from performing your investigation?

A.   No."

(Doc. 95-19; 112:24-25; 113:1).

In their Statement of Material Facts, ¶ 83, University Defendants assert as fact that Dillman knew nothing about the details of Breese's investigation until he received his final report on December 10, 2007. University Defendants further assert as fact that other than

19

the initial phone call from Victoria Sanders in August of 2007, "Dillman never talked to Arthur Breese or Victoria Sanders about Bernard's allegations."

Plaintiffs, in response, resort to the "denied as stated" qualified denial. Then, after asserting matters which they submit were within Dillman's knowledge, but are not responsive to University Defendants' assertion that Dillman knew nothing of the details of Breese's investigation until he received Breese's final report, state: "It is admitted that Dillman never talked to Arthur Breese about his investigation until the investigation was concluded."

The parties agree that Breese acknowledged that Victoria Sanders never told him that she was updating Dr. Robert Dillman on the investigation and never mentioned to Breese anything about the possible impact of his investigation on President Dillman. (Doc. 94, ¶ 84).

Breese further acknowledged that he did not discuss the investigation with Dillman while Breese was conducting his investigation. (Doc. 94, ¶ 85). Breese's final report was submitted to Dillman on December 10, 2007 and, after he submitted his final report, he had a brief telephone conversation with Dillman. (Doc. 94, ¶¶ 86, 87).

Plaintiffs dispute the University Defendants' assertion that before Bernard's complaint on August 24, 2007 regarding Isaac Sanders, "[i]t was ESU's practice not to accept anonymous letters as a basis for an investigation into discrimination or harassment."

(Doc. 94, ¶ 88) Plaintiffs, however, in further response, state: "Breese stated it was ESU's practice not to follow up on accusations made **solely** through anonymous letters." (Emphasis in the original).

Breese himself testified that during his investigation of the Bernard complaint, he heard nothing about anonymous letters being sent out and received no anonymous letters in connection with his investigation from Victoria Sanders which related to his investigation into the Bernard complaint. (Doc. 95-19; 63-25; 65:1-20).

On October 1, October 10 and November 6, 2007, ESU received three anonymous letters addressed to Defendant Dillman. On November 15 and November 20, 2007, ESU received copies of two more anonymous letters, both dated November 1, 2007. One of these two letters had been addressed to ESU's Council of Trustees and the other had been addressed to a former ESU Foundation Board member. All of the anonymous letters were received after Bernard made his initial allegations to Breese in August of 2007. (Doc. 94, ¶ 91).

The first letter, dated September 28, 2007, made no reference to any alleged sexual improprieties involving Isaac Sanders. (Doc. 94, ¶ 93).

The four remaining letters that referred to Isaac Sanders make various accusations. However, they do not provide details of Isaac Sanders' alleged misconduct, including dates, times, names of witnesses or any victim, except that Plaintiff Bernard is mentioned once by his first name. Nor do these letters state the source of the writer's information, any

21

information indicating that the source was reliable, or how the writer became aware of the information provided. (Doc. 94, ¶ 94). The letters contained a threat to send the letters to the ESU Council of Trustees, law enforcement and the press if Defendant Dillman did not take action. The letters were in fact sent to the aforementioned parties. (Doc. 94, ¶ 95).

The anonymous letters consist of a letter dated September 28, 2007 to Dr. Dillman (Doc. 95-13, p. 21), which is directed at then-ESU Foundation employee, Vincent Dent; a letter dated October 10, 2007 directed to Dr. Dillman, which makes reference to Isaac Sanders' "assignations" and "gay liaisons" with students (Doc. 95-13, p. 24); and an undated letter which bears a receipt stamp of November 6, 2007 to Dr. Dillman, which references both Dent and Isaac Sanders and notes that "people are disgusted with those that use their position to gain sexual favors from young people (even if they are slightly over 18)." This letter makes reference to unidentified students and characterizes Isaac Sanders as a "full fledged predator"; an additional letter dated November 1, 2007, addressed to Dr. Dillman, wherein the writer, with respect to Isaac Sanders, observes only that: "You have your hands full with Sanders . . . ." Finally, a similar letter was sent addressed to former Foundation Chair William Cramer.

Because one of the anonymous letters stated that Isaac Sanders had been arrested, Dillman asked ESU's Chief of Police, Robin Olson, to review campus police records and to check with Stroud Area Regional Police Department to see if Isaac Sanders had been charged with anything. (Doc. 94, ¶ 97).

Olson, it is admitted by Plaintiffs, did not find arrest records. (Doc. 94, ¶ 98[5]).

The parties agree that some of these letters were turned over to authorities. (Doc. 94, ¶ 99).

On January 7, 2008, Dillman sent his written decision to Bernard. (Doc. 94, ¶ 107). Dillman wrote that he found that there was "insufficient evidence to support the allegation of sexual harassment." (Doc. 94, ¶ 108). Plaintiffs, while admitting this fact, assert that "Dillman based his decision on an investigation that Breese stated 'was not thorough'." Plaintiffs further assert that "there is substantial evidence that Dillman dismissed the complaint to protect I. Sanders' and Dillman's reputations." Plaintiffs make reference to Charmaine Clowney, Esquire, former PASSHE Assistant Vice Chancellor for Diversity and Multicultural Affairs, and assert that "V. Sanders told her that ESU's administration wanted to prevent Dillman from receiving another vote of no confidence from the faculty after he had received two such votes, the last in 2006." Plaintiffs then assert, "[k]eeping the investigation strictly confidential and dismissing the complaint protected Dillman and his reputation." (Doc. 109, ¶ 108). A review of the Verified Statement With Exhibit of Charmaine Clowney (Doc. 110-31) and the attachment to her statement of a newspaper article containing an interview she gave to the *Pocono Record*, published on March 15, 2009, shows Clowney criticized East Stroudsburg University and the Pennsylvania State System of Higher Education in general for failure to track complaints of discrimination,

---

[5] Plaintiffs' response to Statement of Material Facts, ¶ 98, begins with the phrase, "Denied as stated[,]" but

including sexual discrimination and sexual harassment. She stated that she "worried" about

the qualifications of ESU's Social Equity Director, Victoria Sanders. She then indicated that

she was "perturbed by statements she heard Victoria Sanders make twice." The newspaper

article attached to the Verified Statement of Clowney then states:

> According to Clowney, Victoria Sanders said that the purpose of EEO policy
> was to protect faculty and administration from being subjected to student
> complaints.
>
> Clowney contends that Victoria Sanders explained to her that ESU
> administration wanted to prevent Dillman from receiving another vote of no
> confidence from the faculty. He received two such votes, the last in 2006.
> Keeping faculty and administration free from complaints was a way to prevent
> that, Clowney said of Victoria Sanders."

(Doc. 110-31, p. 12).

On this basis, Plaintiffs assert, as noted above, "there is substantial evidence that

Dillman dismissed the complaint to protect I. Sanders' and Dillman's reputations."

After Defendant, Kenneth Borland, assumed the position of Acting President, he had

a series of meetings with staff from the Advancement Office. These meetings involved

complaints about Isaac Sanders' management of the Advancement Office and alleged

mistreatment of full-time staff. Borland met separately with John Ross, Vincent Dent, Isaac

Sanders, and Bob Kelley on January 4, 2008. Borland met with Carolyn Bolt on January 14,

2008. (Doc. 94, ¶¶ 109-111). Borland also met at separate times with Teresa Werkheiser,

John Shewchuck and Christina Mace. On January 16, 2008, Borland met with Tanya

---

then admits that Olson did not find arrest records.

24

Williams. (Doc. 94, ¶¶ 115, 116). Plaintiff Bernard's allegations against Isaac Sanders were not discussed at any of these meetings and nor were any other student complaints of sexual harassment or sexual assault by Isaac Sanders discussed. (Doc. 94, ¶ 117).

University Defendants assert that "no member of the Advancement Office who has been deposed in this case had ever witnessed any improper conduct between Isaac Sanders and any student in the Advancement Office." (Doc. 94, ¶ 118). Plaintiffs respond with "[d]enied as stated." (Doc. 109, ¶ 118). In support of such denial, the Plaintiffs state: "Werkheiser stated that she found it 'odd' that I. Sanders would 'take home' the international students (deposition citations omitted). Werkheiser also testified that Drame told her that Plaintiff Homas came to her and told her about I. Sanders' sexual assaults of him." (*Id.*). Plaintiffs also make reference to the Verified Statements of Dent and LaShawne Pryor. Thus, Plaintiffs have not addressed by an admission or denial the specific assertion of fact in paragraph 118.

Plaintiffs, in denying that Defendant Borland was not aware of Bernard's allegations against Isaac Sanders until mid-January of 2008 (Doc. 94, ¶ 120), base their denial on statements that "Victoria Sanders provided a copy of the Breese report to Borland, on or about January 3, 2008, when Borland took office as Acting President, and prior to January 7, 2008 . . . ." Plaintiffs also assert that Borland, prior to becoming Acting President, "knew of allegations and rumors regarding I. Sanders' sexual improprieties, was aware that there was an investigation pending against I. Sanders, and heard other rumors about the

25

anonymous letters but did not see them until later," citing to Borland's deposition. Plaintiffs also assert that Borland, in October of 2007, "heard rumors on campus that I. Sanders had been stopped by the police near Stroudsmoor and was found with a man," again citing to Borland's Deposition. Whether these assertions present a sufficient basis for a denial of Defendants' assertion that Borland was not aware of Bernard's allegations against Isaac Sanders until mid-January, 2008 is addressed in the analysis portion of this Memorandum.

Plaintiff Bernard, on March 26, 2008, initiated the complaint filing process with the Pennsylvania Human Relations Commission. ESU was not served with the PHRC Complaint until July, 2008 and, thereafter, ESU filed an Answer with the PHRC denying liability. (Doc. 94, ¶¶ 121-123).

PHRC, by letter dated March 16, 2009, notified ESU that it had reviewed Bernard's complaint of discrimination and determined that it should be closed administratively and gave Bernard notice of his right to sue. (Doc. 94, ¶ 124).

On June 8, 2008, the *Pocono Record* ran a story that additional students were coming forward claiming that Isaac Sanders had sexually harassed or abused them. (Doc. 94, ¶ 125).

Dillman placed Isaac Sanders on administrative leave, after discussing the matter with University counsel and Thomas Krapsho, the State System's Vice-Chancellor for Human Resource and Labor Relations. The decision to place Isaac Sanders on administrative leave was made jointly between Dillman and Krapsho. (Doc. 94, ¶ 126).

While admitting these facts, Plaintiffs also assert that "Dillman failed to place I. Sanders on administrative leave until almost a year after Bernard made his complaint, even though, when allegations had been made against Julie Anne Simpson, the women's basketball coach, Dillman had directed that Simpson be placed on administrative leave until the investigation was complete because he might 'have to deal with Coach Simpson in follow-up activities surrounding these charges.'" (Doc. 109, ¶ 126).

At this time, ESU hired an outside law firm to conduct an investigation into the allegations reported in the *Pocono Record* (Doc. 94, ¶ 127) and, by letter dated July 1, 2008, Isaac Sanders was placed on administrative leave "effective immediately." (Doc. 94, ¶ 128). The letter placing Isaac Sanders on leave instructed him that, "absent prior approval by Dillman or Victoria Sanders, he was not permitted on campus, nor could he contact any University employee, student, donor or potential donor."

While admitting these facts, Plaintiffs further respond that despite the explicit instructions prohibiting Isaac Sanders from returning to campus or from contacting any students, Isaac Sanders did attempt to contact Plaintiff Anthony Ross multiple times, caused Bernard to be threatened and, through Dent, attempted to intimidate Salter and dissuade him from pursuing his claims against Isaac Sanders. (Doc. 109, ¶ 128).

In paragraph 129 of Defendants' Statement of Material Facts, Defendants assert that during the summer of 2008, ESU was notified through Bernard's counsel that five former ESU students were going to bring claims against the University. Plaintiffs admit that only

27

five former students were the subject of unwanted sexual harassment and assault by Isaac Sanders and that three of the students who initially joined in this suit with Bernard, William A. Brown, III, Dejean Murray and Jerry Salter had their claims dismissed as untimely.

Of the remaining Plaintiffs, Homas alleges that he was sexually assaulted by Isaac Sanders off campus in the Fall of 2004 while a graduate student and that he was again sexually assaulted by Isaac Sanders at the end of the Spring Semester 2005. (Doc. 94, ¶¶ 130, 131). Homas left ESU after the Spring Semester of 2005 and, when he returned to ESU for the summer session of 2006, he accepted a work-study position with Isaac Sanders in the Advancement Office. (Doc. 94, ¶ 132). Homas then alleges that in the spring of 2007, he was sometimes tricked and at other times forced by Isaac Sanders into performing sexual acts on numerous occasions. (Doc. 94, ¶ 133).

Plaintiffs deny that Homas failed to report the sexual assaults to ESU prior to reporting it to his attorney in the summer of 2008. Plaintiffs, in support of this denial, assert that Homas would hide in the office of Michelle Drame, who was an ESU employee in the Advancement Office and that, from time to time, Homas mentioned to Drame that Isaac Sanders was "intimate with student workers and staff and that there were 'inappropriate things going on sexually' [Homas Dep. 172:2-175:25, 177:16-25, 178:4-182:5]." (Doc. 109, ¶ 134).

Plaintiff Anthony Ross alleges that he was subjected to unwelcome touching on approximately three occasions between May, 2006 and January, 2007. He further alleges that Isaac Sanders also made unwelcome comments during that time. (Doc. 94, ¶ 135).

Plaintiff Ross did not report his allegations to ESU until July of 2008, after Isaac Sanders was placed on leave. (Doc. 94, ¶ 138).

William A. Brown, III, whose complaint in this matter was dismissed, never reported his allegations to ESU until after he came forward in the summer of 2008 through Attorney Murray. (Doc. 94, ¶ 141).

Dejean Murray, whose complaint in this matter was dismissed, never reported his allegations to ESU until after he came forward in the summer of 2008 through Attorney Murray. (Doc. 94, ¶ 144).

Jerry Salter, whose complaint in this matter was also dismissed, never reported his allegations to ESU until he came forward in the summer of 2008 through Attorney Murray. (Doc. 94, ¶ 147).

ESU terminated Isaac Sanders' employment in the following sequence:

Dillman received the investigation report from the outside law firm on September 26, 2008.

Following receipt of the report, Dillman conducted a pre-disciplinary conference with Isaac Sanders on October 3, 2008.

On October 22, 2008, Dillman sent Isaac Sanders a letter stating that his employment with the University was being terminated for cause. The letter set forth the reasons for the termination, including sexual advances towards students. The termination was effective December 21, 2008. (Doc. 94, ¶¶ 148-150).

Since August 24, 2007, Plaintiff Bernard admits that there was no further unlawful touching by Isaac Sanders. Bernard, however, asserts attempts by Isaac Sanders to intimidate him. (Doc. 109, ¶ 151).

Plaintiff Homas denies that there have been no subsequent incidents of sexual harassment by Isaac Sanders since May of 2007, asserting that Isaac Sanders, after his dismissal from ESU, approached Homas and his son on or about June of 2009, and "stood close to Homas and tried to touch him as Sanders laughed." (Doc. 109, ¶ 152).

Defendant Ross denies that aside from Isaac Sanders' attempts to hug him in May of 2008, there have been no incidents of sexual harassment by Sanders since early 2007. In support of this denial, Ross testified that Isaac Sanders continued to call him and send him text messages through October of 2008. (Doc. 109, ¶ 153).

## II. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine issue as to any material fact." FED. R. CIV. P. 56(a). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is

entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.,* 901 F.2d 335, 340 (3d Cir.1990). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed.2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson,* 477 U.S. at 248. Rather, the opposing party must point to a factual dispute requiring trial and the district court "may limit its review to the documents submitted for the purposes of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified School Dist.,* 237 F.3d 1026, 1030-1031 (9th Cir. 2001); *see also Forsyth v. Barr,* 19 F.3d 1527 1527, 1537 (5th Cir. 1994). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as

true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

## III. ANALYSIS

## A. Count I – Title IX

In relevant part, Title IX provides that "no person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX can also be enforced through a private right of action wherein monetary damages are available. *Gebser v. Lago Vista Indep. School Dist.,* 524 U.S. 274, 281, 118 S.Ct. 1989, 158 A.L.R. Fed. 751 (1998) (citing *Cannon v. University of Chicago,* 441 U.S. 677, 99 S. Ct. 1946, 60 L. Ed. 2d. 560 (1979); *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 112 S.Ct. 1028, 117 L. Ed. 2d 208 (1992)). In imposing a duty upon a funding recipient not to discriminate on the basis of sex, Title IX encompasses sexual harassment, including when a teacher "sexually harasses and abuses a student." *Franklin,* 503 U.S. at 75.

Under Title IX, a plaintiff cannot recover damages "unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual knowledge of, and is deliberately indifferent to, the teacher's misconduct." *Gebser,* 524 U.S. at 277. Accordingly, in a case such as this, under Title IX, to proceed on a claim against an educational institution, the student must establish a prima facie case

demonstrating that (1) he was subjected to a sexually hostile environment or *quid pro quo* sexual harassment; (2) an "appropriate person", who at minimum had authority to take corrective measures on the district's behalf, was given actual notice; and (3) the institution's response to the misconduct or harassment amounted to "deliberate indifference." *Klemencic v. Ohio State University*, 263 F.3d 504, 510 (7th Cir. 2001); *Morse v. Regents of the Univ. of Colorado*, 154 F.3d 1124, 1127-28 (10th Cir. 1998) (citing *Gebser*, 524 U.S. at 289-91).

A person with authority to take corrective actions is a person with the "supervisory power over the offending employee," including the power to discipline the employee and take action to end the abuse in question. *Rosa H. v. San Elizario Indep. School Dist.*, 106 F.3d 648, 660 (5th Cir. 1997).

Recovery based on the principles of *respondeat superior* or constructive notice "frustrate[s] the purposes" of Title IX, and therefore the school official must have actual knowledge in order for the plaintiff to prevail. *Gebser*, 524 U.S. at 285. Actual notice necessitates more than a simple report of inappropriate conduct, however the standard "does not set the bar so high that a school district is not put on notice until it receives a clearly credible report of sexual abuse from the plaintiff-student." *Escrue v. Northern OK College*, 450 F.3d 1146, 1154 (10th Cir. 2006) (quoting *Doe v. School Administrative Dist. No. 19*, 66 F.Supp.2d 57, 62 (D.Me. 1999)). Therefore, while actual knowledge does not require absolute certainty that harassment has occurred, there must be more than an

awareness of a mere possibility of the harassment. *Bostic v. Smyrna School Dist.*, 418 F.3d 355, 360 (3d Cir. 2005). The educational institution has "'actual knowledge' if it knows the underlying facts, indicating sufficiently substantial danger to students, and was therefore aware of the danger." *Id.* at 361.

Upon a showing of actual knowledge, Plaintiff must show that the funding recipient exercised deliberate indifference. A funding recipient is "deliberately indifferent" when the recipient's response to the harassment, or lack of response, is "clearly unreasonable in light of the known circumstances." *Davis Next Friend LaShona D. v. Monroe County Bd. of Educ.*, 526 U.S. 629, 648-649, 119 S.Ct. 1661, 143 L. Ed. 2d 839 (1999). Deliberate indifference requires an "official decision by the recipient not to remedy the violation." *Gebser*, 524 U.S. at 290. This is an exacting and strict standard requiring that the official disregard a known or obvious consequence of his action or inaction. Therefore, the appropriate remedial action necessarily depends on "the particular facts of the case – the severity and persistence of the harassment, and the effectiveness of any initial remedial steps." *Rosa H.*, 106 F.3d at 661.

Furthermore, deliberate indifference incorporates a causation requirement. The Title IX funding recipient's deliberate indifference must subject the students to further harassment, to wit, the indifference must "cause students to undergo harassment or make them liable or vulnerable to it." *Davis*, 526 U.S. at 644-645 (internal quotations omitted). This harassment must take place in a context subject to the school's control. *Id.* at 645.

Therefore, the school is only liable when "the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs." *Id*. This causation element results in a requirement that harassment, or the likelihood or vulnerability of a student to be subjected to it, must occur subsequent to an official's decision to not remedy a known violation.

The fact that the appropriate person's initial response does not remedy or prevent the harassment, or that the school does not use a particular method to remedy or prevent the harassment, does not provide sufficient grounds for liability. *Baynard v. Malone*, 268 F.3d 228, 236 (4th Cir. 2001). While "a minimalist response is not within the contemplation of a reasonable response," the absence of a more aggressive action does not amount to deliberate indifference. *Escrue*, 450 F.3d at 1155 (quoting *Vance v. Spencer County Pub. School Dist.*, 231 F.3d 253, 260 (6th Cir. 2000)). Consequently, the funding recipient is not required to "engage in [a] particular disciplinary action." *Davis*, 526 U.S. at 648.

### 1. Quid Pro Quo *Sexual Harassment*

To establish a prima facie case against an educational institution under Title IX, a plaintiff must first show the presence of a genuine issue of material fact as to whether he was subjected to *quid pro quo* sexual harassment or a sexually hostile environment. *Klemencic*, 263 F.3d at 510. Here, Plaintiffs allege a claim of *quid pro quo* harassment by I. Sanders toward Bernard, Homas, and A. Ross. (Doc. 107-2, at 51). Plaintiffs have not claimed, nor argued, that there is evidence of a sexually hostile educational environment,

asserting instead that whether the conduct that they have alleged rises to the level of a hostile educational environment is "plainly irrelevant." (*Id.* at 52). Therefore, it is unnecessary for the Court to analyze whether a hostile educational environment claim is viable given Plaintiffs' statements that "the evidence in the record here plainly states a claim of *quid pro quo* harassment for all three Plaintiffs" and that "it is plainly irrelevant whether or not the conduct alleged rises to the level of a hostile educational environment." (*Id.* at 51, 52).

As Plaintiffs and Defendants correctly state, to establish a *quid pro quo* sexual harassment claim, the plaintiff must show that (1) he belongs to a protected group; (2) he was subject to unwelcome sexual harassment; (3) the harassment was based on his sex; and (4) that submission to, or rejection of, the sexual harassment resulted in a tangible educational action. *E.N. v. Susquehanna Twp. School Dist.*, No. 1:09-CV-1727, 2011 WL 3608544 at *13 (M.D.Pa. 2010) (citing *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 27 (3d Cir. 1997) (enumerating elements of a Title VII claim for *quid pro quo* sexual harassment)); *see also McGraw v. Wyeth-Ayerst Labs., Inc.*, 1997 WL 799437 at *3 (E.D.Pa. Dec. 1997) ("To make out a claim for *quid pro quo* sexual harassment, an employee must show that a supervisor conditioned tangible job benefits on the employee's submission to unwelcome sexual conduct or penalized [him] for refusing to engage in such conduct."). Under Title IX, the plaintiff must establish that a tangible educational action resulted from plaintiff's refusal

to submit to the sexual demands. *Crandell v. New York College of Osteopathic Medicine*,
87 F.Supp.2d 304, 318 (S.D.N.Y. 2000).

Plaintiffs argue that "the record . . . is replete with evidence of I. Sanders giving the
Plaintiffs gifts, offering and/or providing them with jobs and paying the tuition for their
classes, all as an inducement or in return for their submission to his sexual advances."
(Doc. 107-2, at 52).

With respect to Bernard, I. Sanders did not deny most of Bernard's allegations
concerning his assistance and gifts to Bernard and admitted that he processed a grant so
that Bernard could enroll in summer classes. (Doc. 94, ¶¶ 67-68). According to I. Sanders,
this help included money for food, prescription glasses, rent, and to have his car repaired.
(Internal Investigation Memorandum, Doc. 95-13, Ex. 18, at 3-4). Nonetheless, in Bernard's
letter in response to Breese's internal investigation report, Bernard stated that "[he] was not
promised or told by Isaac Sanders that [he] would be given these things" (referring to money
and food), that he "never requested anything from [I. Sanders]," and that he told I. Sanders
that paying for his eyeglasses "was not necessary." (Doc. 95-13, Ex. 18, at 1-2). Bernard
also claimed that when I. Sanders attempted to fondle him in the car, Bernard rebuffed his
advances, that he refused to accept underwear from I. Sanders, told I. Sanders not to send
him e-mails such as the picture depicting a stick-figure and gas pump, and that he "jerked
back" when I. Sanders reached over to touch Bernard's stomach in the Advancement Office

kitchen, and then pulled away when I. Sanders attempted to touch his private parts on that same occasion. (Internal Investigation Memorandum, Doc. 95-13, Ex. 18, at 3-4).

Plaintiffs also rely on Breese's "finding that there were, in fact, claims of *quid pro quo* harassment claims." (*Id.*). However, Breese only stated in his deposition that he "thought, maybe, *quid pro quo* would come in" and therefore wanted more latitude to investigate financial matters, but admitted that Bernard never alleged *quid pro quo* and never suggested to Breese that he had given sexual favors in exchange for things that I. Sanders was doing for him. (Dep. of Arthur Breese, at 19, 137-138).

With respect to A. Ross, in June, 2006, I. Sanders allegedly put "his hands in [Ross'] upper thighs next to [Ross'] genitals" while telling Ross that he "[would] take care of everything." (Stmt. of Anthony Ross, at 5-6). During this encounter, I. Sanders also hugged Ross and rubbed his back "down towards [Ross'] butt." (*Id.* at 6). In July or August, 2006, I. Sanders allegedly offered Ross a graduate assistantship working for him in the Advancement Office, telling Ross that "all [Ross] had to do was pretty much get paperwork stuff done and [I. Sanders] was going to pretty much take care of the rest. . . ." (Dep. of Anthony Ross, at 25-26, 79-81). Ross rejected this offer. Later that year, while in I. Sanders' office, I. Sanders rubbed Ross' back, leaned his body against Ross' back, and put his genitals against Ross' shoulder. (*Id.* at 8). Ross further alleges that I. Sanders also made unwelcome and inappropriate comments during that time. (Stmt. of Anthony Ross, at 5-8). I. Sanders also paid Ross' outstanding tuition bill to the University in September,

2007. However, I. Sanders did not tell Ross about this payment. I. Sanders allegedly attempted to have further contact with A. Ross after this time, including an allegation that I. Sanders attempted to hug Ross when Ross went to I. Sanders' office to pick up a reference from him in May, 2008.

Homas returned to ESU to complete his graduate degree in the Summer of 2006. Homas claims that, in Spring, 2007, while working in the Advancement Office, I. Sanders would regularly trick Homas into performing oral sex on him in I. Sanders' office. (Dep. of Timotheus Homas, at 118, 132-134).[6]

Plaintiffs' specific claims of sexual advances by I. Sanders, in conjunction with I. Sanders' admissions that he gave money and gifts to Bernard, paid A. Ross' tuition bill, and provided A. Ross with a job reference, raise triable issues of fact as to the presence of *quid pro quo* sexual harassment. However, while the Court recognizes the presence of these factual issues as to each Plaintiff, the plaintiffs fail to establish the other elements necessary to establish liability on the part of the University Defendants under Title IX, specifically, actual notice and deliberate indifference. As the Court will discuss in detail when addressing these two elements, *infra*, with respect to Bernard, ESU immediately began an investigation of Bernard's official complaint; this investigation was in accordance with the

---

[6] While Plaintiffs broadly assert that "the evidence in the record here plainly states a claim of *quid pro quo* sexual harassment for all three Plaintiffs," they do not cite to any specific instances. (Doc. 107-2, at 51). In turn, University Defendants assert that "there is no evidence in this record supporting a quid pro quo claim by either Bernard or Ross." (Doc. 120, at 25). University Defendants previously admitted that Homas' allegations, if true, could meet the Title IX requirement of a sexually hostile work environment. (Doc. 102,

University's Notice of Nondiscrimination; the investigation was not clearly unreasonable; and Dillman, as the appropriate person, considered the final investigation report and determined that it contained insufficient evidence to support Bernard's allegation of sexual harassment. Therefore, as a matter of law, the University Defendants were not deliberately indifferent as to Bernard. Further, as to Ross and Homas, the two plaintiffs did not come forward until June, 2008. Consequently, with respect to Breese's investigation, there cannot be allegations of an inadequate investigation because Ross' and Homas' claims had not been presented at the time of this investigation and therefore University Defendants cannot be said to have had actual notice as to these claims. When Ross' and Homas' claims were presented in June, 2008, Dillman promptly acted on the allegations, resulting in I. Sanders' suspension in July, 2008, and subsequent termination in October, 2008.

Therefore, for the reasons that follow, while we find that there are triable issues of fact as to whether each Plaintiff was subjected to *quid pro quo* sexual harassment, these issues are insufficient to allow Plaintiffs to survive summary judgement. Bernard, Ross, and Homas must still demonstrate deliberate indifference and actual knowledge on the part of an appropriate person, specifically Dillman, in order to succeed on their Title IX claim. However, Plaintiffs' fail to show any triable issues that University Defendants had actual knowledge of I. Sanders' alleged sexual misconduct prior to Bernard's official complaint and that, upon receiving the complaint, their response was one of deliberate indifference. As to

---

at 28). It is unclear whether University Defendants also believe that Homas could meet the requirement to

Homas and Ross, summary judgment must be entered for the University Defendants

because when they were provided actual notice of these plaintiffs' complaints of sexual

harassment at the hands of I. Sanders, there was a virtually immediate response resulting in

I. Sanders' suspension in July, 2008, and termination in October, 2008.

## 2. Actual Knowledge

Here, the University Defendants do not dispute that East Stroudsburg University

receives federal financing assistance and is subject to Title IX's requirements. (Doc. 102, at

17). I. Sanders, as Vice-President for Advancement at ESU, head of the Advancement

Office, and the CEO of the ESU Foundation, reported to Dillman and the Chair of the

University Foundation Executive Committee. (Doc. 94, ¶¶ 7, 8). Therefore, as President of

the University and I. Sanders' supervisor, Dillman clearly had the authority to take corrective

measures on the University's behalf.

Plaintiffs contend that University Defendants, and specifically Dillman, had actual

knowledge of I. Sanders' harassment, or at minimum, knowledge of underlying facts

indicating a sufficiently substantial danger to the students. (Doc. 107-2, at 45-47). In

support of this claim, they cite to several incidents and witness statements, none of which

this Court finds sufficient to establish actual knowledge on the part of any University

Defendant prior to Bernard's official complaint.

---

establish *quid pro quo*.

Plaintiffs first point to the deposition of former ESU police officer Randy Nelson. (Doc. 107-2, at 45). According to Nelson, other officers told him that I. Sanders was gay and related to him an incident that occurred prior to 2004 wherein I. Sanders was found in a car on a dark part of campus, late at night, with another man.[7] (Dep. of Randy Nelson, at 35-38; Stmt. of Randy Nelson, at 5). The mere fact that I. Sanders was in a car with another man cannot impute any level of knowledge to the University Defendants that I. Sanders was engaging in sexual harassment of male students.

Plaintiffs also state that Dent "admitted that he was aware of I. Sanders' long standing history of sexual misconduct with students."[8] (Doc. 107-2, at 45-46). Dent's statement details his relationship with I. Sanders, and his eventual discovery of I. Sanders' bisexuality or homosexuality. Arguably, the most probative statements that Dent made that could be used to indicate that Dent had prior knowledge of a history of sexual misconduct on the part of I. Sanders are that "Dr. Sanders would often meet with grad students in his office behind closed and locked doors," that "it was not uncommon for Dr. Sanders to go out to lunch or even dinner with these students" and that "there did come a time when [Dent] became aware that something was not quite right." (Stmt. of Vincent Dent, at 2). However,

---

[7] Plaintiffs erroneously state that I. Sanders was found with a "male student." There is no evidence in Officer Nelson's statement or deposition to support this contention. At most, Officer Nelson stated that the police "were trying to confirm whether [I. Sanders] was in this car with a student." (Stmt. of Randy Nelson, at 5). The statement does not say whether or not this was confirmed and Officer Nelson's deposition regarding this incident only refers to the other person in the car as "the other male." (Dep. of Randy Nelson, at 35).

[8] While Plaintiffs' cite to Dent's Statement, p. 2, it is not clear to what part of this page they are referring. However, the Court will look to the entirety of Dent's statement for support of Plaintiffs' contention.

42

Dent also stated that "none of the students ever came to [him] with any concerns about Dr. Sanders" and admitted that he told Breese that he "had not witnessed any inappropriate behavior between Dr. Sanders and Frantz as [he] had not." (*Id.* at 3, 5). Dent's statements are therefore far cries from any evidence that he "was aware of I. Sanders' long standing history of sexual misconduct with students," or even that he had any knowledge of sexual acts taking place between I. Sanders and his students.[9]

"Most importantly" to the Plaintiffs is their assertion that:

Dillman was personally aware of I. Sanders' improper conduct with students as early as 2006 . . . [and] was told by numerous individuals, including senior staff members Bolt and Kelly (*sic*), and then head of Human Resources McGarry that I. Sanders was hiring unqualified young African American males outside of the university guidelines.

(Doc. 107-2, at 46). This statement does not present a sufficient denial or dispute of fact as to the University Defendants' assertion that Dillman had never been made aware of any student complaints against I. Sanders prior to the phone call by V. Sanders on August 26, 2007. (Doc. 102, at 21-22). The hiring of "young African American males outside of the university guidelines" is not indicative of "improper conduct with students." Nor can these hiring practices be reasonably construed as indicative of sexual misconduct. At best, as

---

[9] Even if Dent's statements could be construed to indicate a prior knowledge of sexual misconduct, I. Sanders was Dent's supervisor so that it does not appear on the record evidence that Dent was an "appropriate person" for the purpose of compliance with the "actual notice" requirement. Furthermore, there is no indication that Dent did tell, or attempted to tell, anyone of any concerns that he may have had. Therefore, it is impossible to impute any possible knowledge that he may have had to any of the University Defendants.

Bolt stated, I. Sanders' hiring practices may have been suggestive of "a double standard for people of different colors." (Dep. of Carolyn Bolt, at 80).

Finally, Plaintiffs assert that "I. Sanders had developed a reputation for engaging in inappropriate sexual relationships with students he employed in the Advancement Office." (Doc. 107-2, at 46). As such, Plaintiffs point to stories circulating in the Advancement Office that "I. Sanders was running a 'sex-ring' involving international students going back to 2003" and that these stories had reached employees in other offices, including Bernard's then-girlfriend Omwenga. (Id.). This argument raises multiple issues. First, there is no evidence that I. Sanders actually did run a 'sex-ring' or what specific activity, if any, occurred. Werkheiser, to whose deposition and verified statement Plaintiffs cite to support this contention, stated that she "was told in 2006 by Vicky Cooke, assistant to Isaac Sanders before Laurie Schaller that a custodian at ESU, knew and told her that Sanders was running a 'sex ring' involving international students back in 2003 or so." (Stmt. of Teresa Werkheiser, at 4). Furthermore, in response to a question regarding her understanding of Cooke's statement as to what I. Sanders was doing, Werkheiser merely responded that "I didn't really - --. I mean, it's kind of self-explanatory with the word in it and, you know, some kind of ring. I really didn't know any details or anything. . . ." (Dep. of Teresa Werkheiser, at 26). Second, Werkheiser's statement is unsubstantiated double hearsay at best. Third, absent any testimony from Omwenga, it is impossible to know what she specifically heard or knew. Moreover, she was under no duty to report such rumor-like statements to her

supervisors and it does not appear that she did so. Finally, Plaintiffs present no evidence that, even if these rumors were circulating in the office, Dillman ever heard or was aware of the stories, or that it is even plausible to infer that unsubstantiated rumors can amount to notice for Dillman.

In turn, University Defendants contend that the first time ESU became aware of a charge of harassment against I. Sanders was on August 23, 2007. (Doc. 102, at 21). It is undisputed that on this evening, Attorney Murray contacted ESU professor, Dr. Donna Hodge, to set up a meeting regarding Bernard's allegations, and that, on this same evening, Hodge subsequently asked V. Sanders to attend this meeting. (Doc. 94, ¶ 28). It is further undisputed that this was the first time that V. Sanders had heard of Bernard's complaint and that she did not notify Dillman about Bernard's allegation until August 26, 2007. (*Id.* at ¶¶ 28, 35). Given the fact that neither of the other plaintiffs, A. Ross and Homas, or the dismissed Plaintiffs, Brown, Salter, and Murray, came forward with their allegations prior to August 23, 2007, Bernard's complaint is indisputably the first official allegation of sexual harassment against I. Sanders by an ESU student.

University Defendants assert that before her conversation with Hodge, V. Sanders had not been aware of any student complaints of sexual harassment by I. Sanders. (Doc. 94, ¶ 29). Plaintiffs assert that "Plaintiff, Anthony Ross, states that Victoria Sanders' son, Lorenzo Sanders, who was a student at the University *probably* knew what was going on since he was friendly with another victim, Dejean Murray." (Italics added). (Doc. 109, ¶ 29).

Plaintiffs further state: "In addition, it was well known on campus that I. Sanders repeatedly engaged in improper sexual conduct with ESU students." (*Id.*). These statements do not present a proper and sufficient denial of, nor create a triable issue of fact as to, the University Defendants' assertion that V. Sanders, prior to speaking with Hodge, was not aware of any student complaints of sexual harassment by I. Sanders.

Consequently, Plaintiffs have failed to present a triable issue of fact as to the University Defendants' assertions that Dillman had never been made aware of any student complaints against I. Sanders prior to the phone call by V. Sanders on August 26, 2007, and that V. Sanders had no knowledge of sexual harassment by I. Sanders of any ESU students prior to the phone call from Hodge on August 23, 2007. Further, while the exact time that Borland became aware of Bernard's allegations is in dispute, aside from Plaintiffs' broad assertions that Borland "knew of allegations and rumors regarding I. Sanders' sexual improprieties, was aware that there was an investigation pending against I. Sanders, and had heard other rumors about the Anonymous Letters . . . [and] also heard rumors on campus that I. Sanders had been stopped by the police . . . and was found with a man", there is no genuine issue of fact that Borland actually knew of any sexual harassment by I. Sanders, until early-January, 2008, at the earliest. (Doc. 102, at 22; Doc. 109, ¶ 120). There is an absence of any genuine issue of fact as to the University Defendants' assertion that Dillman, V. Sanders, and Borland, were not aware of any sexual harassment by I. Sanders prior to August 23, 2007. The Court determines that while the fact as to the timing

of the University Defendants' actual knowledge is material, Plaintiffs have not put this fact at issue.

### 3. Deliberate Indifference

Plaintiffs have also failed to present any genuine issue of fact as to the University Defendants' assertion that they were not deliberately indifferent to Plaintiffs' allegations. (Doc. 102, at 17-28). The parties put at issue whether (1) ESU's response to the plaintiffs' allegations caused the plaintiffs to be subjected to further harassment and inappropriate conduct after August 2007, and (2) the adequacy of the investigation conducted by Breese, and the reasons for Dillman's dismissal of Bernard's complaint.

a. Whether Plaintiffs were subjected to further harassment and/or inappropriate conduct after August 2007.

If the intentional acts of discrimination have ceased "by the time a supervisory employee . . . learns of it, there is no liability in a private suit for that conduct based on some personal failure to take 'proper remedial action' thereafter." Rosa H., 106 F.3d at 661. In response to University Defendants' contention that "nothing ESU did or failed to do subjected the plaintiffs to further discrimination," Plaintiffs argue that Dillman's failure to place I. Sanders on administrative leave, or take other action against him prior to his dismissal, allowed I. Sanders to continue his inappropriate conduct.[10] In support of this

---

[10] Plaintiffs broadly assert that ESU and Dillman failed to take any action against I. Sanders "until more than a year after Bernard formally complained of harassment." (Doc. 107-2, at 48). This is a misleading statement. ESU conducted an investigation immediately upon receiving Bernard's complaint. The adequacy of this investigation is discussed later in the opinion.

argument, Plaintiffs briefly detail allegations of contact and inappropriate conduct between Plaintiffs and I. Sanders. In regard to A. Ross, Plaintiffs point to the undisputed fact that I. Sanders paid Ross' tuition without his knowledge or consent. (Doc. 107-2, at 47). I. Sanders also attempted to hug Ross on May 30, 2008, and contacted Ross via phone calls and text messages through October, 2008.[11] (*Id.* at 47-48). Plaintiffs also contend that in 2009, I. Sanders approached Homas and his son at a mall, stood close to him, and, laughing, tried to touch Homas. (*Id.* at 48). Finally, Plaintiffs argue that evidence has been presented that after Bernard filed his complaint, I. Sanders, Dillman, and other persons associated with I. Sanders, attempted to intimidate him.[12]

Plaintiffs' reliance on these incidents is insufficient to put at issue University Defendants' assertion that their actions, or inactions, did not cause Plaintiffs to suffer further harassment.

---

[11] There is no evidence in the record that I. Sanders texted A. Ross after August 2007. However, the University Defendants acknowledge that I. Sanders did (1) attempt to hug Ross when Ross went to I. Sanders' office to pick up a reference from him in May 2008; (2) left a message on Ross' cell phone in July 2008; and (3) called Ross in October 2008, although it is unknown whether or not he left a message, and if he did so, the contents of that message. (Doc. 120, at 14-15). Plaintiffs fail to mention the attempted hug by I. Sanders in their Response to Defendants' Motion for Summary Judgment, in relation to the Title IX argument, but the Court assumes that they would intend that this incident be considered as possible evidence of inappropriate conduct and contact.

[12] While each "[attempt] to intimidate [Bernard]" is not specifically stated in this portion of Plaintiffs' brief, the Court interprets the statement as referring to Bernard's allegations that in November 2007, I. Sanders, from afar, "made some gesture to throw up his hands and look over his glasses" while looking at Bernard, Defendant Dillman glared at Bernard when he saw Bernard in a campus store during the investigation, a July of 2008 phone call wherein Bernard received a death threat on his cell phone "from what sounded like an African-American man with an accident *[sic]*," and Bernard's belief that "the threat was coming from I. Sanders, Dent's daughter or someone else connected with the case." (Doc. 109, ¶ 45; Dep. of Frantz Bernard, at 183).

Post-August, 2007, with the exception of I. Sanders' payment of A. Ross'
outstanding bill, each incident alleged by Ross occurred after he had officially graduated.
Ross graduated May 9, 2008. (Doc. 94, ¶ 13). I. Sanders attempted to hug Ross, albeit on
campus, on May 30, 2008, and called him in July and October of 2008. Furthermore, I.
Sanders had been placed on leave at the time of the two phone calls. Given that Title IX
protects against exclusion from participation in, or the denial of the benefits of any education
program or activity receiving Federal financial assistance, a person no longer enrolled at
ESU cannot be considered to fall within its protections. Additionally, the University
suspended I. Sanders in July 2008 and specifically instructed him not to have any contact
with any university employee or student; therefore there is no evidence that the University
could have taken any further actions to prevent I. Sanders from contacting Ross.[13]

I. Sanders paid A. Ross' outstanding $811 bill to the University in September, 2007.
University Defendants argue that this does not constitute harassment because Ross did not
discover that the payment had been made until August, 2008. By this time, Ross had
already graduated. This isolated payment, without more, is insufficient to establish further
harassment. As University Defendants state, "while Ross may have justifiably

---

[13] In response to University Defendants' Statement of Material Facts, wherein they state that "In late May
2008, Isaac Sanders tried to hug Ross, but Ross pushed himself away" (Doc. 94, ¶ 137), Plaintiffs
inexplicably "den[y] as stated" and proceed to enumerate each of I. Sanders' alleged sexual acts and
harassment against Ross, the large majority of which occurred prior to Bernard's official complaint. (Doc.
109, ¶ 137). Even more misleading is Plaintiffs' failure to include dates for any of the enumerated incidents
that occurred prior to Bernard's allegations, in an apparent attempt to show misconduct by I. Sanders after
August, 2007. Nonetheless, the Court interprets Plaintiffs' "denied as stated" to actually be an admission
of Defendants' simple and straightforward statement.

resented Sanders for paying [the bill] without his knowledge, it can hardly be considered sexual harassment." (Doc. 120, at 16).

I. Sanders' interaction with Homas in 2009 also fails to offer any factual support for Plaintiffs' arguments. The incident occurred off campus and I. Sanders was no longer employed by ESU at that time. It also occurred after Homas had been awarded his Masters degree. Therefore this event was completely outside of the University's control.

Bernard's allegation regarding a death threat in July, 2008, fails in two respects.

First, Bernard said that the call:

> sounded like a African man has threaten me (sic) but because the mans (sic) accent was heavy and the reception was bad I could hardly hear what he was saying. To me it sounded like "death is coming your way" I said "what" and he said the same thing over and then hung up.

(Doc. 95-4, Ex. 9). Bernard also admitted that "it could have been a crank call." (Dep. of Frantz Bernard, at 289). Given that Bernard could not relate the contents of the call with any certainty, and has not presented any evidence that the call is attributable to Dillman, I. Sanders, or anyone related to them, or that the call has any relationship to Bernard's complaint or the University's actions, the phone call's connection to this case presents nothing more than mere speculation. Second, the call took place after I. Sanders had been placed on leave from the University and told not to contact any university student or employee. Consequently, there is no evidence that University Defendants could have taken any action to prevent this threatening call, if it did indeed originate from I. Sanders, an assertion without any basis on the record.

50

Bernard argues that Defendant Dillman glared at him and that I. Sanders "made some gesture to throw up his hands and look over his glasses" from afar, and that these statements present issues of fact as to whether Bernard was subjected to further harassment or inappropriate conduct. However, as a matter of law, these isolated incidents cannot be deemed sufficient to create a genuine issue for trial to demonstrate retaliation and/or harassment. I. Sanders did not approach Bernard or attempt to speak with him in any way. There is no allegation that I. Sanders was following Bernard. As for Dillman, he stated that in August, 2007, he "didn't know who [Bernard] was." (Dep. of Robert Dillman, at 52). There is no indication in the record that he ever met Bernard prior to his final decision in January, 2008. Further, the statement that Dillman "glared at Bernard" does not carry with it a sufficient basis to infer that Dillman knew the identity of the person to whom he directed what Plaintiffs characterize as a glare.

Plaintiffs have failed to identify any discriminatory conduct after August, 2007, of which University Defendants had actual knowledge that could constitute sexual harassment. Therefore, Plaintiffs have not demonstrated any material issues of fact as to the existence or causation of any injuries as a result of alleged deliberate indifference.

b. *Whether the investigation conducted by Breese, and Dillman's reasons for dismissing Bernard's complaint, were adequate.*

University Defendants detail the affirmative steps that V. Sanders, Dillman, and Breese took to address Bernard's complaint (Doc. 102, at 24-26): an investigation was

begun soon after the initial complaint was filed, and Breese interviewed Bernard on August 28, 2007; Bernard was placed in a new work-study position in the Media Communications Department (Id.)[14]; Breese notified I. Sanders of the allegations, obtained his written responses, and allowed Bernard to read and comment on I. Sanders' responses to the allegations; Breese interviewed I. Sanders as well as all witnesses identified by Bernard or I. Sanders[15]; and Breese sent a copy of his draft report to Lehman in November, 2007, and allowed Bernard and I. Sanders to review it and make comments which Breese subsequently incorporated into the final report prior to sending it to Dillman. (Doc. 102, at 25-26). The University Defendants further state that upon learning of a local newspaper article in June, 2008, identifying five former students claiming that I. Sanders had harassed them, ESU placed I. Sanders on administrative leave, gave I. Sanders express written instructions that in the absence of approval by Dillman or V. Sanders, he was not allowed on campus or to contact any university ernployee, student, donor, or potential donor, and hired an outside law firm to conduct an investigation, which led to a pre-disciplinary conference between Dillman and I. Sanders, and ultimately I. Sanders' termination. (Id. at 26).

Plaintiffs do not deny University Defendants' assertions regarding the steps that the University took prior to Dillman's final decision in January, 2008. Therefore, none of these

---

[14] University Defendants' statement that they "took immediate steps to separate Isaac Sanders from Bernard" requires explanation. (Doc. 102, at 24). By the time that Bernard filed his complaint, Bernard had already quit his job in the Advancement Office.

facts are in dispute. Rather, the sufficiency of the investigation itself remains the only

material fact at issue.

To establish that the University Defendants' actions subsequent to Bernard's

complaint were inadequate, ESU's response must have been "clearly unreasonable."

*Davis*, 526 U.S. 649. Here, Plaintiffs contend that the investigation was "clearly

inadequate." (Doc. 107-2, at 49). Plaintiffs point to multiple facts in support of this

argument[16]: Breese only interviewed Micah Ash, Vincent Dent, Bernard, and I. Sanders; V.

Sanders and Lehman directed Breese how, and what to, investigate[17]; V. Sanders and

Lehman limited the scope of the investigation by limiting Breese to the sexual harassment

allegations and not permitting him to inquire into financial aspects of the case; Lehman

reviewed and edited Breese's questions prior to Breese's interviews; V. Sanders and

Lehman limited the scope of Breese's investigation to Bernard's specific complaint, causing

Breese to omit relevant information about the case[18]; and Breese was not provided with any

---

[15] Bernard also gave Breese Omwenga's name. However, she refused to give a statement based, at least in part, on her attorney's advice.

[16] Plaintiffs broadly state that "Breeze (*sic*) was strictly limited by V. Sanders and Lehman as to who he could speak to, what evidence he could look into and even as to what questions he could ask." While Plaintiffs subsequently list several specific allegations, in an attempt to address every argument reasonably encompassed within Plaintiffs' statement, the Court has referred back to Plaintiffs' Counterstatement of Material Facts in their Memorandum of Law in Response to the Motion for Summary Judgment of Defendants East Stroudsburg University (Doc. 107-2, at 26-30), and supplemented the specific facts that it reasonably believes fall within Plaintiffs' statement.

[17] To clarify, Breese testified that "[V. Sanders] told me that – and both her and Andy Lehman, I should say, both told me how to proceed. You know, 'Bring in Frantz. Have him tell you exactly what took place. Take notes.'" (Dep. of Arthur Breese, at 15-16).

[18] In particular, the plaintiffs object to the omission of an email from I. Sanders to Bernard, depicting a stick figure with a gasoline pump in his rectum. (Doc. 107-2, at 29). However, it is worth noting that this email was provided to Breese by V. Sanders, not Bernard or I. Sanders. (Dep. of Arthur Breese, at 37-38).

of the anonymous letters sent to ESU and its Trustees. (Doc. 107-2, at 49-50).

Furthermore, Plaintiffs contend that Breese's failure to comply with the express

requirements of ESU's Harassment and Discrimination Policy by not stating whether it was

"more likely than not" that sexual contact had occurred resulted in an inadequate final

report. (Id. at 50).

Analysing each of Plaintiffs' contentions in turn regarding the sufficiency of the

University's investigation, it is clear that, while certain facts mentioned are material in an

analysis to identify triable issues of deliberate indifference, none of these facts have been

controverted by Plaintiffs and/or reach the strict unreasonableness standard set forth by the

Supreme Court in Davis.

The University Notice of Nondiscrimination, instructing the Office of Diversity & Equal

Opportunity how to conduct an investigation into a complaint, states that the investigation

"at a minimum shall include interviews with all complainants and respondents." (Notice of

Nondiscrimination, at 10). There is no requirement that the Director, Breese in this case,

must interview other people, particularly individuals not named by either Bernard or I.

Sanders, or undertake an investigation of his own as to other possible witnesses. In all of

Breese's prior investigations and reports, approximated at 20 to 25, he had never

interviewed anyone who was not a party to the complaint, either as the complainant or the

accused, or someone not identified by one of the parties to the complaint. (Dep. of Arthur

Breese, at 142-143). There is also no indication that the University has any other interview

procedures depending on the scope and/or gravity of the matters under investigation. Therefore, the decision to only interview Ash, Dent, Bernard, and I. Sanders did not depart from the accepted procedures.

There is no dispute that V. Sanders and Lehman were involved in the I. Sanders investigation. Plaintiffs raise multiple issues regarding the conduct of V. Sanders and Lehman, including that they directed Breese how, and what, to investigate and limited the scope of the investigation by restricting Breese to only the sexual harassment allegations, specifically only to Bernard's complaint, causing Breese to omit relevant information about the case. Breese stated that V. Sanders and Lehman "both told me how to proceed. You know, 'Bring in Frantz. Have him tell you exactly what took place. Take notes.'" (Dep. of Arthur Breese, at 15-16). Breese also admitted that he felt V. Sanders was controlling the investigation, step by step. (Id. at 32). Further, it is undisputed that Breese was told not to investigate the financial aspects of the case and that a separate investigation into financial improprieties was supposedly taking place. However, Plaintiffs fail to show how V. Sanders and Lehman's instructions were inappropriate. There is no evidence that either person was acting in bad faith or attempting to influence Breese's investigation or findings,[19] nor that their issuance of instructions was outside the scope of V. Sanders' and Lehman's duties. As to the separation of financial and sexual allegations, Breese stated that he was

---

[19] In fact, in response to a question by I. Sanders' attorney, asking whether Lehman "ever hinder[ed] or prevent[ed] [Breese] from performing [the] investigation", Breese stated that he did not. (Dep. of Arthur Breese, at 112-113).

concerned about this limitation because some of Bernard's allegations could have been indicative of *quid pro quo* sexual harassment. (*Id.* at 19). Yet, Breese did address the financial allegations pertinent to Bernard's claims. In Breese's Internal Investigation sent to Dillman, Breese acknowledged that I. Sanders stated that he "processed a grant for funds to be transferred in the amount of $1000.00 to Bernard's university account," and gave Bernard money for food, prescription glasses, rent, and to have his car repaired. (Internal Investigation Memorandum, Doc. 95-13, Ex. 18, at 3-4). Therefore, Plaintiffs have not established the extent to which, if any, a further investigation by Breese into I. Sanders' financial transactions would have provided additional probative information in relation to the sexual harassment allegations.

Plaintiffs' contention regarding Breese's omission of information purportedly relevant to the case appears to revolve around the omission of an email from I. Sanders to Bernard, depicting a stick figure with a gasoline pump in his rectum. (Doc. 107-2, at 29). This picture was originally mentioned by Bernard in his initial interview with Breese. (Doc. 95-13, Ex. 18, at 2). However, this email was provided to Breese by V. Sanders, not Bernard or I. Sanders. (Dep. of Arthur Breese, at 37-38). Breese stated that the reason the picture was not included in the report was because "it was not presented to [him] by the respondent or the complainant" and that "it was introduced by [his] supervisor, Victoria Sanders, and it was being addressed with her and Dr. Dillman." (Dep. of Arthur Breese, at 41, 113-114). The fact that V. Sanders provided the picture to Breese undercuts the plaintiffs' claims that V.

Sanders was limiting the scope of Breese's investigation and withholding important information. Nor is there evidence in the record how the inclusion of the picture in the final report would have affected Dillman's final decision, given that Dillman was already aware of the picture.

It is once again undisputed that Lehman reviewed Breese's questions. According to Breese, Lehman "went over the questions and some of them – he felt as though he wanted to narrow them because he felt some of the questions were leading." (Dep. of Arthur Breese, at 16). In particular, Plaintiffs point to Breese's testimony that, in response to a proposed question for I. Sanders asking "Did you fondle the complainant's genitals?", Lehman emailed Breese that "you can ask him if there was any contact b/w he and the student but I would not ask him if he was fondling the student's genitals.  You can also ask if he ever had physical contact with Franz (sic) at any time, and, if so, when." (Doc. 95-20, Ex. 9).  What Plaintiffs fail to state is that in Lehman's email in response to Breese's proposed list of questions, not only is this the only question that Lehman recommends should be changed, but Lehman actually provides additional questions for Breese to ask I. Sanders, Ash, and Dent.  In any event, Lehman's suggested restructuring of this single question plainly was directed at developing a full account from I. Sanders by beginning with the broadest possible inquiries into I. Sanders' conduct.

Plaintiffs' reliance on Breese's failure to comply with the express requirements of ESU's Harassment and Discrimination Policy by not stating whether it was "more likely than

not" that sexual contact had occurred as evidence of an inadequate final report, is unavailing. The nondiscrimination policy states that "the findings shall indicate whether it was more likely than not that a violation of this policy occurred." (Notice of Nondiscrimination, at 10). By its terms, the policy pre-supposes the investigator is able to make a finding. Breese stated in an email to Lehman that "as the neutral investigator it is difficult to ascertain if anything happened." (Doc. 95-13, Ex. 16). In his deposition, Breese admitted that the situation amounted to a "he said/he said." (Dep. of Arthur Breese, at 63). While Breese stated that he found "it hard to believe that [Bernard] would come and report something that didn't happen," he did not tell Dillman or V. Sanders that he found Bernard to be credible. (Id. at 83-84). Breese's statement to Lehman, his deposition testimony, and the report itself, establish that Breese did not find that a violation of the nondiscrimination policy was more likely than not. Therefore, the failure to make a finding "whether it was more likely than not that a violation of this [non-discrimination policy] occurred," is essentially tantamount to a statement that it is more likely than not that the violation did not occur.

Dillman, V. Sanders, and Lehman, did not provide Breese with any of the anonymous letters sent to ESU and its Trustees. This fact does not raise the quality of the investigation to the level of a material fact at issue. It is undisputed that letters received by ESU were forwarded to Lehman. At least some of these letters were subsequently sent to

the FBI for further investigation. (Doc. 94, ¶ 99; Doc. 109, ¶ 99).[20]  Therefore, while

Plaintiffs may contend that Breese was denied access to these letters, the University

Defendants cannot be said to have been hiding the letters or attempting to suppress their

contents.

Of the five letters that Plaintiffs offer into evidence, and specifically address in

Dillman's deposition, the last three are virtually identical.[21]  (Doc. 95-13, Ex. 9-13).  The first

letter in question, dated September 28, 2007, only addresses allegations against Dent, and

"suggest[s] that [Dillman] advise Sanders[22] of this letter ONLY after [Dillman] ha[s] verified

the contents" of the letter.  (Doc. 95-13, Ex. 9) (capitalization in original).  According

Plaintiffs every benefit of the doubt, this letter is still not material to a deliberate indifference

analysis.  The second letter also revolves around financial allegations, although it also

mentions rumors about I. Sanders.  Nonetheless, the letter does not allege any form of

sexual harassment or non-consensual sexual acts.  Rather, it relies on the fact that I.

Sanders "was in a position of authority" and had "gay liaisons with his students."  (Doc. 95-

13, Ex. 10).  In response to why Dillman did not provide this letter to Breese, Dillman stated

that "this dealt with consensual relationships – gay bashing in my view – with no complaints,

---

[20] Plaintiffs deny that every letter was sent to the FBI, although they fail to specify which letters were or were not sent.  (Doc. 109, ¶ 99).

[21] The difference between the three letters is minimal.  The fourth and fifth letters are copies of the third letter, with the exception of who is listed as the recipient, and a brief introduction to each recipient asking for their help.  (Doc. 95-13, Ex. 11-13).

[22] I. Sanders' name is mentioned several times throughout the letter, but only in the context of his position as Dent's supervisor.  Further, at the end of the letter, the author stated that he/she "[has] no doubt that Sanders is doing a decent job."  (Doc. 95-13, Ex. 9, at 2).

no names, no indications of the substance, and Arthur Breese had a document in front of

him by a legal supported person who went to his office and talked about sexual

harassment." (Dep. of Robert Dillman, at 87).

The third, fourth, and fifth letters are the most helpful to Plaintiffs' argument.  The

most important passage for the purposes of Plaintiffs' claim states:

> People are disgusted with those who use their positions to gain sexual favors
> from young people (even if they are slightly over 18).
>
> As you no doubt now know, this young man was one of many.  You can easily
> find the others (another group on campus has identified four students so far).
> Run through the list of graduate assistants that he has had over the years.
> He picked them with a purpose.  It was not a one-time event as he may have
> led you to believe.  He is a full-fledged predator.  So your cover-up of his
> arrest now is seen as so very wrong.  We are sure that word of the other
> young man (under 18 when propositioned by Sanders) who came forward has
> not reached your ears or you would have taken some decisive action.  This
> boy was also a student, so Sanders' sexual misconduct in (sic) a matter of
> concern to the University.

(Doc. 95-13, Ex. 11).  Dillman addressed allegations within this letter that concerned him

with Chief Olson.[23]  In their conversation, Dillman recalls

> want[ing] to know whether there was any truth to whether there was
> something going on on the campus and . . . ask[ing] [Olson] if he had
> anything on record of anything that occurred on campus. . . . [and] if he could
> determine by talking to his counterpart in the Stroud Regional whether there
> was anything that would be an indication that this letter had some real
> substance to it because it cites in here that the – that Isaac was somehow
> caught. . . .

---

[23] It is unclear whether this letter was the specific trigger for Dillman's conversation with Chief Olsen.
However, Dillman stated that he made this inquiry "roughly around the time of this and – yeah, I would have
thought that this would have triggered something." (Dep. of Robert Dillman, at 100).

(Dep. of Robert Dillman, at 99). After being told that there was "nothing on the local police, campus police, about Isaac and there wasn't anything in the Stroud Regional about Isaac," Dillman ended his inquiry. (Id. at 100-101).

ESU also had a policy not to accept anonymous letters, and "if the complainant or the individual, the respondent, did not come forward [the investigator] did not include them in [his/her] internal investigation reports." (Dep. of Arthur Breese, at 112). Nonetheless, Breese stated that had he seen the letters, he would have conducted his investigation differently, including trying to "seek, find out who wrote them . . . and then [he] would have asked different questions of Isaac and Vincent [Dent]." (Id. at 145). He also would have addressed these letters with V. Sanders and Lehman. (Id.).

Even taking into account Breese's statements regarding conducting his investigation differently had he received some, or all, of the anonymous letters, and Dillman's decision not to provide Breese with any of the letters, these do not raise a triable issue of deliberate indifference on the part of the appropriate person, i.e. Dillman. Ultimately, Plaintiffs cannot deny the fundamental fact that Dillman was the decision-maker and person with the appropriate authority to take remedial measures. When presented with the anonymous letters, Dillman took action within a reasonably short period of time to investigate the more concrete allegations, such as I. Sanders' possible arrest, as well as forwarding the letters to the FBI. As with the picture of the stick figure, Dillman was already aware of the letters when he received Breese's final report. There is no evidence in the record that Breese's

61

knowledge or possession of the letters, and their inclusion in the final report, might have affected Dillman's final decision in any way.

For the Court to draw the legal inference that Plaintiffs suggest, namely that Dillman had motive or intent to frustrate Breese's investigation and/or bring about a false conclusion regarding Bernard's claims, the plaintiffs would have to come forward with evidence showing genuine issues for trial as to each of the elements necessary to establish a finding of deliberate indifference. See Davis, 526 U.S. at 644-645; Anderson, 477 U.S. at 248 (stating that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. This materiality inquiry is independent of and separate from the question of the incorporation of the evidentiary standard into the summary judgment determination. That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." (Internal citations omitted)). Plaintiffs offer the affidavit and verified statement of Charmaine Clowney[24] in support of their contention that Dillman acted with improper motivation. Specifically, Plaintiffs point to a March 15, 2009, article in the Pocono Record, wherein Clowney is quoted stating that V. Sanders "said that the purpose of EEO policy was to protect faculty and administration from being subject to student complaints," and that V. Sanders "explained to [Clowney] that that ESU

administration wanted to prevent Dillman from receiving another vote of no confidence from the faculty." (Doc. 110-31, Ex. I). These statements do not specifically indicate a connection with Bernard's claim or the subsequent investigation, and there is no indication as to when V. Sanders allegedly made these remarks. Therefore, the statements lack the requisite level of specificity needed to raise a triable issue of material fact as to whether Dillman's treatment of the investigation could constitute deliberate indifference.

In addition to all of the above, it must be noted that the University Defendants followed the Notice of Nondiscrimination handbook, detailing the necessary steps to be undertaken by the Office of Diversity & Equal Opportunity when conducting an investigation. The plaintiffs only point to Breese's omission of the "more likely than not" language in an attempt to show a violation of the University's investigation policies. Further, even assuming Plaintiffs are correct that the investigation was less thorough than it could or should have been, the absence of a more aggressive course of action is not in itself indicative of deliberate indifference. *See Escrue*, 450 F.3d at 1155 (quoting *Vance*, 231 F.3d at 260). Plaintiffs are essentially arguing that in the absence of a virtually unlimited investigation, extending well beyond the Bernard allegations against I. Sanders themselves, the University Defendants have been deliberately indifferent. This ignores the "clearly unreasonable" standard that must be adhered to in any determination of the validity of the recipient's response to the harassment. *Davis*, 526 U.S. at 658. This standard is aptly

---

[24] While Plaintiffs do not reference Clowney's statements until addressing Count II of the Second Amended

stated in *Baynard*, where the Court, citing the Supreme Court's decision in *Farmer v. Brennan*, stated that "'deliberate indifference describes a state of mind more blameworthy than negligence' but 'is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result'. Indeed, a supervisory official who responds reasonably to a known risk is not deliberately indifferent even if the harm is not averted." *Baynard*, 268 F.3d at 236 (quoting *Farmer v. Brennan*, 511 U.S. 825, 835, 844, 114 S.Ct. 1970, 128 L. Ed.2d 811 (1994)). Plaintiffs' argument has no support in the case law developed in the implementation of Title IX's prohibition against discrimination. Therefore, drawing all reasonable inferences in favor of the plaintiffs, Plaintiffs have failed to create a genuine issue of material fact that the University Defendants acted with deliberate indifference.

### 4. Conclusion

For the reasons set forth above, the Court will grant University Defendants' Motion for Summary Judgment on Plaintiffs' Title IX claim due to Plaintiffs' failure to present any genuine issues of material fact on the actual knowledge or deliberate indifference elements necessary to establish a Title IX claim.

### B. Count II – 42 U.S.C. § 1983

To succeed on a claim under 42 U.S.C. § 1983, the plaintiff must demonstrate a violation of a right protected by the Constitution or laws of the United States, committed by a

Complaint, regarding their § 1983 claim, Clowney's assertions are equally relevant here.

person acting under color of state law. *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000) (en

banc). Therefore, in evaluating a § 1983 claim, a Court must first "identify the exact

contours of the underlying right said to have been violated" and determine "whether the

plaintiff has alleged a deprivation of a constitutional right at all." *Id.* (citing *County of*

*Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L. Ed. 1043 (1998)). As

applied in a case such as the one currently before this Court, under the Due Process

Clause, the "contours" of a student's right to bodily integrity encompass the student's right to

be free from sexual assaults by his teachers. *Stoneking v. Bradford Area School Dist.*, 882

F.2d 720, 727 (3d Cir. 1989).

Respondeat superior cannot be the sole basis for supervisory liability. *Andrews v.*

*City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990) (citing *Rizzo v. Goode*, 423 U.S.

362, 377, 96 S.Ct. 598, 607, 46 L. Ed.2d 561 (1976)). There must be affirmative conduct on

the part of the supervisor that contributes to the discrimination. *Id.* Inaction and insensitivity

alone are not sufficient. *Stoneking*, 882 F.2d at 730 (citing *Rizzo*, 423 U.S. at 336-337).

Therefore, a supervisor can be held personally liable under § 1983 if he or she "participated

in violating the plaintiff's rights, directed others to violate them, or, as the person in charge,

had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K. v.*

*Luzerne County Juvenile Detention Center*, 372 F.3d 572 (3d Cir. 2004) (citing *Baker v.*

*Monroe Township*, 50 F.3d 1186, 1190-1191 (3d Cir. 1995)). Furthermore, the supervisor

must have "contemporaneous, personal knowledge" of the violation and acquiesce in it. *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005).

Consequently, to establish supervisory liability for a subordinate's violation of a student's constitutional right to bodily integrity, the plaintiff must show that "(1) the defendant learned of facts or a pattern of inappropriate sexual behavior by a subordinate pointing plainly toward the conclusion that the subordinate was sexually abusing the student; and (2) the defendant demonstrated deliberate indifference towards the constitutional rights of the student by failing to take action that was obviously necessary to prevent or stop the abuse; and (3) such failure caused a constitutional injury to the student." *Chancellor v. Pottsgrove School Dist.*, 501 F.Supp.2d 695, 709 (E.D.Pa. 2007) (citing *Doe v. Taylor Ind. School Dist.*, 15 F.3d 443, 454 (5th Cir. 1994) (en banc)); *see also Alton v. Texas A&M University*, 168 F.3d 196 (5th Cir. 1999) (applying this three pronged analysis to determine whether a university official had supervisory liability).

### 1. Contemporaneous and Personal Knowledge

In addressing Plaintiffs' § 1983 claim, University Defendants renew their arguments that V. Sanders first learned of sexual harassment allegations against I. Sanders on August 23, 2007, that this was the first time any University Defendant had actual knowledge of possible sexual misconduct, and that no further harassment took place after this time. (Doc. 102, at 36). In turn, Plaintiffs allege that ESU Defendants "misstate" the time at which Dillman knew about I. Sanders' improper conduct, and that Defendants "falsely state" that

the harassment of the three plaintiffs ended before Bernard formally complained to V.

Sanders. (Doc. 107-2, at 53). While the Court has already addressed these allegations in

its analysis of Plaintiffs' Title IX claims, *supra,* we will briefly do so once more.

a. *Whether Dillman had knowledge of I. Sanders' improper conduct.*

Plaintiffs claim that Dillman "had personal knowledge of I. Sanders' improper conduct

with students as early as 2006." (Doc. 107-2, at 53). In support of this proposition, they cite

to testimony and statements by McGarry, Bolt, Werkheiser, and Bernard. The portions of

the record to which Plaintiffs point for support from McGarry's and Bolt's statements solely

reference problems that each woman noticed, or had heard, in regard to I. Sanders' hiring

and management methods.[25] While these contentions, and Dillman's knowledge of these

allegations, can form the basis for an assertion that Dillman was aware of management

problems in the Advancement Office, they do not indicate that I. Sanders' practice of hiring

"minority candidates that may not [be] otherwise qualified" equates to improper sexual

conduct, and more specifically, that the statements and allegations gave Dillman notice of I.

Sanders' sexual harassment and/or assaults of students.

---

[25] Bolt states that I. Sanders would hire the students and "it was kind of a mystery to [her]" how the students were hired and that she told Dillman that there "was a double standard for people of different colors" in the Advancement Office, which caused low morale. (Dep. of Carolyn Bolt, at 28, 80-81). Plaintiffs also rely on an email that McGarry sent Dillman, detailing I. Sanders' approach to the hiring process and indicating that he was intimidating people, pressuring staff to "recommend minority candidates that may not [be] otherwise qualified," that his employees were concerned about retaliation if they were not loyal to I. Sanders, and that he "[had] made subtle comments to [employees] about being racist, when they [did] not do as he wishe[d]." (Dep. of Susan McGarry, Ex. 1).

Werkheiser's and Bernard's deposition testimony cited by Plaintiffs is equally

unconvincing to support Plaintiffs' contentions regarding when Dillman had notice.  Plaintiffs

once again point to Werkheiser's statements regarding I. Sanders' involvement in a sex-

ring.  (Dep. of Teresa Werkheiser, at 24-29).  Furthermore, Bernard claimed that after he

told Omwenga about the incident in the car:

> She mentioned to me that Doctor Sanders did seem kind of funny which was
> an implication to the fact of his sexual orientation that he might have been
> bisexual or gay or whatever you want to call it.
>
> …
>
> She also told me rumors about him being with other possible students.
>
> …
>
> She told me I believe she thought [Pryor] was attractive, but she may have
> found out that him and Doctor Sanders had a thing or something . . .

(Dep. of Frantz Bernard, at 250-251).  When asked to define "a thing," Bernard stated that

"it could have been – I don't know, maybe a relationship of some sort. . . .  A sexual

relationship of some sort or maybe an occurrence happening sexually between them.  I

don't really know." (Id. at 251).  Bernard also admitted that the way in which Omwenga

characterized any possible relationship between I. Sanders and both Homas and Pryor "was

more like a rumor but . . . consensual." (Id. at 304).  Bernard's characterization of

Omwenga's statements amounts to summaries of nothing more than unsubstantiated

rumors of consensual relationships between I. Sanders and students.  Plaintiffs present no

evidence that either Werkheiser or Omwenga ever conveyed these rumors to anyone else.

Furthermore, neither Werkheiser nor Omwnega was under a duty to report such rumor-like

statements to a supervisor.  Even if these rumors were circulating in the office, there is no

68

indication that Dillman ever heard or was aware of these stories, and it is not plausible to infer that unsubstantiated rumors can impute notice to Dillman.

Even if the Court subscribes to a theory that establishing supervisory liability under § 1983 requires a marginally lower standard of notice than Title IX,[26] Plaintiffs have failed to meet their burden to refute University Defendants' assertion that they were unaware of any sexual harassment by I. Sanders prior to August 23, 2007. *See Baynard*, 268 F.3d at 238 (stating that while Defendant could not be held liable under Title IX because there was "no evidence in the record to support a conclusion that [Defendant] was *in fact* aware that a student was being abused," the defendant "certainly should have been aware of the *potential* for [sexual] abuse, and for this reason was properly held liable under § 1983." (Italics in original)). Here, allegations of inappropriate hiring practices, low office morale, and rumors regarding possible consensual sexual relationships between I. Sanders and students, do not show that the potential for sexual abuse was present and are insufficient to show that Dillman had any form of notice of sexual abuse or of its potential existence.

b. *Whether the harassment continued after Bernard filed a formal complaint.*

Plaintiffs repeat their assertion that "I. Sanders continued to press A. Ross to have an inappropriate personal relationship through October 2008 and attempted to intimidate Bernard and Salter to dissuade them from following through with their complaints against I. Sanders." (Doc. 107-2). As the Court has previously addressed A. Ross' and Bernard's

alleged harassment post- August 2007 in its Title IX analysis, *supra*, and dismissed the

allegations as insufficient to establish any discriminatory behavior by I. Sanders over which

the University Defendants had control, we will only address Salter's allegations.

The plaintiffs argue that:

Dent contacted Salter in June 2008 at I. Sanders' direction to attempt to
coerce Salter into revealing who had made the allegations against I. Sanders.
I. Sanders then tried to get Salter fired by making false and defamatory
statements about him and sent investigators to intimidate him.

(Doc. 107-2, at 48, n. 14).

First, and most importantly, Salter graduated in 2006. By June 2008, Dent was no

longer an employee at ESU. Therefore, the University had no control over Dent, and was

no longer responsible for Salter. It is plainly unreasonable to suggest that ESU could be

expected to take any action to prevent Dent from contacting Salter. Nonetheless, in the

interest of completely addressing Plaintiffs' argument, it is worth noting that while Salter did

state that Dent called him, the entirety of the conversation appears to revolve around Dent's

interest in whether Dejean Murray was planning on reporting I. Sanders, and if so, whether

it was because Murray wanted money. (Doc. 95-30, Ex. 1, at 8-9). There is no evidence of

attempted coercion. As to the investigator allegedly sent to intimidate Salter, this event

occurred in July 2008, after I. Sanders was put on leave, and Salter stated that he did not

---

[26] Plaintiffs do not argue that a lower standard applies. However, in the interest of giving Plaintiffs every
benefit, the Court finds it useful to evaluate Plaintiffs' claims under such a theory.

"have any idea who this guy was," including whether the investigator was working for the University or I. Sanders. (Dep. of Jerry Salter, at 76).

Therefore, Plaintiffs' contentions do not present a genuine issue of material fact as to the University Defendants' assertion that no further harassment took place after Bernard filed his official complaint in August 2007.

## 2. Deliberate Indifference

There is no dispute that Plaintiffs have a Due Process right to be free from unjustified invasions of their bodily integrity and that sufficient evidence exists to establish that I. Sanders may have violated this right. (Doc. 120, at 27). Because the standard for deliberate indifference under § 1983 remains the same as the standard under Title IX, both Plaintiffs and Defendants renew the same arguments that the Court previously analyzed in Section III(A)(2), *supra.* Given that the Court has already established a lack of knowledge on the part of any University Defendant prior to August 23, 2007, and the absence of any constitutional violations to Plaintiffs' bodily integrity after Bernard filed his official complaint, the only question of material fact at issue is whether the University Defendants acquiesced in I. Sanders' violations.[27]

To establish acquiescence, the Plaintiffs must show that University Defendants accepted, complied, or tacitly submitted to I. Sanders' actions. Plaintiffs raise the identical

---

[27] There is no question that University Defendants did not participate in violating the plaintiffs' right to bodily integrity or direct I. Sanders to do so, therefore the Court need not address this issue.

factual allegations as previously stated under the Title IX deliberate indifference analysis,[28]

none of which the Court found to be factually material and/or sufficient to establish

deliberate indifference. Plaintiffs boldly assert that the allegations they put forth

demonstrate that:

> after [Defendants] knew of I. Sanders' sexual assaults and harassment of
> Plaintiffs, Dillman, Borland, and V. Sanders each engaged in numerous acts
> both individually and in concert with each other, that had the effect if not the
> purpose of covering up I. Sanders' improper actions with the Plaintiffs and
> other ESU students.

(Doc. 107-2, at 55). Despite this conclusory statement, as previously established, Plaintiffs'

have failed to provide evidence to support this argument.

The only allegation that Plaintiffs raise which the Court has not yet addressed is in

regards to Borland's actions.[29] Plaintiffs state that:

> after concerns similar to those raised before and after the Bernard complaint
> were brought to Borland's attention while he was acting President, he placed
> two of the complaining employees (Bolt and Kelley) on administrative leave
> while permitting I. Sanders to continue working, and failed to investigate at all
> the information regarding I. Sanders' inappropriate conduct with students.

(Doc. 107-2, at 55). Given Plaintiffs' mention of Bolt and Kelley, the Court can only infer

that the "concerns" are in reference to I. Sanders' hiring and management practices. The

manner in which Borland handled allegations regarding personnel issues and disputes at

---

[28] These include not putting I. Sanders on administrative leave prior to July, 2008; "dismiss[ing]" Bernard's complaint; Dillman's "actual knowledge of I. Sanders' history of inappropriate activities with students"; I. Sanders being found in a car with a man at night; the anonymous letters; V. Sanders "orchestrat[ing] and "limiting" Breese's investigation"; and Clowney's affidavit and verified statement. (Doc. 107-2, at 53-55).

the University, and how long he had been aware of complaints regarding I. Sanders' management style, do not allow for the inference that Borland engaged in any individual act, or in concert with any other University Defendant, to cover up sexual assaults and/or harassment. None of the complaints by University employees alleged improper sexual activity on the part of I. Sanders. Furthermore, Plaintiffs do not elaborate on the contents of the "information regarding I. Sanders' inappropriate conduct with students." The portions of Borland's deposition to which Plaintiffs cite only discuss the lack of an investigation into staff members' complaints about I. Sanders' attitude and treatment of them. (Dep. of Kenneth Borland, at 51-52, 81-82). There is no direct or implied reference to a lack of investigation into any student allegations of sexual improprieties. Accordingly, whether Borland conducted a thorough or timely investigation into I. Sanders' hiring and management practices does not raise an issue of material fact for trial as to whether Borland engaged in a personal or concerted effort to cover-up allegations of sexual misconduct.

For the reasons previously stated in the Court's Title IX analysis, as well as those addressed here, the plaintiffs have failed to show a triable issue of material fact as to the University Defendants' assertion that Dillman, V. Sanders, and Borland did not acquiesce in, or attempt to cover-up, I. Sanders' sexual misconduct.

---

[29] This allegation was not previously addressed because it appears to be irrelevant to the claims of sexual misconduct. Nonetheless, in the interest of addressing each of Plaintiffs' allegations, we will briefly dispose of the issue.

### 3. Constitutional Injury

For the reasons discussed at length in Section III(A)(2), *supra*, even assuming that there was evidence sufficient to raise triable issues of fact as to University Defendants' knowledge and deliberate indifference, which the Court determined has not been shown, there is no evidence of record that any Plaintiff suffered an injury in the relevant time period, i.e. after August 2007.

### 4. Conclusion

For the reasons set forth above, the Court will grant University Defendants' Motion for Summary Judgment on Plaintiffs' § 1983 claim due to Plaintiffs' failure to present any genuine issues of material fact for trial.

## C. Counts III and IV – Conspiracy

University Defendants also seek summary judgment on Counts III and IV of Plaintiffs' Second Amended Complaint, which allege a conspiracy to violate §1985 on the part of I. Sanders, Dillman, V. Sanders, and Borland, and conspiracy to violate § 1986 on the parts of Dillman, V. Sanders, and Borland. (*See* Doc. 28, at 51, 53).

Section 1985(3) does not create any substantive rights, instead allowing individuals to enforce their substantive rights against conspiring private parties. *Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006) (citing *Marino v. Bowers*, 657 F.2d 1363, 1371 (3d Cir. 1981)). To state a claim under § 1985(3), a plaintiff must allege:

(1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of

74

persons to the equal protection of the laws; (3) an act in furtherance of the
conspiracy; and (4) an injury to person or property or the deprivation of any
right or privilege of a citizen of the United States.

*Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997); *see Griffin v. Breckenridge*, 403 U.S. 88,

102-103, 91 S.Ct. 1790, 29 L. Ed.2d. 338 (1971); *see also Farber*, 440 F.3d at 136 (stating

that "defendants must have allegedly conspired against a group that has an identifiable

existence independent of the fact that its members are victims of the defendants' tortious

conduct. This independent existence is necessary to preserve the distinction between two of

the requirements of a § 1985(3) claim: that the conspirators be motivated by class-based

invidiously discriminatory animus and that the plaintiff be the victim of an injury he or she

seeks to remedy by means of § 1985(3).").

To establish a conspiracy, there must be an agreement or "meeting of the minds"

and a concerted action. *Capogrosso v. Supreme Court of New Jersey*, 588 F.3d 180, 185

(3d Cir. 2009); *Startzell v. City of Philadelphia*, 533 F.3d 183, 205 (3d Cir. 2008) (quoting

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, 90 S.Ct. 1598, 26 L. Ed.2d 142 (1970)).

As a threshold matter, the Court cannot reach the other elements necessary to

establish a violation of § 1985(3) in the absence of evidence establishing an agreement or

meeting of the minds among the defendants to deprive Plaintiffs of their right to liberty.

Here, Plaintiffs argue for the existence of conspiracy as follows:

Plaintiffs have produced a substantial body of evidence that I. Sanders,
Dillman, Borland, and V. Sanders, all state actors, acted together to cover up
I. Sanders sexual assault and harassment of the Plaintiffs by (1) tightly
orchestrating Breese's investigation, (2) failing to place Sanders on

administrative leave while the first two investigation (*sic*) were on-going,[30] (3) failing to provide the anonymous letters (and other relevant evidence) to Breese but providing them to I. Sanders,[31] (4) editing Breese's report prior to submitting it to Dillman, and (5) turning the Borland investigation into an attack on Bolt and Kelley rather than an investigation into the allegations of I. Sanders' improper behavior.

(Doc. 107-2, at 57). The Court has already addressed each of these allegations in turn and

need not do so again. Each of Plaintiffs' assertions is either immaterial, a

mischaracterization, or a legal conclusion absent any evidentiary basis on the record.

Plaintiffs' contentions essentially amount to questions as to the thoroughness and breadth

of the investigation. These issues alone do not indicate the existence of a conspiracy or an

invidious, intentional purpose to discriminate between classes or individuals. Specifically,

none of these contentions presents evidence of an agreement among the defendants to

discriminate against African American males. Therefore, on this record, Plaintiffs have not

shown a triable issue of material fact as to the existence of a conspiracy.

In response to University Defendants' argument that Plaintiffs have failed to allege

any class based animus as required under § 1985(3), as well as failed to offer any evidence

of class based discriminatory animus on the part of Dillman, V. Sanders, or Borland, in

investigating and responding to Bernard's claims (Doc. 102, at 39), Plaintiffs allege that

---

[30] Presumably Plaintiffs are referring to Breese's investigation into Bernard's complaint and Borland's investigation into allegations by Bolt and Kelley about management problems in the Advancement Office.
[31] Dillman admitted that he showed I. Sanders "one of the letters" but was not sure if it was the first or second letter. (Dep. of Robert Dillman, at 90-91). As previously stated, the first letter only addressed allegations against Dent, and the second letter revolved principally around financial allegations, but did mention rumors about I. Sanders although there were no allegations of sexual harassment or non-consensual sexual acts. There is no evidence that I. Sanders received, or saw, any other letters.

there is "clear evidence that Plaintiffs were targeted by I. Sanders for sexual assault and harassment because they were young African American males. Therefore, his targeting of them was based on their race and gender" (Doc. 107-2, at 56). While this allegation may support a finding of class based animus by I. Sanders, it fails to present a triable issue of material fact as to University Defendants' assertion that there was no discriminatory animus on their part in addressing Bernard's complaint.[32] Further, as the Court previously established, there was no injury to any Plaintiff after Bernard filed his official complaint in August, 2007. In light of Plaintiffs' failure to offer any evidence indicative of the existence of a conspiracy or an invidious, intentional purpose to discriminate between classes or individuals on the part of University Defendants, as well as evidence of the presence of an injury to any Plaintiff subsequent to Bernard's complaint, the Court does not need to reach the issue of any acts in furtherance of the conspiracy under § 1985(3) to determine that summary judgment must be granted for the University Defendants on Plaintiffs' § 1985(3) claim.

A § 1986 claim provides an additional safeguard for rights protected under § 1985 and Plaintiff must show that:

(1) the defendant had actual knowledge of a § 1985 conspiracy, (2) the defendant had the power to prevent or aid in preventing the commission of

---

[32] Plaintiffs appear to recognize that their argument fails in regards to establishing any class based discriminatory animus on the part of University Defendants. Plaintiffs' statement that there is "clear evidence that Plaintiffs were targeted by I. Sanders for sexual assault and harassment because they were young African American males. Therefore, his targeting of them was based on their race and gender" forms the entirety of their argument on this subject. (Doc. 107-2, at 56).

a § 1985 violation, (3) the defendant neglected or refused to prevent a § 1985 conspiracy, and (4) a wrongful act was committed.

Clark v. Clabaugh, 20 F.3d 1290, 1295 (3d Cir. 1994) (internal citations omitted). Consequently, if a plaintiff fails to establish a cause of action under § 1985, he cannot succeed on a § 1986 claim. Rogin v. Bensalem Twp., 616 F.2d 680, 696 (3d Cir. 1980). Here, due to Plaintiffs' inability to provide sufficient evidence to demonstrate a factual issue for trial on their conspiracy claim under § 1985(3), a claim for § 1986 also cannot go forward.

In the alternative to a claim of conspiracy under § 1985(3), Plaintiffs request that the Court allow Plaintiffs to amend their Complaint to include a claim of conspiracy under § 1983. (Doc. 107-2, at 57). Under a § 1983 claim for conspiracy, a plaintiff must prove that the defendant (1) deprived the plaintiff of a right secured by the Constitution and laws of the United States; and (2) deprived the plaintiff of this constitutional right while acting under color of law. Adickes, 398 U.S. at 150. However, Plaintiffs still fail to raise a triable issue of material fact. While University Defendants were acting under color of law, there is no evidence of record that any Plaintiff was deprived of his liberty in the relevant time period, i.e. subsequent to University Defendants' acquisition of "actual notice." Furthermore, as previously stated, there is no evidence of an agreement as necessary to establish the presence of a conspiracy. Therefore the Defendants also cannot be held liable for conspiracy under § 1983.

The Court has reviewed the record and found that the evidence presented by Plaintiffs fails show a triable issue as to the existence of a conspiracy or an invidious, intentional purpose to discriminate between classes or individuals. Because Plaintiffs have not come forward with any triable issue of material fact as to their contention that an agreement existed among the University Defendants to violate the rights of African American males, the Court will grant University Defendants' Motion for Summary Judgment on Plaintiffs' § 1985(3), § 1986, and § 1983 conspiracy claims.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant University Defendants' Motion for Summary Judgment (Doc. 93).[33] A separate Order follows.

Robert D. Mariani
United States District Court Judge

---

[33] Given this conclusion, the Court does not need to reach the University Defendants' arguments regarding whether claims brought by A. Ross and Homas before February 2007 are barred by the statute of limitations. Accepting that some, or all, of Plaintiffs' claims have been timely filed, we have determined that Defendants are entitled to Summary Judgment as a matter of law.