IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FRANTZ BERNARD, et al.,          :
                                   :
       **Plaintiffs**          :
                                   :
     **v.**                   :      **3:09-CV-00525**
                                   :      **(JUDGE MARIANI)**
**EAST STROUDSBURG**     :
**UNIVERSITY, et al.,**      :
                                   :
     **Defendants**      :

## MEMORANDUM OPINION

### I. PROCEDURAL HISTORY

On February 13, 2009, Plaintiffs, Frantz Bernard, Timotheus Homas, Anthony Ross, William Brown, Jerry Salter and Dejean Murray brought this action in the Court of Common Pleas of Monroe County alleging violations of Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, *et seq.,* as well as violations by Defendants, East Stroudsburg University, the East Stroudsburg University Board of Trustees and individual Trustees, Robert J. Dillman, Isaac W. Sanders, Kenneth Borland and Victoria L. Sanders,[1] pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1985. Further, Plaintiffs alleged violations by Defendants, East Stroudsburg University Trustees, Dillman, Borland and V. Sanders, under 42 U.S.C. § 1986. (Doc. 1).

---

[1] Isaac Sanders and Victoria Sanders are not related.

An Amended Complaint was filed by the plaintiffs on April 7, 2009 (Doc. 4) and a
Second Amended Complaint was filed on July 14, 2009. (Doc. 28).

This Court previously granted Defendants' Motions to Dismiss with respect to the
claims of Plaintiffs William Brown, Dejean Murray and Jerry Salter, who have been
dismissed by this Court because their claims were untimely. (Doc. 48).

Prior to this, counsel for the plaintiffs and defendants stipulated to the dismissal
without prejudice of the members of the Board of Trustees of East Stroudsburg University,
Defendants Darell T. Covington, Amy Schaeffer Welch, Trudi Q. Delinger, Harry F. Lee,
Hussain G. Malick, Nancy V. Perretta, L. Patrick Ross, David M. Sanko, Robert H. Willever,
and Eli Berman. (Doc. 7).

Defendant, I. Sanders, has moved for summary judgment on the remaining Plaintiffs'
claims pertaining to him (Doc. 128): Count II (42 USC § 1983) and Count III (42 U.S.C. §
1985). East Stroudsburg University, Robert J. Dillman, Kenneth Borland, and Victoria L.
Sanders (collectively hereinafter University Defendants) have also moved for summary
judgment on Plaintiffs' claims. (Doc. 93). The Court will address University Defendants'
motion in a separate opinion. The issues have been fully briefed and the parties have
submitted extensive documentary evidence in support of their respective positions.

For the reasons that follow, I. Sanders' motion for summary judgment will be granted
in part and denied in part.

2

## II. THE UNDISPUTED FACTS OF RECORD

In accordance with Local Rule 56.1, I. Sanders has submitted a Statement of

Material Facts as to which he submits there is no genuine issue for trial. (Doc. 130). The

Plaintiffs have submitted their response to I. Sanders' Statement of Material Facts (Doc.

135) with the result that many of the numbered paragraphs of I. Sanders' Statement of

Material Facts have been admitted by the plaintiffs. In addition, there are other assertions of

fact made by I. Sanders which, though responded to by the plaintiffs with a qualified denial,

contain additional statements by the plaintiffs which are in substance admissions of I.

Sanders' asserted facts.

The following facts have been admitted except specifically noted:

In 2007, I. Sanders was employed as the Vice President for Advancement at East

Stroudsburg University, as well as CEO of the East Stroudsburg University Foundation, a

private, non-profit organization. (Doc. 130, ¶¶ 1, 9). The Advancement Office, of which I.

Sanders was head, raised funds for ESU and worked with university alumni to cultivate their

relationship with ESU. (Doc. 130, ¶¶ 1, 8). I. Sanders reported to two people: Robert

Dillman, President of ESU, and the chair of the University Foundation Executive Committee.

(Doc. 130, ¶ 2).

Plaintiffs Frantz Bernard, Timotheus Homas, and Anthony Ross are former ESU

students. (Doc. 130, ¶ 4). Bernard was an undergraduate student from Fall, 2006, through

Fall, 2011, and graduated on December 16, 2011. (*Id*. at ¶ 5). Homas was an

undergraduate student at ESU from Summer, 2000, through Summer, 2004, graduating in

August, 2004. (*Id.* at ¶ 6). Homas also attended ESU as a graduate student from Fall,

2004, through Spring, 2005, and then from Summer, 2006, through Fall, 2007. (*Id.*). He

was awarded a Masters' Degree from ESU on May 9, 2008. (*Id.*). Ross was an

undergraduate student from Fall, 2003, through Summer, 2006, although he did not receive

his diploma until May 9, 2008, due to a non-payment of a balance on his account. (*Id.* at ¶

7).

In mid-August, 2007, Bernard, Margaret Omwenga, an ESU graduate student, and

Micah Ash, an ESU student, contacted attorney Albert Murray, Jr., regarding allegations by

Bernard that I. Sanders had sexually assaulted and harassed him between May 2007 and

August 2007, during the time Bernard was a work-study student in the Advancement Office.

(Doc. 130, ¶ 10).[2] Omwenga and Ash had originally introduced Bernard to I. Sanders.

On August 24, 2007, Bernard and Murray met with Professor Donna Hodge and

Victoria Sanders at Hodge's home, and Bernard informed V. Sanders about the specifics of

his allegations against I. Sanders. (*Id.* at ¶ 12). This meeting was the first time that Bernard

had put ESU on notice of what had occurred with I. Sanders. (*Id.* at ¶ 13). The plaintiffs

respond to this asserted statement of fact with "[d]enied as stated," and further state that

"[p]rior to his complaint, Frantz Bernard notified Maggie Omwenga ("Omwenga") about the

---

[2] The Plaintiffs, in initially responding to Defendants' Statement of Fact, do so by responding, "Denied as stated." But the very next sentence in Plaintiffs' Response is: "It is admitted that the individuals specified contacted attorney Murray in August 2007." Plaintiffs continue on to specifically deny that this was ESU's first notice of allegations of inappropriate conduct by I. Sanders, a contention irrelevant to the statement at hand.

incident with I. Sanders in the car. While Ms. Omwenga was a student at the time, she was

also employed by ESU but did not report the improper activities of I. Sanders' reported to

her by Bernard." Nonetheless, Bernard, in his Deposition, (Doc. 95-1), admits that his

meeting on August 24, 2007 at the home of Professor Hodge, at which V. Sanders was

present with Bernard and his counsel, was the first time that he put the University on notice

of what had occurred with I. Sanders:

> Q.   August 24, 2007, that Friday meeting at the home of Professor Hodge
> with Dr. Sanders present, your lawyer outside in the car, is that the first notice
> that you gave to the University about what had occurred with Dr. Sanders?
>
> A.   Well, I didn't say he was outside in the car. I don't know where he was.
>
> Q.   I thought you did. The record can bear me out. I thought you did say
> that?
>
> A.   No. I said he was outside the house.
>
> Q.   I thought he was outside in the car, pardon me for me. Was Professor
> Hodge her house, Dr. Sanders present, your lawyer outside not in a car, was
> that the first time that you put the University on notice of what occurred with
> Dr. Sanders?
>
> A.   Yes."

(Dep. of Frantz Bernard, at 96-97).

V. Sanders referred Bernard to the University's Office of Diversity to file a complaint

and subsequently called University counsel, Andrew Lehman, to tell him about Bernard's

allegations. (Doc. 130 at ¶¶ 14, 15).

On Monday, August 27, 2007, Bernard filed a complaint against I. Sanders with the Office of Diversity and Equal Opportunity. (Doc. 130, ¶ 16). At this time, Bernard had already stopped working at the Advancement Office due to an alleged incident wherein I. Sanders attempted to touch him in the office kitchen earlier in August 2007. (Id. at ¶ 17). Approximately one week after Bernard's meeting with V. Sanders and Hodge, ESU provided Bernard with a work-study position in the Media Communications Department.[3] (Id. at ¶ 18). Bernard chose this position from a list of work-study positions provided to him by Arthur Breese, the Director of Diversity and Campus Mediation for ESU. (Id. at ¶¶ 18, 21).

After Bernard filed his formal complaint on August 27, 2007, I. Sanders did not attempt to harass him further. (Doc. 130, ¶ 20).

Plaintiffs, however, assert that Defendant I. Sanders attempted to intimidate Bernard. They state that in November of 2007 "upon seeing Bernard from a distance on the ESU campus, I. Sanders made a disgruntled gesture toward Bernard, throwing up his hands and looking over his glasses in apparent protest of Bernard's complaint against him." (Doc. 135, ¶ 20).

Bernard further asserts that he was "harassed on campus by persons associated with I. Sanders in an attempt to prevent Bernard from following through with his complaint,

---

[3] Defendant states that Bernard's work-study position was in the Medical Communications Department. Plaintiff states that this is "admitted." In fact, Bernard worked in the Media Communications Department. (Dep. of Frantz Bernard, at 40). The Court assumes this was an oversight by both parties.

6

including Defendant Dillman, who glared at Bernard when he saw Bernard in a campus store during the investigation." (*Id.*).

Finally, Plaintiffs assert that in July of 2008, Bernard received a death threat on his cell phone "from what sounded like an African-American man with an accident (*sic*)." Plaintiffs further assert that Bernard "believed the threat was coming from I. Sanders, [Vincent] Dent's daughter or someone else connected with the case." (*Id.*).

During Breese's time as Director of Diversity and Campus Mediation, he conducted between 20 and 25 investigations. (Doc. 130, ¶ 21). After Bernard filed his complaint, Breese interviewed him on August 28, 2007, and wrote a summary of Bernard's allegations against I. Sanders. (*Id.* at ¶ 22). Bernard's statement alleged that between May 26, 2007, and August 26, 2007, I. Sanders acted inappropriately with Bernard on several occasions while Bernard was a work-study student in the Advancement Office. The statement alleged an off-campus sexual assault, two instances of attempted unwanted touching on campus, and several on and off campus unwelcomed comments. The statement also alleged that I. Sanders obtained a job for Bernard at the Alumni Center, secured financial aid for his summer courses and gave Bernard several personal gifts that included money. (*Id.* at ¶ 23).

In addition to the gifts and financial assistance which I. Sanders gave to Bernard, Bernard later acknowledged to Breese that, two days after the off-campus sexual assault, Bernard telephoned I. Sanders for help in locating a place for Bernard to stay because he

had an argument with Omwenga, his girlfriend at the time, and did not want to stay with her. (Doc. 130, ¶ 24).

Breese also asked Bernard if he had any witnesses. Bernard told him that he had told both Omwenga and Ash about the incidents with I. Sanders, but could not provide any other names aside from those two individuals. (Doc. 130, ¶ 25).[4] Breese notified I. Sanders of Bernard's allegations and provided him with an opportunity to respond. (*Id*. at ¶ 26). In September, 2007, I. Sanders provided Breese with two written responses to Bernard's written allegations against him, and identified Vincent Dent, an employee in the Advancement Office, as a witness. (Doc. 130, ¶¶ 26, 27).

Later in September, 2007, Bernard and Breese met again and Breese showed Bernard I. Sanders' written response to Bernard's allegations. (Doc. 130, ¶ 28). Bernard was given the opportunity to comment on the response and identify what was true and false in I. Sanders' and Dent's statements. (*Id*.).

From late October, 2007, to mid-November, 2007, Breese interviewed Ash, I. Sanders, and Dent. (Doc. 130, ¶ 31). Omwenga refused to be interviewed, in part because "she consulted with her attorney and was advised not to get involved." (*Id*. at ¶ 33).

There were no known eyewitnesses to the improper conduct alleged by Bernard against I. Sanders aside from Bernard and I. Sanders. (Doc. 130, ¶ 34).

---

[4] Plaintiffs respond with: "[a]dmitted in part, denied in part." However, while they further contend that Breese had an obligation to conduct a thorough investigation, they do not appear to be denying any part of Defendant's statement. Therefore, it is deemed admitted.

8

I. Sanders disputed Bernard's allegations of sexual harassment and assault but did not dispute most of Bernard's allegations concerning his assistance and gifts to Bernard. (Doc. 130, ¶ 35). Specifically, I. Sanders admitted that he processed a grant so that Bernard could enroll in classes for the summer and also told Breese that he secured a work-study position for Bernard in the Advancement Office. He further told Breese that he had helped Bernard with purchases, including prescription glasses. (Doc. 130, ¶ 36). In Bernard's written statement that he gave to Breese, Bernard acknowledged that he accepted assistance and gifts from I. Sanders after the date that Bernard alleged I. Sanders sexually assaulted him off-campus. (Doc. 130, ¶ 37). In admitting the above statement to be true, Plaintiffs further respond that I. Sanders provided these items, which were unsolicited by Bernard, to "groom and exploit Bernard." Plaintiffs also assert that "Bernard in fact rejected a gift of underwear that I. Sanders attempted to give him once he found that the gift was from I. Sanders." (Doc. 135, ¶ 37).

I. Sanders also forwarded an email to Bernard and others, depicting a stick figure with a gasoline pump in its rectum. (Doc. 130, ¶ 120; Doc. 135, ¶ 120). This email was provided to Breese by V. Sanders, but was not included in Breese's final report. (Dep. of Arthur Breese, at 37-38).

In response to I. Sanders' and Dent's responses to Bernard's allegations, Bernard stated that, "it is clever of them to give partial truth with their deceit because it now makes it difficult to pick apart what really happened." (Doc. 95-13, Ex. 18, p. 10).

On November 28, 2007, after having concluded his investigation, Breese sent a copy

of his draft report to ESU counsel Lehman for review. (Doc. 130, ¶ 39). In a cover

memorandum to Lehman, Breese wrote:

> Here is the summary of the final report. As the neutral investigator, it is
> difficult to ascertain if anything happened. Please review and advise. I would
> like to allow Bernard and Sanders to come in next week to review the report
> and, if they choose, to respond in writing to the written report. Thanks."

(Doc. 95-13, Ex. 16). Both Bernard and I. Sanders reviewed the report and submitted

comments which were incorporated by Breese into the final report that was ultimately

submitted to Dillman on December 10, 2007. (Doc. 130, ¶¶ 42, 43).

On October 1, October 10 and November 6, 2007, ESU received three anonymous

letters addressed to Dillman. On November 15 and November 20, 2007, ESU received

copies of two more anonymous letters, both dated November 1, 2007. One of these two

letters had been addressed to ESU's Council of Trustees and the other had been addressed

to a former ESU Foundation Board member. All of the anonymous letters were received

after Bernard made his initial allegations to Breese in August of 2007. (Doc. 130, ¶ 45).

The first letter, dated September 28, 2007, made no reference to any alleged sexual

improprieties involving I. Sanders. (Doc. 130, ¶ 47).

The four remaining letters that referred to I. Sanders made various accusations but

did not provide details of I. Sanders' alleged misconduct, including dates, times, names of

witnesses or any victim, except that Bernard was mentioned once by his first name. Nor did

these letters state the source of the writer's information or whether that source was reliable,

10

or otherwise indicate how the writer became aware of the information provided.  (Doc. 130, ¶ 48).  The letters contained a threat to send the letters to the ESU Council of Trustees, law enforcement and the press if Dillman did not take action.  The letters were in fact sent to the aforementioned parties.  (Doc. 130, ¶ 49; Doc. 135, ¶ 49).

Because one of the anonymous letters stated that I. Sanders had been arrested, Dillman asked ESU's Chief of Police, Robin Olson, to review campus police records and to check with Stroud Area Regional Police Department to see if I. Sanders had been charged with anything.  (Doc. 130, ¶ 51).  Olson, it is admitted by Plaintiffs, did not find arrest records.  (Doc. 135, ¶ 52).[5]

The parties agree that at least some of these letters were turned over to the authorities by ESU's attorneys.  (Doc. 135, ¶ 53).

Plaintiffs dispute I. Sanders' assertion that before Bernard's complaint on August 24, 2007 regarding I. Sanders, "[i]t was ESU's practice not to accept anonymous letters as a basis for an investigation into discrimination or harassment."  (Doc. 130, ¶ 44; Doc. 135, ¶ 44).  However, in further response, Plaintiffs state that "Breese stated it was ESU's practice not to follow up on accusations made **solely** through anonymous letters."  (Emphasis in the original).  (Doc. 135, ¶ 44).

Breese himself testified that during his investigation of the Bernard complaint, he heard nothing about anonymous letters being sent out and received no anonymous letters

---

[5] Plaintiffs' response to I. Sanders' Statement of Material Facts, ¶ 52, begins with the phrase, "Denied as stated[,]" but then admits that Olson did not find arrest records.

from V. Sanders which related to his investigation into the Bernard complaint. (Dep. of Arthur Breese, at 63, 65).

On January 7, 2008, Dillman sent his written decision to Bernard. (Doc. 130, ¶ 61). Dillman wrote that he found that there was "insufficient evidence to support the allegation of sexual harassment." (Doc. 130, ¶ 62). Plaintiffs, while admitting this fact, assert that "Dillman based his decision on an investigation that Breese stated 'was not thorough'." Plaintiffs further assert that "there is substantial evidence that Dillman dismissed the complaint to protect I. Sanders' and Dillman's reputations." (Doc. 135, ¶ 62). Plaintiffs make reference to Charmaine Clowney, Esquire, former PASSHE Assistant Vice Chancellor for Diversity and Multicultural Affairs, and assert that "V. Sanders told her that ESU's administration wanted to prevent Dillman from receiving another vote of no confidence from the faculty after he had received two such votes, the last in 2006." (*Id.*). Plaintiffs then assert that "[k]eeping the investigation strictly confidential and dismissing the complaint protected Dillman and his reputation." (*Id.*). A review of the Verified Statement With Exhibit of Charmaine Clowney (Doc. 110-31) and the attachment to her statement of a newspaper article containing an interview she gave to the *Pocono Record*, published on March 15, 2009, shows Clowney criticized East Stroudsburg University and the Pennsylvania State System of Higher Education in general for failure to track complaints of discrimination, including sexual discrimination and sexual harassment. She stated that she "worried" about the qualifications of ESU's Social Equity Director, Victoria Sanders. She then indicated that

12

she was "perturbed by statements she heard Victoria Sanders make twice." The newspaper

article attached to the Verified Statement of Clowney then states:

> According to Clowney, Victoria Sanders said that the purpose of EEO policy
> was to protect faculty and administration from being subjected to student
> complaints.
>
> Clowney contends that Victoria Sanders explained to her that ESU
> administration wanted to prevent Dillman from receiving another vote of no
> confidence from the faculty. He received two such votes, the last in 2006.
> Keeping faculty and administration free from complaints was a way to prevent
> that, Clowney said of Victoria Sanders."

(Doc. 110-31, p. 12).

On this basis, Plaintiffs assert, as noted above, "there is substantial evidence that

Dillman dismissed the complaint to protect I. Sanders' and Dillman's reputations." (Doc.

135, ¶ 62).

After Kenneth Borland assumed the position of Acting President in January, 2008, he

had a series of meetings with staff from the Advancement Office. These meetings involved

complaints about I. Sanders' management of the Advancement Office and alleged

mistreatment of full-time staff. (Doc. 130, ¶ 63). Borland met separately with John Ross,

Dent, I. Sanders, and Bob Kelley on January 4, 2008. (*Id*. at ¶ 64). Borland met with

Carolyn Bolt on January 14, 2008. (*Id*. at ¶ 65). At separate times on January 15, 2008,

Borland also met with Teresa Werkheiser, John Shewchuck and Christina Mace. (*Id*. at ¶

68). On January 16, 2008, Borland met with Tanya Williams. (*Id*. at ¶ 69). Plaintiff

Bernard's allegations against I. Sanders were not discussed at any of these meetings, nor

were any other student complaints of sexual harassment or sexual assault by I. Sanders. (Doc. 130, ¶ 70).

University Defendants assert that "no member of the Advancement Office who has been deposed in this case had ever witnessed any improper conduct between Isaac Sanders and any student in the Advancement Office." (Doc. 130, ¶ 71). Plaintiffs respond with "[d]enied as stated." (Doc. 135, ¶ 71). In support of such denial, the Plaintiffs state: "Werkheiser stated that she found it 'odd' that I. Sanders would 'take home' the international students (deposition citations omitted). Werkheiser also testified that [Michelle] Drame told her that Plaintiff Homas came to her and told her about I. Sanders's sexual assaults of him." (Id.). Plaintiffs also make reference to the Verified Statements of Dent and LaShawne Pryor. Therefore, Plaintiffs have not addressed by an admission or denial Defendant's specific assertion of fact in paragraph 71.

Plaintiffs, in denying that Borland was not aware of Bernard's allegations against I. Sanders until mid-January of 2008, base their denial on statements that "Victoria Sanders provided a copy of the Breese report to Borland, on or about January 3, 2008, when Borland took office as Acting President, and prior to January 7, 2008 . . . ." (Doc. 135, ¶ 73). Plaintiffs also assert that Borland, prior to becoming Acting President, "knew of allegations and rumors regarding I. Sanders' sexual improprieties, was aware that there was an investigation pending against I. Sanders, and heard other rumors about the anonymous letters but did not see them until later," citing to Borland's deposition. Plaintiffs further

14

contend that Borland, in October of 2007, "heard rumors on campus that I. Sanders had been stopped by the police near Stroudsmoor and was found with a man," again citing to Borland's Deposition. (Id.).

Plaintiff Bernard, on March 26, 2008, initiated the complaint filing process with the Pennsylvania Human Relations Commission (PHRC). (Doc. 130, ¶ 74). PHRC, by letter dated March 16, 2009, notified ESU that it had reviewed Bernard's complaint of discrimination and determined that it should be closed administratively and gave Bernard notice of his right to sue. (Doc. 130, ¶ 75).

On June 8, 2008, the Pocono Record ran a story that additional students were coming forward and claiming that I. Sanders had sexually harassed or abused them. (Doc. 130, ¶ 76). Dillman subsequently placed I. Sanders on administrative leave, after discussing the matter with University counsel and Thomas Krapsho, the State System's Vice-Chancellor for Human Resource and Labor Relations. The decision to place I. Sanders on administrative leave was made jointly between Dillman and Krapsho. (Doc. 130, ¶ 77).

While admitting these facts, Plaintiffs also assert that "Dillman failed to place I. Sanders on administrative leave until almost a year after Bernard made his complaint, even though, when allegations had been made against Julie Anne Simpson, the women's basketball coach, Dillman had directed that Simpson be placed on administrative leave until

the investigation was complete because he might 'have to deal with Coach Simpson in follow-up activities surrounding these charges.'" (Doc. 135, ¶ 77).

At this time, ESU hired an outside law firm to conduct an investigation into the allegations reported in the *Pocono Record* and, by letter dated July 1, 2008, I. Sanders was placed on administrative leave "effective immediately." (*Id*. at ¶¶ 78, 79). The letter placing I. Sanders on leave instructed him that, "absent prior approval by Dillman or Victoria Sanders, he was not permitted on campus, nor could he contact any University employee, student, donor or potential donor." (*Id*. at ¶ 79).

While admitting these facts, Plaintiffs respond that despite the explicit instructions prohibiting I. Sanders from returning to campus or from contacting any students, I. Sanders did attempt to contact A. Ross multiple times, caused Bernard to be threatened and, through Dent, attempted to intimidate Salter and dissuade him from pursuing his claims against I. Sanders. (Doc. 135, ¶ 79).

Defendant asserts that during the summer of 2008, ESU was notified through Bernard's counsel that five former ESU students were also going to bring claims against the University. (Doc. 130, ¶ 80). Plaintiffs admit that five former students were the subject of unwanted sexual harassment and assault by I. Sanders and that three of the students who initially joined in this suit with Bernard, William A. Brown, III, Dejean Murray, and Jerry Salter, had their claims dismissed as untimely. (Doc. 135, ¶ 80). Plaintiffs further state that "I. Sanders, with the knowledge of university officials and personnel engaged in a

'continuous pattern of predatory sexual behavior and harassment' toward students and others at ESU from on or about 2001 until early 2009." (*Id.*).

On September 26, 2008, Dillman received the investigation report from the outside law firm. (Doc. 130, ¶ 99). On October 22, 2008, I. Sanders was terminated for cause, effective December 21, 2008. (*Id.* at 101). Dillman's letter to I. Sanders set forth the reasons for the termination, including sexual advances towards students. (*Id.*).

Of the remaining Plaintiffs, Homas alleges that he was sexually assaulted by I. Sanders off campus in the Fall of 2004 while a graduate student and that he was again sexually assaulted by I. Sanders at the end of the Spring Semester 2005. (Doc. 130, ¶¶ 81, 82). Homas left ESU after the Spring Semester of 2005 and, when he returned to ESU for the summer session of 2006, he accepted a work-study position with I. Sanders in the Advancement Office. (Doc. 130, ¶ 83). Homas further alleges that in the spring of 2007, he was sometimes tricked and at other times forced by I. Sanders into performing sexual acts on numerous occasions. (Doc. 130, ¶ 84).

Plaintiff Anthony Ross alleges that he was subjected to unwelcome touching on approximately three occasions between May 2006 and January 2007. He further alleges that I. Sanders also made unwelcome comments during that time. (Doc. 130, ¶ 86).

## II. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine issue as to any material fact." FED. R. CIV. P. 56(a). Summary judgment

"should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.,* 901 F.2d 335, 340 (3d Cir.1990). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson,* 477 U.S. at 248. Rather, the opposing party must point to a factual dispute requiring trial and the district court "may limit its review to the documents submitted for the purposes of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified School Dist.,* 237 F.3d 1026, 1030-1031 (9th Cir. 2001); *Forsyth v. Barr,* 19 F.3d 1527 1527, 1537 (5th Cir. 1994). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving

18

party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

## III. ANALYSIS

### A. Count II – 42 U.S.C. § 1983

To succeed on a claim under 42 U.S.C. § 1983, the plaintiff must demonstrate the violation of a right protected by the Constitution or laws of the United States, committed by a person acting under color of state law. *Nicini v. Morra,* 212 F.3d 798, 806 (3d Cir. 2000) (en banc). Section 1983 is not in itself a source of substantive rights, instead providing a remedy for violations of rights protected by other federal statutes or by the U.S. Constitution. *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L. Ed.2d 791 (1985). Therefore, in evaluating a § 1983 claim, a Court must first "identify the exact contours of the underlying right said to have been violated" and determine "whether the plaintiff has alleged a deprivation of a constitutional right at all." *Id.* (citing *County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L. Ed. 1043 (1998)). As applied in a case such as the one currently before this Court, under the Due Process Clause of the Fourteenth Amendment, the "contours" of a student's right to bodily integrity encompass the student's right to be free from sexual assaults by school staff. *Stoneking v. Bradford Area School Dist.,* 882 F.2d 720, 727 (3d Cir. 1989).

"The traditional definition of acting under color of state law requires that the

defendant in a § 1983 action have exercised power 'possessed by virtue of state law and

made possible only because the wrongdoer is clothed with the authority of state law.'" *West*

*v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L. Ed.2d 40 (1988) (quoting *United States v.*

*Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L. Ed. 1368 (1941)).  Generally, employment

by the state is sufficient to render a defendant a state actor. *West*, 487 U.S. at 49.  Further,

a "defendant acts under color of state law when he abuses the position given to him by the

state." *Id*. at 49-50.  Nonetheless, within the Third Circuit

> [i]t is well settled that an otherwise private tort is not committed under color of
> law simply because the tortfeasor is an employee of the state.  Rather, in
> order for the tortfeasor to be acting under color of state law, his act must
> entail "[m]isuse of power, possessed by virtue of state law and made possible
> only because the wrongdoer is clothed with the authority of state law."

*Mark v. Borough of Hatboro*, 51 F.3d 1137, 1150 (3d Cir. 1995) (quoting *United States v.*

*Classic*, 313 U.S. at 326); *see also D.T. v. Indep. School Dist. No. 16*, 894 F.2d 1176 (10th

Cir. 1990) (concluding that a public school teacher/coach's sexual molestation of students at

a summer basketball camp, unconnected to school activities, when teacher was not

employed by the school district, did not occur under color of state law).

### 1. Color of State Law

Defendant I. Sanders asserts that he was not acting under color of state law, and

therefore cannot be held liable under § 1983.  (Def. I. Sanders' Brief in Supp. of Second

Mot. for Summ. J., Doc. 129, at 6).  Instead, he contends that "the conduct Mr. Bernard

complains of amounts to purely private conduct," and does not involve I. Sanders' duties as a University official. (*Id*. at 8, 9). Further, I. Sanders argues that Homas' allegations all center upon off-campus conduct that occurred at a time when Homas was not working for I. Sanders, and that Homas later accepted a work-study position with I. Sanders. (*Id*. at 9-10). I. Sanders also contends that there is no *quid pro quo* evidence with respect to Bernard or Homas, therefore supposedly strengthening his argument.[6]  (*Id*.).

I. Sanders' claim is frivolous. As Vice President for Advancement at ESU, a public university, I. Sanders was clearly a state employee. By virtue of his position, he met all three Plaintiffs. Bernard was introduced to I. Sanders by Omwenga and Ash, two other ESU students, and told that I. Sanders "was a mentor" and person "you can go to and get advice." (Dep. of Frantz Bernard, at 18). A. Ross also first met I. Sanders on campus and I. Sanders allegedly offered Ross a graduate assistantship working for him on their second meeting together, telling him that "all [Ross] had to do was pretty much get paperwork stuff done and [I. Sanders] was going to pretty much take care of the rest. . . ." (Dep. of Anthony Ross, at 25-26, 79-80). Homas also first met I. Sanders on campus and felt pressured to remain in contact with him, even after the first alleged assault, due in part to pressure from

---

[6] As established in the Court's Memorandum Opinion granting Summary Judgment to the University Defendants (*see* III(A)(3)), there is a genuine issue of material fact as to the presence of *quid pro quo*. However, *quid pro quo* harassment is not necessary to establish that a person was acting under color of state law.

another university employee.[7]  (Dep. of Timotheus Homas, at 39, 62-67).  Therefore all

three men came in contact with I. Sanders on campus, and solely by virtue of their status as

students at ESU and I. Sanders' position of authority at the University.  Additionally, many of

I. Sanders' alleged assaults and/or harassment took place within the Advancement Office,

where Bernard and Homas were only present due to their work-study positions.

Further, I. Sanders' arguments with respect to why his actions against Homas

constitute private acts are misleading.  I. Sanders misrepresents, or purposely ignores, the

entirety of Homas' allegations.  Homas alleges that he was sexually assaulted by I. Sanders

off campus in the Fall of 2004 as well as at the end of the Spring 2005 semester, both prior

to working for I. Sanders.  (Doc. 130, ¶¶ 81, 82).  Homas also claims that, in Spring 2007,

while working in the Advancement Office, I. Sanders would regularly trick Homas into

performing oral sex on him in I. Sanders' office.  (Dep. of Timotheus Homas, at 118, 132-

134).  Therefore, there are sufficient material issues of fact for trial, in particular with respect

to whether I. Sanders engaged in sexual harassment, sexual assault, and/or other sexual

misconduct against Homas in 2004, 2005, and 2007, both on and off the ESU campus.

It is clear that I. Sanders, as a state employee vested with significant power over the

ESU students, is a state actor.  By virtue of his position, I. Sanders' was able to misuse his

authority in the course of performing his duties.  His actions do not constitute "purely private

---

[7] After the first assault, Homas alleges that he tried to avoid I. Sanders, but that his supervisor at the time, Ms. Graham, repeatedly pressured Homas to call I. Sanders, and reprimanded him for not doing so.  (Dep. of Timotheus Homas, at 62-67).

conduct." His position as Vice President of Advancement allowed him to have contact with the plaintiffs and facilitated his alleged attempts to sexually harass and/or assault the plaintiffs. His employment was also central in choosing his alleged victims. Therefore, as a matter of law, the Court finds that I. Sanders was acting under color of state law.

## 2. Constitutional Right

Given that I. Sanders acted under color of state law, the only genuine issue of material fact is whether I. Sanders violated a protected right under the Constitution or laws of the United States. Specifically, to succeed on their § 1983 claim, Plaintiffs must establish that I. Sanders violated their liberty interest in bodily integrity, a substantive due process claim recognized under the Fourteenth Amendment.[8] *Stoneking*, 882 F.2d at 727. Sexual harassment is also a cognizable substantive due process claim under § 1983. *See Hayut v. State University of New York*, 352 F.3d 733, 743-744 (2d Cir. 2003) (stating that "to survive a summary judgment motion on [a] section 1983 claim for sexual harassment", plaintiff must proffer evidence that the defendant was acting under color of state law and that his conduct deprived plaintiff of a constitutional right).

Plaintiffs put forth several claims in support of their position that Bernard's, A. Ross', and Homas' substantive due process rights were violated, none of which I. Sanders adequately refutes. Plaintiffs allege that:

---

[8] In addressing Plaintiffs' § 1983 claim, I. Sanders recognizes that Plaintiffs base this claim on a violation of their bodily integrity, but argue that Plaintiffs' must prove the elements of a "state-created danger" claim in order to prevail. (Doc. 129, at 12-13). A review of the Complaint makes clear that the claim is not substantially premised, if at all, on a theory of state-created danger. Further, as we have already determined that I. Sanders was acting under color of state law, this argument is irrelevant to our analysis.

23

During the period from 2004 through October, 2008, Defendant Sanders regularly and on an ongoing basis subjected the Plaintiffs . . . to severe and pervasive sexual assault and harassment by, *interalia,*

    a. repeatedly touching, groping, feeling, Plaintiffs on their buttocks, inner thighs, and in their genital areas without Plaintiffs' consent;

    b. repeatedly otherwise touching Plaintiffs inappropriately without their consent;

    c. repeatedly forcing Plaintiffs to engage in unwelcomed acts of oral sex;

    d. repeatedly soliciting Plaintiffs to engage in unwelcomed acts of a sexual nature even after his inappropriate sexual advances were refused;

    e. repeatedly making inappropriate sexual comments to Plaintiffs;

    f. making repeated invitations to Plaintiffs to travel with him out of town with the intention of engaging plaintiffs in unwelcomed acts of a sexual nature;

    . . .

    i. repeatedly sending harassing and threatening telephone messages and emails to Plaintiffs in an attempt to prevent them from reporting his improper conduct or pursuing their claims against him.

(Doc. 28, at 46-47).   On review of the record, Plaintiffs have put forth sufficient evidence to

create triable issues of fact as to whether I. Sanders' violated Plaintiffs' constitutional rights.[9]

In response to Bernard's official complaint to Breese, I. Sanders admitted that he

"processed a grant for funds to be transferred in the amount of $1000.00 to Bernard's

university account," and gave Bernard money for food, prescription glasses, rent, and to

have his car repaired.  (Internal Investigation Memorandum, Doc. 95-13, Ex. 18, at 3-4).

---

[9] The Court notes that Defendant I. Sanders has not moved for Summary Judgment on the basis that any, or all, of Plaintiffs' claims of sexual assault and/or harassment are time barred.

During Breese's investigation, Bernard also alleged a series of inappropriate comments and sexual assaults. Bernard claimed that in May of 2007, I. Sanders took him to a restaurant, where I. Sanders made several inappropriate comments both in the car and in the restaurant, and then later attempted to fondle him in the car. (*Id.* at 2). Bernard also stated that I. Sanders bought him underwear (which he refused to accept), sent Bernard an e-mail depicting a stick-figure with a gas pump in his rectum, attempted to hug Bernard, and soon before Bernard quit his position in the Advancement Office, I. Sanders attempted to touch Bernard's stomach and private parts in the kitchen at work. (*Id.* at 2-3).

Plaintiff A. Ross alleges that he was subjected to unwelcome touching on approximately three occasions between May of 2006 and January of 2007. According to Ross, in June, 2006, I. Sanders put "his hands in [Ross'] upper thighs next to [Ross'] genitals" while telling Ross that he "[would] take care of everything." (Stmt. of Anthony Ross, at 5-6). During this encounter, I. Sanders also hugged Ross and rubbed his back "down towards [Ross'] butt." (*Id.* at 6). Later that year, while in I. Sanders' office, I. Sanders rubbed Ross' back, leaned his body against Ross' back, and put his genitals against Ross' shoulder. (*Id.* at 8). Ross further alleges that I. Sanders also made unwelcome and inappropriate comments during that time. (*Id.* at 5-8). I. Sanders also attempted to hug Ross in May, 2008, and contacted Ross via phone calls through October, 2008. (Doc. 135, ¶ 88; Doc. 130, ¶ 88).

25

Homas puts forth the most serious allegations against I. Sanders. Homas alleges that he was sexually assaulted by I. Sanders off campus in the Fall of 2004 as well as at the end of the Spring 2005 semester. (Doc. 130, ¶¶ 81, 82). In Fall, 2004, Homas claims that I. Sanders forced Homas to perform oral sex, among other things, on him in a car. (Dep. of Timotheus Homas, at 49-56). During Spring, 2005, a similar incident occurred in I. Sanders' office. (Id. at 70-74). Homas also claims that, in Spring, 2007, while working in the Advancement Office, I. Sanders would regularly trick Homas into performing oral sex on him in I. Sanders' office. (Id. at 118, 132-134). In 2009, I. Sanders also allegedly approached Homas and his son at a mall, stood close to Homas, and, laughing, tried to touch him. (Doc. 135, ¶ 125).

I. Sanders broadly denies Plaintiffs' allegations, calling them "repugnant, hurtful and wholly unfounded." (Doc. 129, at 2). However, in light of the multiple issues of fact with respect to I. Sanders' conduct towards the plaintiffs, I. Sanders has failed to show the absence of any genuine issue of material fact that might affect the outcome of the suit under § 1983. Therefore, there is sufficient evidence in the record to create triable issues as to whether I. Sanders violated Plaintiffs' due process rights under § 1983. Accordingly, I. Sanders' motion for summary judgment on Count II is denied.[10]

---

[10] University Defendants have had Summary Judgment entered in their favor on the § 1983 count as well as on all conspiracy claims. This does not preclude the Court from determining that Plaintiffs have presented sufficient facts to entitle them to trial on their cause of action under § 1983 against I. Sanders for his alleged sexual misconduct.

## B. Count III – Conspiracy

I. Sanders also seeks summary judgment on Count III of Plaintiffs' Second Amended

Complaint, which alleges a conspiracy to violate §1985 on the part of I. Sanders, Dillman, V.

Sanders, and Borland. (*See* Doc. 28, at 51).

Section 1985(3) does not create any substantive rights, instead allowing individuals

to enforce their substantive rights against conspiring private parties. *Farber v. City of*

*Paterson*, 440 F.3d 131, 134 (3d Cir. 2006) (citing *Marino v. Bowers*, 657 F.2d 1363, 1371

(3d Cir. 1981). To state a claim under § 1985(3), a plaintiff must allege:

> (1) a conspiracy; (2) motivated by a racial or class based discriminatory
> animus designed to deprive, directly or indirectly, any person or class of
> persons to the equal protection of the laws; (3) an act in furtherance of the
> conspiracy; and (4) an injury to person or property or the deprivation of any
> right or privilege of a citizen of the United States.

*Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997); *see Griffin v. Breckenridge*, 403 U.S. 88,

102-103, 91 S.Ct. 1790, 29 L. Ed.2d 338 (1971); *see also Farber*, 440 F.3d at 136 (stating

that "defendants must have allegedly conspired against a group that has an identifiable

existence independent of the fact that its members are victims of the defendants' tortious

conduct. This independent existence is necessary to preserve the distinction between two of

the requirements of a § 1985(3) claim: that the conspirators be motivated by class-based

invidiously discriminatory animus and that the plaintiff be the victim of an injury he or she

seeks to remedy by means of § 1985(3).").

To establish a conspiracy, there must be an agreement or "meeting of the minds" and a concerted action. *Capogrosso v. Supreme Court of New Jersey*, 588 F.3d 180, 185 (3d Cir. 2009); *Startzell v. City of Philadelphia*, 533 F.3d 183, 205 (3d Cir. 2008) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, 90 S.Ct. 1598, 26 L. Ed.2d 142 (1970)).

Here, I. Sanders fails to present any compelling argument to show the lack of a genuine issue of material fact as to Plaintiffs' § 1985 claim. Instead, Defendant merely asserts that "Plaintiffs here have not produced the necessary facts to state a conspiracy existed between the named Defendants to violate the rights of the Plaintiffs herein" and that Plaintiffs "do not have any facts that suggest that the three[11] named defendants worked from a common plan to violate the rights of the Plaintiffs." (Doc. 129, at 23-24). Despite I. Sanders' brief and inadequate rebuttal of Plaintiffs' § 1985 claim, the defendant is ultimately correct that Plaintiffs have not put forth sufficient evidence to create a triable issue of fact as to the presence of a conspiracy.

As a threshold matter, the Court cannot reach the other elements necessary to establish a violation of § 1985(3), in the absence of evidence establishing an agreement or meeting of the minds among the Defendants to deprive Plaintiffs of their right to liberty. Here, Plaintiffs argue for the existence of conspiracy as follows:

> Plaintiff's (*sic*) have produced a substantial body of evidence that I. Sanders, Dillman, Borland, and V. Sanders, all state actors, acted together to cover up

---

[11] Defendant repeatedly states that Plaintiffs have alleged a 1985(3) claim of conspiracy against three individuals: I. Sanders, V. Sanders, and Borland. This is incorrect. Plaintiffs also included Dillman in Count III.

I. Sanders sexual assault and harassment of the Plaintiffs by (1) tightly orchestrating Breese's investigation, (2) failing to place Sanders on administrative leave while the first two investigation (*sic*) were on-going,[12] (3) failing to provide the anonymous letters (and other relevant evidence) to Breese but providing them to I. Sanders,[13] (4) editing Breese's report prior to submitting it to Dillman, and (5) turning the Borland investigation into an attack on Bolt and Kelley rather than an investigation into the allegations of I. Sanders' improper behavior.

(Doc. 134-2, at 48-49). The Court has already addressed each of these allegations in the

Court's Memorandum Opinion granting Summary Judgment to the University Defendants.

That discussion is incorporated herein and need not be reiterated. Each of Plaintiffs'

assertions is either immaterial, a mischaracterization, or a legal conclusion absent any

evidentiary basis on the record. Plaintiffs' contentions essentially amount to questions as to

the thoroughness and breadth of the investigation. These issues alone do not indicate the

existence of a conspiracy or an invidious, intentional purpose to discriminate between

classes or individuals. Specifically, none of these contentions presents evidence of an

agreement among all of the defendants to discriminate against African American males.

Therefore, on this record, Plaintiffs have not shown a triable issue of material fact as to the

existence of a conspiracy.

---

[12] Presumably Plaintiffs are referring to Breese's investigation into Bernard's complaint and Borland's investigation into allegations by Bolt and Kelley about management problems in the Advancement Office.
[13] Dillman admitted that he showed I. Sanders "one of the letters" but was not sure if it was the first or second letter. (Dep. of Robert Dillman, at 90-91). As previously stated, the first letter only addressed allegations against Dent, and the second letter revolved principally around financial allegations, but did mention rumors about I. Sanders although there were no allegations of sexual harassment or non-consensual sexual acts. There is no evidence that I. Sanders received, or saw, any other letters.

Plaintiffs have also failed to present evidence of class based discriminatory animus on the part of Dillman, V. Sanders, or Borland in investigating and responding to Bernard's claims, as required under § 1985(3). Plaintiffs allege that there is "clear evidence that Plaintiffs were targeted by I. Sanders for sexual assault and harassment because they were young African American males. Therefore, his targeting of them was based on their race and gender." (Doc. 134-2, at 48). While this allegation may support a finding of class based animus by I. Sanders, it fails to present a triable issue of material fact as to whether there was a discriminatory animus on the part of the University Defendants in addressing Bernard's complaint.[14] Further, as the Court previously established in its Memorandum Opinion granting Summary Judgment to the University Defendants, there was no injury to any Plaintiff after Bernard filed his official complaint in August, 2007. Therefore, while Plaintiffs may have put forth sufficient evidence to create an issue of fact as to whether I. Sanders discriminated against African American males, Plaintiffs failed to establish that any other person participated in, or agreed to, this conspiracy. In light of Plaintiffs' failure to offer any evidence indicative of the existence of a conspiracy or an invidious, intentional purpose to discriminate between classes or individuals on the part of University Defendants, as well as evidence of the presence of an injury to any Plaintiff subsequent to Bernard's complaint, the Court does not need to reach the issue of any acts in furtherance of the

---

[14] Plaintiffs appear to recognize that their argument fails in regards to establishing any class based discriminatory animus on the part of University Defendants. Plaintiffs' statement that there is "clear evidence that Plaintiffs were targeted by I. Sanders for sexual assault and harassment because they were young African American males. Therefore, his targeting of them was based on their race and gender" forms the entirety of their argument on this subject. (Doc. 134-2, at 48).

conspiracy under § 1985(3) to determine that summary judgment must be granted for I. Sanders on Plaintiffs' § 1985(3) claim.

In the alternative to a claim of conspiracy under § 1985(3), Plaintiffs request that the Court allow Plaintiffs to amend their Complaint to include a claim of conspiracy under § 1983. (Doc. 134-2, at 48-50). Under a § 1983 claim for conspiracy, a plaintiff must prove that the defendant (1) deprived plaintiff of a right secured by the Constitution and laws of the United States; and (2) deprived plaintiff of this constitutional right while acting under color of law. *Adickes*, 398 U.S. at 150. However, Plaintiffs still fail to raise a triable issue of material fact. While I. Sanders and University Defendants were acting under color of law, there is no evidence of record that any Plaintiff was deprived of his liberty in the relevant time period, i.e. subsequent to University Defendants' acquisition of "actual notice." Furthermore, as previously stated, there is no evidence of an agreement as necessary to establish the presence of a conspiracy. Therefore Defendants also cannot be held liable for conspiracy under § 1983.

The Court has reviewed the record and found that the evidence presented by Plaintiffs fails to indicate the existence of a conspiracy or an invidious, intentional purpose to discriminate between classes or individuals. Because Plaintiffs have not come forward with any triable issue of material fact as to their contention that an agreement existed among I. Sanders and the University Defendants' to violate the rights of African American males, the Court will grant I. Sanders' Motion for Summary Judgment on Plaintiffs' § 1985(3) and §

1983 conspiracy claims due to Plaintiffs' failure to present any genuine issues of material fact for trial.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Isaac

Sanders' Motion for Summary Judgment (Doc. 128). A separate Order follows.

Robert D. Mariani
United States District Court Judge