## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FRANTZ BERNARD, et al.,      :
     :
         Plaintiffs,      :
     :
         v.      :     **3:09-CV-00525**
     :     **(JUDGE MARIANI)**
EAST STROUDSBURG      :
UNIVERSITY, et al.,      :
     :
         Defendants.      :

## MEMORANDUM OPINION

### I. INTRODUCTION

A jury trial was held in the above-captioned case in October, 2014, which concluded

in a verdict in favor of Defendant Isaac Sanders and against Plaintiffs Frantz Bernard,

Timotheus Homas, and Anthony Ross. Now before the Court is "Plaintiffs' Rule 59 Motion

for a New Trial or Amending a Judgment". (Doc. 220). For the reasons set forth below, the

Court will deny the plaintiffs' motion in its entirety.

### II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Because the factual background of this case is thoroughly familiar to all parties and

has been discussed at length by this Court before (*see generally*, Mem. Op. Granting

Summ. J. to University Defs., Doc. 140; Mem. Op. Granting in Part and Denying in Part

Summ. J. to I. Sanders, Doc. 142), a detailed discussion of the facts of the case is

unnecessary here. Briefly, for purposes relevant to the present motion, on February 13,

2009, Plaintiffs, Frantz Bernard, Timotheus Homas, Anthony Ross, William Brown, Jerry

Salter, and Dejean Murray commenced this action, alleging violations of Title IX of the

Education Amendments Act of 1972, 20 U.S.C. § 1681, et seq., as well as violations by

Defendants, East Stroudsburg University, Robert J. Dillman, Kenneth Borland and Victoria

L. Sanders (hereinafter "ESU Defendants" or "University Defendants") and Isaac W.

Sanders, pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1985. Further, the Plaintiffs alleged

violations by Defendants Dillman, Borland, and V. Sanders under 42 U.S.C. § 1986.

In October, 2010, District Court Judge James Munley granted the motions to dismiss

of Defendants with respect to the claims of Plaintiffs Brown, Murray, and Salter, who were

dismissed from the action because their claims were untimely. (Doc. 48). In April, 2014,

this Court granted the University Defendants' motion for summary judgment (Doc. 141) and

granted in part and denied in part Defendant I. Sanders' motion for summary judgment,

leaving the remaining Plaintiffs' § 1983 claim for trial (Doc. 143). On May 12, 2014,

Plaintiffs filed a motion pursuant to Fed. R. Civ. P. 59(e) to "Alter or Amend the Judgment

Entered in Favor of Defendants East Stroudsburg University, Robert Dillman, and Victoria

Sanders" with respect to Count I (Title IX) and Count II (42 U.S.C. § 1983) (Doc. 145), which

the Court interpreted as a motion for reconsideration and denied. (Docs. 162, 163).

A jury trial was held from October 27, 2014 through October 31, 2014. After

deliberation, the jury found in favor of Defendant I. Sanders. After the entry of judgment,

Plaintiffs timely filed the instant Rule 59 motion pursuant to the Federal Rules of Civil Procedure (Doc. 220).

## III. STANDARD OF REVIEW

A losing party may move for a new trial or to alter or amend a judgment pursuant to Federal Rule of Civil Procedure 59.

"The court may, on motion, grant a new trial on all or some of the issues - and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." Fed. R. Civ. P. 59(a)(1)(A).  The Court may grant a new trial "purely on a question of law;" or to correct a previous ruling "on a matter that initially rested within the discretion of the court, e.g. evidentiary rulings or prejudicial statements made by counsel" or "because [the Court] believes the jury's decision is against the weight of the evidence" among other grounds. *Klein v. Hollings*, 992 F.2d 1285, 1289-1290 (3d Cir. 1993) (internal citations omitted).  While the Court has wide discretion to order a new trial to correct rulings that initially rested in its discretion, it has relatively narrow discretion to overturn a verdict on the grounds that the verdict is against the weight of the evidence. *Id.*  This is because

> where no undesirable or pernicious element has occurred or been introduced into the trial and the trial judge nonetheless grants a new trial on the ground that the verdict was against the weight of the evidence, the trial judge in negating the jury's verdict has, to some extent at least, substituted his judgment of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of the facts.

*Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90 (3d Cir. 1960).

> Accordingly, the district court ought to grant a new trial on the basis that the verdict was against the weight of the evidence only where a miscarriage of justice would result if the verdict were to stand. Where the subject matter of the litigation is simple and within a layman's understanding, the district court is given less freedom to scrutinize the jury's verdict than in a case that deals with complex factual determinations . . . .

*Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1352 (3d Cir. 1991) (internal citations omitted).

The Court may also alter or amend a judgment pursuant to Fed. R. Civ. P. 59(e), otherwise known as a motion for reconsideration. *See Keifer v. Reinhart Foodservices, LLC.*, 563 F.App'x 112, 114 (3d Cir. 2014). A motion to alter or amend "must rely on one of three major grounds: (1) an intervening change in controlling law; (2) the availability of new evidence not available previously; or (3) the need to correct clear error of law or prevent manifest injustice." *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995) (internal quotation marks and brackets omitted); *see also, Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). Thus, when a jury errs as a matter of law, a Court may rectify this error through a Rule 59(e) motion. *Keifer*, 563 F.App'x. at 115; *see also, United States v. Fiorelli*, 337 F.3d 282, 288 (3d Cir. 2003) ("A motion under Rule 59(e) is a 'device to relitigate the original issue' decided by the district court, and used to allege legal error") (quoting *Smith v. Evans*, 853 F.2d 155, 158-159 (3d Cir. 1988)). However, "motions for reconsideration should not be used to put forward arguments which the movant . . . could have made but neglected to make before

4

judgment." *United States v. Jasin*, 292 F.Supp.2d 670, 677 (E.D. Pa. 2003) (internal

quotation marks and alterations omitted) (quoting *Reich v. Compton*, 834 F.Supp.2d 753,

755 (E.D. Pa. 1993) *rev'd in part and aff'd in part on other grounds*, 57 F.3d 270 (3d Cir.

1995)).  Nor should they "be used as a means to reargue matters already argued and

disposed of or as an attempt to relitigate a point of disagreement between the Court and the

litigant." *Donegan v. Livingston*, 877 F.Supp.2d 212, 226 (M.D. Pa. 2012) (quoting *Ogden*

*v. Keystone Residence*, 226 F.Supp.2d 588, 606 (M.D. Pa. 2002)).  Because federal courts

have a strong interest in the finality of judgments, motions for reconsideration should only

be granted sparingly. *Cont'l Cas. Co. v. Diversified Indus., Inc.*, 884 F.Supp. 937, 943 (E.D.

Pa. 1995) (citing *Rottmund v. Cont'l Assurance Co.,* 813 F.Supp. 1104, 1107 (E.D. Pa.

1992)).

## IV. ANALYSIS

Plaintiffs' motion raises at least 17 issues, including five alleged pre-trial errors, ten

alleged errors relating to the trial, and broad assertions that "[t]he jury verdict was in

violation of the legal standards on which the District Court instructed the jury" and that "[t]he

jury verdict was against the weight of the evidence." (*See generally*, Doc. 220).

### A. The Motions to Dismiss

Plaintiffs first argue that "the complaint of W. Brown must be reinstated on all

counts." (Doc. 232, at 17).  In particular, Plaintiffs argue that the action must be reinstated

with respect to Brown because the continuing violation theory precluded dismissal as to this

former Plaintiff. Plaintiffs do not challenge the Court's dismissals of Dejean Murray or Jerry

Salter. (*Id.* at 16 n.6).

Preliminarily, in Plaintiffs' brief in opposition to the University Defendants' motion to

dismiss, they advanced only a continuing violation theory with respect to their claims under

§§ 1983, 1985, and 1986. (*See* Doc. 16, at 5-6). With respect to their Title IX claim,

Plaintiffs acknowledged that "the last graduation or employment dates of these three

Plaintiffs [Dejean Murray, William Brown, and Jerry Salter] control the statute of limitations

under Title IX." (*Id.* at 6). Brown graduated from ESU on May 13, 2006 and resigned from

his position in the ESU Advancement Office on July 27, 2006. (Doc. 28, ¶ 116). Thus, in

light of Plaintiffs' acknowledgement that Brown's graduation or employment dates were the

controlling dates with respect to the Title IX claim, Brown's Title IX claim which was first

raised in February, 2009, was properly dismissed and Plaintiffs cannot now assert that the

Court erred in its determination with respect to this claim.[1]

With respect to Brown's claims pursuant to §§ 1983, 1985, and 1986, Plaintiffs argue

that Judge Munley misapplied the requisite factors that must be established to prevail on a

"continuing violation theory." (Doc. 232, at 15).[2] Judge Munley, relying on a three-factor

test set forth in *Cowell v. Palmer Township*, 263 F.3d 286 (3d Cir. 2001) to determine

---

[1] Furthermore, Judge Munley's opinion states that "Plaintiffs acknowledge that the defendants are correct" with respect to defendants' argument that Murray, Brown, and Salter's claims under Title IX are barred by the statute of limitations (Doc. 48, at 5), a point that Plaintiffs do not address.

[2] Plaintiffs do not appear to dispute Judge Munley's findings that the applicable statute of limitations in this case are two-years for both the §§ 1983 and 1985 claims, and one-year for the § 1986 claim. Therefore, the only issue is whether the continuing violation theory provided an equitable exception to these temporal limitations.

6

whether Plaintiff Brown could assert the equitable exception of the continuing violations doctrine, found that Brown met the first two factors, subject matter and frequency, but failed to adequately allege the third factor, degree of permanence. (Doc. 48, at 8-10). However, in 2013, the Third Circuit held that "it is clear that there is no longer a permanency requirement under the continuing violation doctrine." *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 166 (3d Cir. 2013). Thus, as Plaintiffs' Reply brief in support of the present motion finally makes clear, Plaintiffs' argument is that *Mandel* constitutes an intervening change in controlling law or, alternatively, that because Brown was dismissed on the basis of his failure to meet the third factor, which has now been deemed to be unnecessary, a failure to reinstate his action would constitute a manifest injustice. (Doc. 257, at 1-5).

"The continuing violations doctrine is an 'equitable exception to the timely filing requirement.'" *Cowell*, 263 F.3d at 292 (quoting *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 754 (3d Cir. 1995)). "Thus, 'when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred.'" *Id.* (quoting *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1295 (3d Cir. 1991)). For a plaintiff to benefit from the continuing violations doctrine, the Third Circuit has adopted a non-exhaustive list of factors "to aid in distinguishing between the occurrence of isolated acts of discrimination and a persistent, ongoing pattern," including the subject matter of the alleged

7

violations, specifically "whether the violations constitute the same type of discrimination" and the frequency of the acts. *Mandel*, 706 F.3d at 166.

Regardless of Judge Munley's reliance on the element of degree of permanence of the underlying acts in dismissing Brown from this action, his ultimate conclusion was correct. Merely because the complaint included an allegation that Brown was approached by I. Sanders "who again tried to engage [Brown] in an inappropriate intimate relationship and urge [Brown] to keep in touch with him" (Doc. 28, ¶ 117) in April, 2007, an incident which Judge Munley noted would fall within the statute of limitations (Doc. 48, at 9), does not, in itself, trigger the applicability of the continuing violation theory.

Brown graduated from ESU in May, 2006, and resigned from his position in the Advancement Office at ESU in July, 2006. The incident referenced above occurred in April, 2007, well-after Brown both graduated and stopped working at ESU. As such, any event which occurred after July, 2006, could not have been committed by I. Sanders while acting under color of state law, preventing Brown from pursuing his § 1983 claim.

In the instant case, Plaintiffs' § 1983 claim against the Defendants is based on a Fourteenth Amendment due process right to bodily integrity. (*See* Doc. 28, ¶¶ 170-172). To succeed on a claim under § 1983, the plaintiff must demonstrate a violation of a right protected by the Constitution or laws of the United States, committed by a person acting under color of state law. *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000) (en banc). "The traditional definition of acting under color of state law requires that the defendant in a §

8

1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)). Generally, employment by the state is sufficient to render a defendant a state actor. *West*, 487 U.S. at 49. Further, a "defendant acts under color of state law when he abuses the position given to him by the state." *Id*. at 49-50. Nonetheless, within the Third Circuit,

> [i]t is well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state. Rather, in order for the tortfeasor to be acting under color of state law, his act must entail "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."

*Mark v. Borough of Hatboro*, 51 F.3d 1137, 1150 (3d Cir. 1995) (quoting *Classic*, 313 U.S. at 326); *see also, D.T. v. Indep. Sch. Dist. No. 16*, 894 F.2d 1176 (10th Cir. 1990) (concluding that a public school teacher/coach's sexual molestation of students at a summer basketball camp, unconnected to school activities, when teacher was not employed by the school district, did not occur under color of state law).

In April, 2007, any actions taken by I. Sanders towards Brown were done in a purely private capacity. There are no allegations in the Second Amended Complaint that could lead this Court to reasonably infer that, in 2007, I. Sanders was acting under color of law with respect to his actions against Brown. Judge Munley's Memorandum Opinion supports this finding. In analyzing the Defendants' motions to dismiss, Judge Munley held that "we

find that the complaint sufficiently alleges state action, for at least the time that the plaintiffs were students or otherwise employed by the university." (Doc. 48). In so holding, Judge Munley's opinion demonstrates a recognition that, had he not stopped his analysis of Plaintiff Brown's claim after concluding that Brown had not met the degree of permanence prong of the continuing violation theory, there would have been a need to analyze whether Brown's only allegation within the statute of limitations could be linked to the prior allegations given the change in the educational and employment relationship between I. Sanders and Brown. In now undertaking this analysis, it is clear that I. Sanders was not acting under color of law in 2007 when he approached Brown, as his alleged actions, no matter how inappropriate, did not entail a "misuse of power" and were not made possible due to his position at ESU or any authority that he had previously exercised over Brown.[3]

Similar reasoning applies to the statute of limitations with respect to Brown's claims under §§ 1985 and 1986. Assuming that Plaintiffs adequately pleaded the elements of these claims, in 2007, Brown was no longer educationally or vocationally affiliated with ESU or I. Sanders. Rather, the statute of limitations began to run, at latest, when Brown stopped

---

[3] Plaintiffs cite to Judge Munley's statement that "if the continuing violation theory applies[, the April, 2007 incident] could *potentially* help protect Brown's older claims from a statute of limitations challenge" (Doc. 48, at 9)(emphasis added) in support of their argument that, but for Judge Munley's reliance on the degree of permanence element, he would have found that Brown was entitled to the benefit of the continuing violations doctrine. (Doc. 257, at 4-5). Despite Plaintiffs' contention, Judge Munley's statement does not preclude a finding that Brown's claims are barred by the statute of limitations on other grounds.

working at ESU in the summer of 2006. The 2007 incident thus cannot be linked to the prior

alleged inappropriate behavior for purposes of invoking the continuing violations doctrine.[4]

Because Plaintiff Brown would not have been able to survive dismissal, regardless of

whether Judge Munley considered the degree of permanence element outlined in *Cowell*,

the Court need not determine whether there was an intervening change in controlling law

between the time that Judge Munley issued his opinion and the Third Circuit decided

*Mandel*. Furthermore, Plaintiffs are unable to show that the continuing violations doctrine

would have salvaged any of Brown's claims, and thus no manifest injustice was committed

by Judge Munley in dismissing Brown.

## B. The Motions for Summary Judgment

The majority of the arguments raised by Plaintiffs in support of their motion were

originally raised in either the briefs in opposition to Defendants' motions for summary

judgment (Docs. 107, 108) and/or in Plaintiffs' motion and accompanying brief "to alter or

amend the judgment entered in favor of" the ESU Defendants (Docs. 145, 146) which the

Court interpreted as a motion for reconsideration (Docs. 162, 163). Plaintiffs impermissibly

use their current Rule 59 motion with respect to the Court's rulings on summary judgment

largely to reargue matters already argued and disposed of or in an attempt to re-litigate a

point of disagreement between themselves and the Court. *See Donegan*, 877 F.Supp. 2d

at 226. With respect to several issues Plaintiffs essentially use this Rule 59 motion as an

---

[4] Even if the 2007 incident were to be considered, Brown's § 1986 claim, which is subject to a one-year statute of limitations, would not be timely.

attempt to obtain a *third* "bite of the apple." The Court does not feel compelled to readdress Plaintiffs' renewed arguments and thus only does so briefly as necessary. We refer the parties to our prior Memorandum Opinions (Docs. 140, 142, 162) for a more extensive discussion of the majority of the issues discussed herein.

## 1. Plaintiffs' Title IX Claim

Plaintiffs argue that the Court "erroneously granted summary judgment to the ESU Defendants and partial summary judgment to I. Sanders." (Doc. 232, at 17). In large part, Plaintiffs' argument is based on a contention that the Court "misapplied the summary judgment standard." (*Id.*).

Plaintiffs first contend that the Court misapplied the summary judgment standard in that it "erred in 'parsing' each issue rather than reviewing the record in its entirety." (*Id.* at 17). In support of this argument, Plaintiffs rely almost exclusively on *Snooks v. Duquesne Light Company*, 314 F.App'x. 499 (3d Cir. 2009) for the general proposition that "parsing" each issue is improper. (Doc. 232, at 17-19). In *Snooks*, a Title VII race and gender discrimination action, the Third Circuit held that the district court "erred by parsing each issue rather than reviewing the record in its entirety", as well as improperly applying the applicable legal analysis. *Snooks*, 314 F.App'x. at 505. Plaintiffs use the quote regarding "parsing" out of context and without examining the rest of the case.

In *Snooks*, an African-American male employee sued his employer after it promoted a Caucasian female to a supervisory position instead of him. The Third Circuit reversed the

12

lower court's grant of summary judgment to the employer, finding that the plaintiff could satisfy his burden under *McDonnell Douglas*[5] of proving that the reason proffered by Defendant for the adverse employment action was pretextual "by 'demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Id.* at 504 (quoting *Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir. 1994)) (emphasis in original).  The Court found that "[t]he most persuasive of Snooks's challenges to [Defendant's] conduct relate to McGill's [a decision-maker in the hiring process] ride along with Stoehr [the other candidate for the position]. Although Snooks has no personal knowledge of what McGill and Stoehr discussed during their eight hours together, the fact remains that Stoehr and McGill spent the day together just two days before the second round of interviews. A reasonable factfinder could infer that the two of them casually chatted over the course of the day, and that McGill could therefore have had a more favorable view of Stoehr simply from their otherwise benign conversation." *Id.*

The differences between *Snooks* and the instant case are notable.  First, *Snooks* involved an employment discrimination action wherein the Court was required to apply a different legal standard, i.e. *McDonell Douglas* and *Fuentes,* in deciding whether the parties each met their respective burdens.  In these employment cases, Courts have noted the

---

[5] *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

particular difficulties when facing an issue of a party's subjective intent in making an

employment decision. *See e.g. Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255

n.8, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) ("In a Title VII case, the allocation of burdens

and the creation of a presumption by the establishment of a prima facie case is intended

progressively to sharpen the inquiry into the elusive factual question of intentional

discrimination."). However, in a Title IX case, there is no element of subjective intent in the

analysis of the actual knowledge requirement. Rather, the issue is whether Dillman[6] had

actual notice that I. Sanders was acting in a sexually inappropriate manner towards ESU

students prior to Bernard's complaint with the the Office of Diversity and Equal Opportunity

in August, 2007.

Second, in *Snooks*, the Court focused on conflicting documentary evidence and

testimony by the decision-makers, as well as the undisputed encounter between one of the

hiring decision-makers and the candidate who ultimately got the job. In that case, there was

actual evidence, not merely accusations or assertions, for a jury to consider in making its

decision. In the present action, Plaintiffs came forward with *no* actual evidence to contradict

the University Defendants' assertion that Dillman did not have actual knowledge of I.

Sanders' alleged sexual harassment of students. Instead, Plaintiffs rely merely on

assertions that rumors existed around campus, citing to the deposition testimony of Officer

---

[6] Plaintiffs do not dispute the Court's finding that Dillman was the individual who had the authority to take corrective measures on the University's behalf, and only raise the issue of Dillman's actual knowledge, not that of V. Sanders or Borland.

14

Randy Nelson, Vicky Cooke, and Teresa Werkheiser, and assert that the Court was incorrect in "dismiss[ing] as insignificant testimony that I. Sanders was hiring young African American males outside university guidelines." (Doc. 232, at 20-21). Even Plaintiffs admit that the evidence they rely on "may very well not 'establish actual knowledge'" but argue that had the Court looked at this evidence as a whole, rather than "parsing", "the evidence does raise an issue of material fact as to Dillman's actual knowledge." (Id. at 21). The problem for Plaintiffs remains that, unlike in Snooks, there is no evidence for a reasonable fact-finder to consider. Unlike in Snooks, where there was actual documentary evidence creating a material factual dispute and it was undisputed that a decision-maker had contact with another applicant for the job, and at issue was the content of the conversation that occurred during the time in question, here there is no link between Dillman and the rumors which Plaintiffs insist the Court should have considered. Plaintiffs present no evidence or testimony that anyone spoke to Dillman about these rumors or any other concerns with respect to I. Sanders and possible sexual misconduct with students or that Dillman saw or heard anything prior to August, 2007, that could reasonably be said to have imparted to him knowledge that I. Sanders was engaging in sexually inappropriate and criminal behavior with ESU students.

Plaintiffs point to a number of alleged errors made by the Court in its analysis of whether a genuine dispute of fact existed as to Dillman's actual knowledge. Plaintiffs offer no support for their arguments. Plaintiffs fail to ever cite to the purported record evidence or

indicate to the Court where this evidence can be found. The most egregious example of this is with respect to Officer Nelson's testimony. Plaintiffs repeatedly focus on this testimony, arguing that the Court was wrong to disregard Officer Nelson's testimony that, as Plaintiffs characterize it, "it was well known on campus that Sanders was engaging in sex with students." (See Doc. 232, at 20, 33). A thorough review of Officer Nelson's deposition testimony as well as his Verified Statement (Doc. 110-7) reveals that Nelson said nothing that could provide the basis for this patently false representation by Plaintiffs. Nelson repeatedly stated that he had been told by other officers that they thought I. Sanders was gay, and related that he heard of one incident in which I. Sanders was found in a car with another man but had "no idea" whether this other man was a student. (See generally, Doc. 110-7 (Dep. of Randy Nelson; Verified Statement of Randy Nelson); Dep. of Nelson, at 55). There is nothing in Officer Nelson's deposition or Verified Statement to indicate that Officer Nelson, or anyone he had spoken to, knew or believed that I. Sanders "was engaging in sex with students." Furthermore, the Court had already put Plaintiffs on notice that Plaintiffs were misrepresenting Officer Nelson's testimony. In its Memorandum Opinion granting ESU Defendants summary judgment, the Court stated that:

> Plaintiffs erroneously state that I. Sanders was found with a "male student." There is no evidence in Officer Nelson's statement or deposition to support this contention. At most, Officer Nelson stated that the police "were trying to confirm whether [I. Sanders] was in this car with a student." (Stmt. of Randy Nelson, at 5). The statement does not say whether or not this was confirmed and Officer Nelson's deposition regarding this incident only refers to the other person in the car as "the other male." (Dep. of Randy Nelson, at 35).

16

(Doc. 140, at 42 n.7).  Plaintiffs have never provided the Court with a citation to the record

wherein Officer Nelson purportedly made the statements that Plaintiffs attribute to him.  Nor

could Plaintiffs do so, since the record does not show that Officer Nelson ever made those

statements.

In conjunction with their inappropriate reliance on Officer Nelson's deposition and

Verified Statement, the plaintiffs argue that:

> Nelson's testimony is particularly compelling when coupled with Sanders'
> "long standing history of sexual misconduct with students", "meeting with grad
> students in his office behind closed and locked doors," "going out to lunch or
> even dinner with these students" and "something was not quite right."

(Doc. 232, at 20).  Once again, none of these quotes contain citations to the record.

However, a review of the Court's prior Memorandum Opinion reveals that they are merely

restatements of Plaintiffs' prior inaccurate characterization of Vincent Dent's testimony (Doc.

140, at 42-43).  With respect to "Sanders' long standing history of sexual misconduct with

students'", it is unclear why Plaintiffs put this in quotes, given that, as the Court stated in its

prior opinion, Dent never said this, nor could his other statements fairly be construed to

indicate that Dent believed such a "long standing history" existed at the time he was

employed at ESU.[7]  (*See id.* at 42 n.8, 43 (stating that "[w]hile Plaintiffs cite to Dent's

Statement, p. 2 [for the proposition that "Dent 'admitted that he was aware of I. Sanders'

long standing history of sexual misconduct with students"], it is not clear to what part of this

---

[7] The Court again points out that it put Plaintiffs on notice that it believed they were
misrepresenting a witness's testimony, and just as with Officer Nelson's testimony, had Plaintiffs disagreed
with this Court's finding, they would have been well-served by providing a specific citation to the Court in
support of their position.

17

page they are referring" and that "Dent's statements are . . . far cries from any evidence that he 'was aware of I. Sanders' long standing history of sexual misconduct with students,' or even that he had any knowledge of sexual acts taking place between I. Sanders and his students")). Furthermore, there is no evidence that Dent ever conveyed any of his other observations to Dillman, therefore negating the argument that Dent's observations somehow provided Dillman with actual knowledge.

In arguing that the Court "parsed" the actual knowledge issue, Plaintiffs also briefly rely on the Court's "dismiss[al of] the 'sex ring' testimony of Cooke and Werkheiser as 'unsubstantiated, double hearsay at best.'" (Doc. 232, at 21 (citing Doc. 140, at 44)). First, Plaintiffs did not submit any testimony by Cooke, thus the Court did not, nor could it, "dismiss" her testimony or comment on the admissibility of any statement by Cooke, given there was none in evidence. The Court's statement regarding the multiple levels of hearsay went only to Werkheiser's testimony that she was told by Cooke that an unnamed custodian at ESU had told Cooke that I. Sanders was running a "sex ring". Second, there is no question that Werkheiser's statement would be inadmissible in Court, was completely unsubstantiated or supported by any other evidence or testimony, and, even when looked at in conjunction with Plaintiffs' other purported evidence, could not raise a triable issue of fact as to Dillman's actual knowledge.[8] *See Countryside Oil Co., Inc. v. Travelers Ins. Co.,* 928

---

[8] This is particularly true in light of the fact that Werkheiser admitted that she did not tell anyone other than Carolyn Bolt of this rumor (*see* Verified Stmt. of Werkheiser, at 4 (stating that she "did not say anything to anyone [except Bolt] about this because at that point, we had no clue Sanders was capable of

F.Supp. 474, 482 (D.N.J. 1995) ("It is well settled that only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment"); *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985) ("[A] party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions".).

In essence, if the Court were to subscribe to Plaintiffs' argument that it erred in "parsing" the evidence, this would lead to the anomalous result that a party could defeat summary judgment simply through a series of reckless assertions and allegations, unsupported by record evidence.  Here, Plaintiffs argue that essentially vague innuendo and rumors alone should raise a genuine issue of material fact regarding Dillman's actual knowledge of I. Sanders' sexual misconduct towards African-American students.  Moreover, these assertions, even when taken as a whole, cannot lead to a reasonable inference that I. Sanders was engaging in inappropriate sexual conduct with Plaintiffs or any other students. Plaintiffs point to no case wherein rumors or innuendo alone, and particularly in the absence of admissible evidence, are enough to avoid summary judgment or create a genuine dispute of material fact.[9]

---

such")).  Nor does Werkheiser assert in her statement that she had knowledge of Dillman hearing the rumors from someone else.

[9] In fact, the Third Circuit has explicitly rejected the notion that rumors alone are sufficient to establish notice.  In analyzing whether a high school administration "knew or should have known of any danger of abuse at a time at which they could have acted to prevent [Plaintiff's] injuries" as required to establish supervisory liability under § 1983, the Court stated:

> Johnson [Plaintiff] contends that even if the Administration was not aware of Stevens's [a high school guidance counselor] abuse of her, it can be held liable for failing to respond to the danger posed by Stevens's well-known proclivity for sexually harassing and abusing female students.  In other words, Johnson attempts to demonstrate that the Administration

For all of the aforementioned reasons, the Court finds that Plaintiffs' arguments are

without merit, and that Plaintiffs failed to establish a genuine dispute of material fact

regarding Dillman's actual knowledge such as to defeat the University Defendants' motion

for summary judgment.

Plaintiffs next take issue with the Court's finding that they failed to present any

genuine dispute of fact as to the University Defendants' assertion and supporting evidence

that they were not deliberately indifferent to Bernard's complaint and allegations.  In so

doing, Plaintiffs raise four issues: (1) the Court's use of the words "exacting and strict" in

defining the deliberate indifference standard; (2) whether Dillman's failure to immediately

---

had a custom of being deliberately indifferent to Stevens's potential for committing
constitutional violations, and that this "deliberate indifference" was the proximate cause of
the injuries she sustained. *See Beck v. City of Pittsburgh,* 89 F.3d 966, 973–74 (3d Cir.
1996); *Kneipp v. Tedder,* 95 F.3d 1199, 1213 (3d Cir. 1996).

As evidence of Stevens's proclivity for sexual harassment, Johnson brought forth various
stories and rumors about Stevens walking too closely to female students in the hallway,
frequently calling female students out of class to his office, and giving gifts to female
students. Even if all of these allegations were true, however, Johnson presented no
evidence that they were ever brought to the attention of a supervisory or policy-making
official of the administration either before or during (or even after) the time of Stevens's
alleged abuse of Johnson. Moreover, even if school officials had been made aware of
these stories before or during Stevens's alleged improper relationship with Johnson, we
share the District Court's reluctance "to impose on the district an obligation to treat as true,
all rumors, until proven otherwise." In the absence of any direct complaints made to school
officials, the mere floating around of unsubstantiated rumors regarding a particular
employee—particularly in the high school setting, which is notoriously rife with adolescent
gossip—does not constitute the kind of notice for which a school district can be held liable
under *Monell's* "policy or custom" requirement.

*Johnson v. Elk Lake Sch. Dist.,* 283 F.3d 138, 144 n.1 (3d Cir. 2002).  In light of the Third Circuit's
reluctance to permit rumors to serve as a sufficient basis for finding that the appropriate person "knew or
should have known of any danger of abuse", a lower standard than that for Title IX wherein the appropriate
person must "know[] the underlying facts, indicating sufficiently substantial danger to students", *see Bostic
v. Smyrna Sch. Dist.,* 418 F.3d 355, 361 (3d Cir. 2005), mere stories and rumors are insufficient to
establish actual notice under Title IX.

suspend I. Sanders was clearly unreasonable in light of the known circumstances; (3) the importance of the Breese investigation; and (4) the Court's consideration of the PASSHE report. (Doc. 232, at 22-29).

Plaintiffs first contend that deliberate indifference is not an "exacting and strict standard" as stated once by the Court. (*Id.* at 22-24 (citing Doc. 140, at 34)). In presenting this contention, it appears that Plaintiffs did no more than simply perform a cursory (and incorrect) analysis of the cases that appeared in the same paragraph as the Court's statement, none of which the Court cited for the proposition that deliberate indifference is an "exacting and strict standard". As a result, Plaintiffs' argument is without merit.

In *Gebser v. Lago Vista Independent School District*, which Plaintiffs cite for the proposition that this Court erred in imposing a high standard (Doc. 232, at 23), the Supreme Court found that the premise behind deliberate indifference "is an official decision by the recipient not to remedy the violation." 524 U.S. 274, 290, 118 S.Ct. 1989, 158 A.L.R. Fed. 751 (1998). The Court continued on to state:

> Under a *lower standard*, there would be a risk that the recipient would be liable in damages not for its own official decision but instead for its employees' independent actions. Comparable considerations led to our adoption of a deliberate indifference standard for claims under § 1983 alleging that a municipality's actions in failing to prevent a deprivation of federal rights was the cause of the violation. *See Board of Comm'rs of Bryan Cty. v. Brown,* 520 U.S. 397,117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *Canton v. Harris,* 489 U.S. 378, 388-392, 109 S.Ct. 1197, 1204-1207, 103 L.Ed.2d 412 (1989); see also *Collins v. Harker Heights,* 503 U.S. 115, 123-124, 112 S.Ct. 1061, 1067-1068, 117 L.Ed.2d 261 (1992).

21

*Id.* at 290-291 (emphasis added). The Court's language, specifically its use of "lower standard", implies that a heightened standard is necessary in examining whether a recipient was deliberately indifferent. Crucially, the cases to which the Supreme Court cited in defining the standard for deliberate indifference shed light on the necessary threshold. In *Bryan County*, the Supreme Court, relying on its prior decision in *Canton*, explained that "'deliberate indifference' is a *stringent standard of fault*, requiring proof that a municipal actor disregarded a *known or obvious* consequence of his action." 520 U.S. at 410 (emphasis added). This language clearly demonstrates the Supreme Court's intention that a showing of deliberate indifference in a Title IX action is subject to an "exacting and strict"[10] standard of proof.

Circuit Courts have also found the standard for deliberate indifference in Title IX cases to be particularly high. *See e.g., Doe v. Sch. Bd. of Broward Cnty*, 604 F.3d 1248, 1259 (11th Cir. 2010) ("Deliberate indifference is an exacting standard; school administrators will only be deemed deliberately indifferent if their 'response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances'" (quoting *Davis Next Friend LaShona D. v. Monroe Cnty Bd. of Educ.*, 526 U.S. 629, 648, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999)); *Doe v. Willits Unified Sch. Dist.*, 473 F.App'x. 775, 775-776 (9th Cir. 2012) ("The test for deliberate indifference is 'whether a reasonable fact-

---

[10] The term "stringent", as used by the Supreme Court, is synonymous with "strict". *See Oxford English Dictionary, available at* www.oed.com (search "stringent") (last visited Feb. 5, 2016) ("of regulations, procedure, requirements, obligations, etc.: rigorous, strict, thoroughgoing; rigorously binding or coercive."); *Merriam-Webster, available at* www.merriam-webster.com (search "stringent") (last visited Feb. 5, 2016) ("marked by rigor, strictness, or severity especially with regard to rule or standard.").

finder could conclude that the [school]'s response was clearly unreasonable in light of the known circumstances.' To meet this high standard there must, in essence, be an official decision not to remedy the violation and this decision must be clearly unreasonable. Summary judgment is proper when a school's response to the harassment was not clearly unreasonable as a matter of law. Even a showing of heightened negligence is insufficient to prove deliberate indifference.") (internal citations omitted).

Ultimately, despite Plaintiffs' quarrel with the Court's recognition of the strict and exacting standard governing Title IX, the fact remains that deliberate indifference does require Plaintiffs to meet a high standard of proof, a task they were unsuccessful in accomplishing.

Plaintiffs' argument that "Dillman's failure to immediately suspend I. Sanders is clearly unreasonable in light of the 'known circumstances' and constitutes deliberate indifference" (Doc. 232, at 24), is merely a recycled argument largely already addressed by this Court in its prior Memorandum Opinion. In support of their contention, Plaintiffs point to three incidents, specifically:

> [1.] Dillman was advised by Bolt, Kelley and McGarry of I. Sanders' hiring unqualified young African American males outside of university guidelines.
> [2.] Dillman questioned Bolt about the Godfrey's Ridge in-car sexual encounter with a student.
> [3.] Dillman was aware of the Advancement Office undercurrent that I. Sanders was running a sex ring in the Advancement Office.

(Doc. 232, at 25). While listing these three examples as evidence that Dillman's failure to immediately suspend I. Sanders was "clearly unreasonable", Plaintiffs fail to explain why

this is so or explain to the Court why its prior analysis and findings were incorrect. *See*

*Davis*, 526 U.S. at 649 ("In an appropriate case, there is no reason why courts, on a motion

to dismiss, for summary judgment, or for a directed verdict, could not identify a response as

not 'clearly unreasonable' as a matter of law.").

Plaintiffs' first point, that "Dillman was advised by Bolt, Kelley and McGarry of I.

Sanders' hiring unqualified young African American males outside of university guidelines",

cannot reasonably be said to have provided notice to Dillman that I. Sanders was *sexually*

*harassing or abusing* these "unqualified African American males." As the Court previously

stated in its Opinion granting summary judgment to the ESU Defendants:

> The assertion by Plaintiffs that Dillman was told that Sanders was "hiring
> unqualified young African-American males outside of University guidelines," is
> not a statement that Dillman was told of any acts of sexual harassment,
> inappropriate sexual relationships with students, or sexual assaults of
> students by I. Sanders.

(Doc. 140, at 10). The Court further found that:

> The hiring of "young African American males outside of the university
> guidelines" is not indicative of "improper conduct with students." Nor can
> these hiring practices be reasonably construed as indicative of sexual
> misconduct. At best, as Bolt stated, I. Sanders' hiring practices may have
> been suggestive of "a double standard for people of different colors."

(*Id.* at 43-44). Plaintiffs do not reference the Court's findings on this subject, nor do they

attempt to explain how Dillman's knowledge of possible hiring irregularities could, or should,

reasonably lead to a conclusion or notice that I. Sanders was engaged in any inappropriate

sexual behavior with these students, and therefore how Dillman's actions could be considered clearly unreasonable with respect to this allegation.

With respect to the second incident alleged by Plaintiffs, that "Dillman questioned Bolt about the Godfrey's Ridge in-car sexual encounter with a student", Plaintiffs once again take liberties with the facts of record. Preliminarily, we note that Plaintiffs have not specifically discussed "Godfrey's Ridge" prior to this motion. Thus, a citation to the record or some further explanation of what Plaintiffs were referring to would have been appropriate. Nonetheless, ESU Defendants' brief in opposition to Plaintiffs' motion informed the Court of the incident at issue. (Doc. 238, at 24-26). Because Plaintiffs do not explain what incident they are referring to, and do not dispute in their Reply brief that the incident discussed by the ESU Defendants is the incident at issue, the Court assumes that the incident discussed by the ESU Defendants is correct.

According to the ESU Defendants, the "Godfrey's Ridge" incident related to a rumor that "I. Sanders had been stopped by the police near the Stroudsmoor Country Inn, located on the south side of Route I-80, and that there was another man in the car at the time." (Doc. 238, at 25). Plaintiffs did previously reference an incident which occurred near the Stroudmoor County Inn in their brief in opposition to summary judgment, although in support of the proposition that Dillman should have informed Breese of the incident. (Doc. 107-2, at 33, 54). It is unclear how Dillman's alleged questioning of Bolt regarding this rumor is evidence of "clearly unreasonable" conduct in light of the "known circumstances" since it is

undisputed that, regardless of what was discussed with Bolt, Dillman did know of this rumor and, as Plaintiffs admit, Dillman "conducted his own investigation into the incident, questioning Bolt and others in December 2007 to ascertain if the incident involved a student." (Doc. 107-2, at 33). This investigation also resulted in Dillman requesting that ESU Chief of Police Olson talk to "his counterpart in the Stroud Regional" and being told by Olson that there was "nothing on the local police, campus police, about Isaac and there wasn't anything in the Stroud Regional about Isaac." (Dep. of Dillman, at 99, 100).

While the connection between Dillman's alleged questioning of Bolt regarding "Godfrey's Ridge" and whether Dillman was deliberately indifferent is unclear, Bolt's testimony still does not support Plaintiffs' contention. Bolt testified that she had heard rumors that I. Sanders "was caught by the police at Godfrey's Ridge engaged in some kind of sexual encounter with a student", but she never testified that she spoke to Dillman about these rumors; rather only stating that in December, she spoke to Dillman about "an investigation" into I. Sanders about his involvement with a student. (Dep. of Bolt, at 94, 142). At no point did Bolt state that she and Dillman discussed the Godfrey's Ridge rumor, let alone that Dillman "questioned" her about it, nor does Dillman's deposition testimony ever reference a discussion on this specific topic with Bolt, rendering Plaintiffs' assertion that such a conversation occurred completely without foundation.

Ultimately, in light of Dillman's investigation of the "Godfrey's Ridge" rumor, including requesting that the ESU Chief of Police attempt to locate records regarding the alleged

26

incident, Dillman's failure to "immediately suspend" I. Sanders was not "clearly

unreasonable". Additionally, Plaintiffs' assertion that "Dillman questioned Bolt about the

Godfrey's Ridge in-car sexual encounter with a student" is entirely unsubstantiated.

Plaintiffs' singular focus on Dillman's supposed questioning of Bolt, while ignoring the other

actions Dillman took with respect to the "Godfrey's Ridge" incident, is an attempt to severely

limit examination of the record evidence, in contradiction to their prior argument that the

Court was wrong to "parse" the evidence. Plaintiffs' contention is also hurt by Bolt's

testimony that she did not "know of such things" in December, 2007, in reference to any

financial irregularities of I. Sanders or any sexual improprieties by I. Sanders, including any

improper conduct by I. Sanders with the student interns. (Dep. of Bolt, at 193-194, 207).

As for Plaintiffs' third assertion in support of their argument, that "Dillman was aware

of the Advancement Office undercurrent that I. Sanders was running a sex ring in the

Advancement Office", the Court has already repeatedly addressed this allegation,

dismissing it as unsubstantiated and purely speculative; in essence, another attempt by

Plaintiffs to re-litigate a past disagreement with the Court and make inflammatory assertions

lacking any factual support. As this Court previously stated:

> The assertion that "there were also stories circulating in the Advancement
> Office with respect to I. Sanders running a 'sex ring'" presents
> unsubstantiated hearsay with no indication that these "stories" were ever
> presented to Dillman.

(Doc. 140, at 10). There is no record evidence that any one ever told Dillman of these

rumors or that he learned of them in some other way, and Plaintiffs' assertion that Dillman

27

"was aware" of the purported sex-ring is once again purely speculative and advanced by Plaintiffs without the slightest basis in the record.

Plaintiffs next assert that "even if it had been properly conducted, the Breese investigation was not a reasonable response to Bernard's complaint", apparently because, in Plaintiffs' opinion "there is no reasonable explanation for Dlllman's failure to provide Breese with the anonymous letters" and that "withholding the letters short-circuited Breese's investigation." (Doc. 232, at 26-28). Plaintiffs raise these arguments for the third time, having previously made these virtually-identical points in both their brief in opposition to ESU Defendants' motion for summary judgment and their motion for reconsideration. (Docs. 107-2, 146).

Because Plaintiffs' argument that Dillman should have provided the anonymous letters to Breese was thoroughly addressed by the Court in its Memorandum Opinion granting the ESU Defendants summary judgment (Doc. 140), and Plaintiffs have failed to offer any new evidence or explanation as to how the Court improperly applied the deliberate indifference standard when analyzing Breese's investigation and the Breese Report, we refer Plaintiffs to our prior Memorandum Opinion (Doc. 140). Plaintiffs are again impermissibly attempting to relitigate a prior point of disagreement with the Court and we therefore see no need to address their arguments in any detail. Suffice it to say that the entirety of Plaintiffs' arguments amount to an assertion of how they believe the Breese

investigation should have been conducted and pure speculation as to Dillman's motives in

not conducting the investigation as they would have preferred.

Finally, Plaintiffs argue that "the trial court failed to consider the PASSHE Report in

analyzing whether Dillman was deliberately indifferent", complaining that despite the fact

they "devoted a subdivision of their [memorandum in response to the ESU Defendants'

motion for summary judgment] to the PASSHE Report", the Court only mentioned it one

time in its Statement of Undisputed Facts.  (Doc. 232, at 29).[11]  This comprises the entirety

of Plaintiffs' argument, without any indication of what error was committed by the Court in

not further addressing the PASSHE Report, and thus leaving the Court to guess the exact

(or even general) contours of Plaintiffs' issue with the Court's decision.  As a result,

Plaintiffs' claims fail because Plaintiffs have done nothing to support them.

Plaintiffs' Reply brief for the first time slightly clarifies their position by asserting that

"[t]he PASSHE report is important circumstantial evidence of Dillman's indifference"

---

[11] The Court actually referenced the PASSHE report three times in its Memorandum Opinion, not once as Plaintiffs assert.  Plaintiffs cite to page 27 of the Court's Memorandum Opinion (Doc. 232, at 29), wherein it stated that "ESU hired an outside law firm to conduct an investigation into the allegations reported in the *Pocono Record* and, by letter dated July 1, 2008, Isaac Sanders was placed on administrative leave 'effective immediately'" (*see* Doc. 140, at 27)(internal citations omitted).  However, on pages 29 and 52 of its Memorandum Opinion, the Court also referenced the Report.  (*See* Doc. 140, at 29 ("Dillman received the investigation report from the outside law firm on September 26, 2008.  Following receipt of the report, Dillman conducted a pre-disciplinary conference with Isaac Sanders on October 3, 2008."); Doc. 140, at 52 ("The University Defendants further state that upon learning of a local newspaper article in June, 2008, identifying five former students claiming that I. Sanders had harassed them, ESU placed I. Sanders on administrative leave, gave I. Sanders express written instructions that in the absence of approval by Dillman or V. Sanders, he was not allowed on campus or to contact any university employee, student, donor, or potential donor, and hired an outside law firm to conduct an investigation, which led to a pre-disciplinary conference between Dillman and I. Sanders, and ultimately I. Sanders' termination.")).

because the "PASSHE Report demonstrated that the facts of I. Sander's [*sic*] conduct were

there to be found if only a vigorous investigation were conducted." (Doc. 257, at 5-6).

However, as the Court stated in its prior Memorandum Opinion granting the ESU

Defendants' motion for summary judgment:

> [E]ven assuming Plaintiffs are correct that the investigation was less thorough
> than it could or should have been, the absence of a more aggressive course
> of action is not in itself indicative of deliberate indifference. *See Escrue* [*v. N.
> OK College*, 450 F.3d 1146, 1155 (10th Cir. 2006)] (quoting *Vance* [*v.
> Spencer Cnty Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000))]. Plaintiffs
> are essentially arguing that in the absence of a virtually unlimited
> investigation, extending well beyond the Bernard allegations against I.
> Sanders themselves, the University Defendants have been deliberately
> indifferent. This ignores the "clearly unreasonable" standard that must be
> adhered to in any determination of the validity of the recipient's response to
> the harassment. *Davis*, 526 U.S. at 658.

(Doc. 140, at 63). This analysis still holds true. Plaintiffs' argument in their Reply brief once

again turns on an assertion that anything less than "a vigorous investigation" must constitute

deliberate indifference. In so arguing, Plaintiffs ignore the clear case law to the contrary.

Regardless, it is unclear how the PASSHE report could possibly vitiate the undisputed

actions that were, or were not, taken in response to Bernard's complaint filed against I.

Sanders on August 27, 2007.[12]

---

[12] Plaintiffs also assert for the first time in their Reply brief that "it is undisputed that the trial court failed to review or consider the PASSHE Report when ruling on both the ESU Defendants' and I. Sanders' motions for summary judgment." (Doc. 257, at 6). This is, in fact, not undisputed, and is untrue. Plaintiffs point to the Court's statement early in the pre-trial conference that it had "never seen" the PASSHE Report. (Doc. 257, at 6). However, upon further clarification by the parties, the Court then stated that it was aware of the Reports. (Pre-Trial Tr., Oct. 3, 2014, at 19-20). During the pre-trial conference, the Court also clarified its prior statement that the PASSHE Report was not of record by recognizing that "[p]ortions were submitted, but there was [*sic*] large parts that were redacted of what we had." (Pre-Trial Tr., Oct. 3, 2014,

Having taken issue with the Court's application of the actual knowledge and deliberate indifference elements of a Title IX claim, Plaintiffs next argue that "a genuine issue of material fact exists on whether I. Sanders continued sexual harassment post-August 2007." (Doc. 232, at 29). In support of this argument, Plaintiffs rely on I. Sanders payment of Ross' outstanding tuition bill in September, 2007, terming this as "grooming" behavior, and on Bernard's testimony that Dillman "glared" at him and that I. Sanders made "gestures" at him.[13]

The issue of whether Plaintiffs were subject to further harassment after Bernard filed his complaint in August, 2007, relates to whether the Title IX funding recipient's deliberate indifference subjected the students to further harassment, to wit, the indifference must "cause students to undergo harassment or make them liable or vulnerable to it." *See Davis*, 526 U.S. at 644-645 (internal quotations omitted).

---

at 17). A review of the exhibits submitted by the parties in support and opposition to the motions for summary judgment supports this statement. Only a portion of the September 26, 2008 Report written by Attorney Miceli (Doc. 113) was submitted by Plaintiffs. (*See* Doc. 113). The Report ends abruptly on page 24, in mid-sentence, and it is abundantly clear that there are multiple pages missing. At that same pre-trial conference, Attorney Murray admitted that he "had always been under the impression, when [Plaintiffs] filed the motions and the report, that the Court had seen and read PASSHE Report, *not in its totality. The totality of the report is 71 pages.* The critical portions of the report are from Page 1 to 31, which reaches the conclusions." (Pre-Trial Tr., Oct. 3, 2014, at 18) (emphasis added). Thus, Plaintiffs admit that they submitted less than half of the Report to the Court, and the Court had no way of knowing that Plaintiffs, through their own inadvertence, had intended on submitting pages 25-31 in support of their motion.

Furthermore, to the extent that Plaintiffs claim they had previously submitted the PASSHE Report as docket number 46 (Doc. 232, at 29), that document is merely a stipulation as to the confidentiality of the two reports created by Black & Gerngross P.C. (Doc. 46). The reports themselves were not included in that docket filing.

[13] The Court interprets Plaintiffs' absence of any mention of incidents including Homas after August, 2007, as an implicit acknowledgment that there is no genuine dispute of material of fact that Homas was not sexually harassed by I. Sanders after August, 2007, in the context of a Title IX claim.

With respect to Ross, Plaintiffs argue that I. Sanders' payment of Ross' outstanding tuition after Bernard filed his complaint is indicative of post-complaint sexual harassment. The Court has already addressed, and dismissed, this exact argument. (*See* Doc. 140, at 49-50). Plaintiffs' mere reassertion of their original contentions, without more, does nothing to persuade the Court that it previously erred in its analysis. Further, to the extent that Plaintiffs take issue with the Court's finding that I. Sanders' payment was an isolated incident (Doc. 232, at 30 (quoting Doc. 140, at 49)), and accuse the Court of weighing the evidence, the payment is the *only* post-complaint incident offered by Plaintiffs in support of their argument that I. Sanders continued to "groom" Ross. Finally, while it is undisputed that I. Sanders paid Ross' outstanding tuition bill in September, 2007, he did not tell Ross about this payment. Ross did not discover that I. Sanders paid his tuition bill until August, 2008, after he had already graduated from ESU. It is only logical that for a person to be harassed, that person must actually be aware of the "harassing" action(s).

Plaintiffs' position is equally meritless with respect to Dillman's "glare" and I. Sanders' "gestures" towards Bernard. Plaintiffs argue that "[i]t is not for the summary judgment court to decide that stalking or approaching constitutes harassment while glaring and gestures do not constitute harassment." (Doc. 232, at 30). However, it is Plaintiffs themselves who admitted that I. Sanders' gesture was not harassment. In their Response to the University Defendants' Statement of Material Fact that I. Sanders' "sexual harassment and abuse of Bernard stopped with the filing of the August 27, 2007 complaint"

(Doc. 94, ¶ 45), Plaintiffs stated that "[a]fter Bernard filed his formal complaint, I. Sanders did not attempt to harass him further, but did attempt to intimidate him", a reference to I. Sanders' "disgruntled gesture." (Doc. 109, ¶ 45). Plaintiffs may not now disavow their previous admission that I. Sanders did not attempt to harass Bernard after he filed his complaint.

>With respect to Dillman's "glare", the Court reiterates its prior finding:

>>As for Dillman, he stated that in August, 2007, he "didn't know who [Bernard] was." (Dep. of Robert Dillman, at 52). There is no indication in the record that he ever met Bernard prior to his final decision in January, 2008. Further, the statement that Dillman "glared at Bernard" does not carry with it a sufficient basis to infer that Dillman knew the identity of the person to whom he directed what Plaintiffs characterize as a glare.

(Doc. 140, at 51). Plaintiffs' current motion does not dispute this determination or point to any record evidence overlooked by the Court to show the existence of a dispute of fact that Dillman knew who Bernard was. Furthermore, even viewing Bernard's allegation in the light most favorable the Plaintiffs, a glare alone does not create a genuine dispute of fact as to whether Bernard was subjected to actionable harassment after filing the complaint in August of 2007. Finally, Plaintiffs change their argument, originally stating that Dillman's glare constituted inappropriate conduct (Doc. 107-2, at 47-48), and now arguing that the glare was somehow indicative of I. Sanders' continued sexual harassment (Doc. 232, at 29-30). Plaintiffs fail to offer any explanation of how this "glare" constituted harassment or why the Court was incorrect to dismiss it as an "isolated incident."

33

Accordingly, Plaintiffs' assertion that the Court erred in finding that no genuine issue

of material fact existed regarding I. Sanders' continued sexual harassment post-August

2007, is also without merit.

## 2. Plaintiffs' Claim Pursuant to 42 U.S.C. § 1983

Plaintiffs allege several errors on the part of the Court with respect to its grant of

summary judgment to the University Defendants on Plaintiffs' § 1983 claim. We note

preliminarily that Plaintiffs' arguments only address Dillman, which the Court interprets as

an acknowledgement that Plaintiffs recognize that there is no dispute of material fact with

respect to the § 1983 claim against V. Sanders and Borland and that Plaintiffs do not

contest the grant of summary judgment as to these two defendants.

As the Court stated in its Memorandum Opinion,

> to establish supervisory liability for a subordinate's violation of a student's
> constitutional right to bodily integrity, the plaintiff must show that "(1) the
> defendant learned of facts or a pattern of inappropriate sexual behavior by a
> subordinate pointing plainly toward the conclusion that the subordinate was
> sexually abusing the student; and (2) the defendant demonstrated deliberate
> indifference towards the constitutional rights of the student by failing to take
> action that was obviously necessary to prevent or stop the abuse; and (3)
> such failure caused a constitutional injury to the student." *Chancellor v.*
> *Pottsgrove School Dist.*, 501 F.Supp.2d 695, 709 (E.D.Pa. 2007) (citing *Doe*
> *v. Taylor Ind. School Dist.*, 15 F.3d 443, 454 (5th Cir. 1994) (en banc)); *see*
> *also Alton v. Texas A&M University*, 168 F.3d 196 (5th Cir. 1999) (applying
> this three pronged analysis to determine whether a university official had
> supervisory liability).

(Doc. 140, at 66). Plaintiffs agree that this is the relevant law, but take issue with the

Court's subsequent labeling of the first prong as requiring "contemporaneous and personal

34

knowledge." (Doc. 232, at 31-32). Plaintiffs argue that *Chancellor*, the case cited by the

Court for the supervisory liability test, does not say this, and that the Court provided no

citation for its "contemporaneous and personal knowledge" requirement. However, in the

sentence immediately preceding the quote from *Chancellor*, most of which is found on the

same page that Plaintiffs claim lacks the appropriate citation, the Court, quoting *Evancho v.*

*Fisher*, 423 F.3d 347, 353 (3d Cir. 2005), stated that "the supervisor must have

'contemporaneous, personal knowledge' of the violation and acquiesce in" the violation.

(Doc. 140, at 65-66).

Next, in support of their argument that "the trial court incorrectly characterized and

applied the knowledge requirement" (Doc. 232, at 31), Plaintiffs list several incidents,

without citation to the record, that they claim demonstrate an issue with respect to Dillman's

actual knowledge. Specifically, Plaintiffs write:

> Dillman was aware that I. Sanders was skirting university protocol in hiring
> young African American males, seen "parking" in a university lot with a male
> student, wining and dining his subordinates, meeting with his young African
> American subordinates behind locked doors, and threatening other
> subordinates who would not knuckle under to his methods.

(*Id.* at 32). As the Court has already pointed out multiple times, both in its prior

Memorandum Opinion (Doc. 140) and this Opinion, there is no evidence that I. Sanders was

"seen 'parking' in a university lot with a male *student*" (emphasis added). The other

allegations, which Plaintiffs state without evidentiary support, all relate to issues regarding I.

35

Sanders' hiring and management style, none of which are sufficient to impute knowledge to Dillman that I. Sanders was engaging in inappropriate sexual behavior with ESU students.

Plaintiffs then assert that "the § 1983 knowledge standard is substantially lower than the Title IX standard" and the Court therefore erred in its application of the knowledge standard in analyzing Plaintiffs' § 1983 claim. (Id. at 32-33). Plaintiffs do not appear to take issue with the law cited by the Court, only its application. In support of their position, Plaintiffs again complain that the Court failed to consider "the campus police officer's testimony that it was common knowledge on campus that I. Sanders was having sexual relations with male students, and that I. Sanders had locked door meetings and lunches and dinners with male students." (Id. at 33). Assuming that Plaintiffs are referencing Officer Nelson's testimony and Dent's testimony, once again, Plaintiffs misstate the facts of record. As previously stated, Officer Nelson never testified in the manner that Plaintiffs claim. See, supra at 16-17. With respect to the locked door meetings and meals with male students, this allegation is based solely on Dent's testimony, wherein he stated that he noticed these things. There is no indication that Dent told Dillman about his observations. Thus, the Court was correct in determining that Plaintiffs' purported evidence "do[es] not show that the potential for sexual abuse was present and [is] insufficient to show that Dillman had any form of notice of sexual abuse or of its potential existence." (Doc. 140, at 69).

Plaintiffs also accuse the Court of incorrectly determining the issues of whether harassment occurred after August, 2007, whether Dillman was deliberately indifferent, and

36

whether Plaintiffs suffered a constitutional injury. Plaintiffs refer the Court to their previous

arguments on these subjects in the Title IX section of their brief, and the Court in turn refers

Plaintiffs to its discussion of these issues both in this Opinion, *supra*, and in its prior

Memorandum Opinion (Doc. 140).

For all the aforementioned reasons, Plaintiffs have not met their burden under Fed.

R. Civ. P. 59 for reconsideration of the Court's grant of summary judgment to the ESU

Defendants.

### 3. Plaintiffs' Claims Pursuant to 42 U.S.C. §§ 1985, 1986[14]

Finally, Plaintiffs argue that "a § 1983 conspiracy may be established by

circumstantial evidence" and list several incidents in support of their contention that "a

genuine issue of material fact exists on whether Dillman, I. Sanders, Borland, and V.

Sanders' acts to cover up I. Sanders' conduct constitutes a conspiracy or is sheer

coincidence." (Doc. 232, at 33-35).

Plaintiffs' reference to a civil conspiracy pursuant to § 1983 is inappropriate in light of

the fact that their conspiracy claims, namely Counts III and IV, were brought pursuant 42

U.S.C. §§ 1985 and 1986. (*See* Second Am. Compl., Doc. 28, at 51-54). In addition,

Plaintiffs' argument proceeds from a false premise, i.e., that there was any evidence of

record that Dillman, I. Sanders, Borland, and V. Sanders engaged in acts to cover up I.

Sanders' conduct. Since that premise is without evidentiary support, the conclusion that

---

[14] Plaintiffs did not request that the Court reconsider its judgment with respect to Count III (42 U.S.C. § 1985) or Count IV (42 U.S.C. § 1986) in their prior motion for reconsideration. (Doc. 145).

there was a genuine dispute of fact as to whether this constituted "a conspiracy or is sheer coincidence" is without merit.

Additionally, as ESU Defendants properly state, Plaintiffs raised the arguments in the current motion and brief, as well as the listed incidents, previously in support of their position in opposition to summary judgment, and Plaintiffs' present brief fails to set forth how the Court erred in its prior analysis. (Doc. 238, at 31). In particular, Plaintiffs do not address how the Court was incorrect in finding that they did not "present[] evidence of an agreement among the defendants to discriminate against African American males" or that there was no evidence to create a factual dispute that ESU Defendants had any class based animus as required under § 1985(3), or any evidence of class based discriminatory animus on the part of Dillman, V. Sanders, or Borland, in investigating and responding to Bernard's claims. (Doc. 140, at 76-77).

Because Plaintiffs once again use the current motion to merely reargue prior points of disagreement and fail to present any new or coherent argument, the Court will deny Plaintiffs' motion with respect to their claims pursuant to §§ 1985 and 1986.

## 4. Conclusion

For all the aforementioned reasons, the Court will deny Plaintiffs' Rule 59 Motion with respect to its rulings on the motions to dismiss and motions for summary judgment.[15]

---

[15] Even if the Court were to find that it committed an error in one or more of its rulings on the motions to dismiss or motions for summary judgment, Defendant Dillman still must remain dismissed from this action.

38

## C. The Court's Rulings Relating to the October, 2014 Trial

### 1. The Preclusion of Testimony by Dejean Murray, William Brown, and Bryan Haskins Pursuant to Federal Rules of Evidence 413, 415, and 403

With respect to the Court's trial rulings, Plaintiffs first argue that the Court "erred in excluding the testimony of Dejean Murray, the deposition testimony of William Brown, and critical portions of Pastor Bryan Haskins' testimony." (Doc. 232, at 36).

---

Following the jury trial in this matter and Plaintiffs' submission of their Rule 59 Motion for a New Trial or Amending a Judgment (Doc. 220), on January 13, 2015 counsel for the ESU defendants filed a Statement Noting a Party's Death (Doc. 251) in accordance with Federal Rule of Civil Procedure 25(a). The statement noted "the death during the pendency of this action of Robert J. Dillman" and named Roseann Dillman as his personal representative. Counsel for ESU included a Certificate of Service stating that Attorneys Murray, Westervelt, Abrams, and Coleman were all served on the day of the Statement's filing.

Pursuant to Federal Rule of Civil Procedure 25(a),

> If a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed.

Fed. R. Civ. P. 25(a). Because at the time of the Court's grant of summary judgment to Defendant Dillman there were remaining claims and defendants, the Court's order did not qualify as a final judgment and therefore the claim against Dillman was not extinguished. *See Giles v. Campbell*, 698 F.3d 153 (3d Cir. 2012) (finding that although summary judgment had been entered in favor of one of the defendants prior to his death, it was not a final judgment). Furthermore, to the extent that Dillman died after the jury trial terminated, "[u]nder Appellate Rule 4(a)(4), a timely motion under either Rule 59(b) or Rule 59(e) suspends the finality of the judgment. . . ." 1 Moore's Federal Rules Pamphlet § 59.8[2] (Matthew Bender)(2016).

Here, over one year has passed since Plaintiffs were served with the Statement Noting a Party's Death as well as the name of Dillman's personal representative were they to choose to substitute her as a party. As a result, the mandatory language of Federal Rule of Civil Procedure 25(a), requiring that "the action by or against the decedent *must* be dismissed" if no motion for substitution is made by any party or the decedent's successor or representative, allows the Court to *sua sponte* dismiss the decedent, even in the absence of a motion to dismiss. *See e.g., Fossyl v. Milligan*, 317 F.App'x. 467 (6th Cir. 2009)(*sua sponte* dismissing one of the defendant-appellants from the action because no motion for substitution was received by the Court within the ninety day time period). Therefore, Plaintiffs' failure to take any action regarding Dillman's death results in the proper dismissal of Dillman on this ground alone. Furthermore, in addition to all causes of action against Dillman being dismissed and because Plaintiffs' current motion does not challenge the Court's dismissal of V. Sanders and Borland with respect to the § 1983 claim, the § 1983 claim is also properly dismissed in its entirety against the ESU Defendants on these grounds.

The Court held three hearings to determine whether the testimony of Dejean Murray, portions of the deposition of William Brown, and the testimony of Bryan Haskins were permissible under Federal Rules of Evidence 413 and 415, and if so, whether such testimony should be permitted pursuant to Federal Rule of Evidence 403. The hearings took place on October 27, 29, and 30, 2014 respectively. While the Court ruled that a portion of Haskins' testimony would be allowed, it precluded Dejean Murray's testimony and the relevant portion of Brown's deposition in their entirety. The Court devoted substantial time in hearing the in-court testimony of Dejean Murray and Bryan Haskins, reading the deposition testimony of Brown, listening to both Plaintiffs and Defendant's counsel's arguments on the issue for all three individuals, and explaining both the applicable law in determining whether one or more of these individuals would be allowed to testify and, finally, its reasoning in making its ultimate rulings. Upon review of the trial transcript, applicable law, and Plaintiffs' current arguments with respect to Dejean Murray, Brown, and Haskins, the Court reaffirms its prior rulings and incorporates herein its reasoning explained during the trial in excluding the testimony of Dejean Murray, the deposition of Brown, and only allowing part of Haskins' testimony.

As the Court previously explained in its Opinion and Order addressing Defendants' Motion in Limine to Prohibit Evidence or Reference to Dismissed Claims, Preclude Witnesses and Evidence and to Compel Offer of Proof:

> It is well established that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular

40

occasion the person acted in accordance with the character." FED. R. EVID. 404(b)(1). However, Federal Rules of Evidence 413 and 415 establish an exception to the general prohibition of character evidence in cases involving sexual assault. *Johnson v. Elk Lake Sch. Dist.*, 283 F.3d 138, 151 (3d Cir. 2002). To be admissible under Rule 415, the past act(s) must conform to the definition of "sexual assault", as defined by Rule 413(d). Further, the balancing requirements of Rule 403 should be applied to Rules 413-415 "with a thumb on the scale in favor of admissibility"; but "where the past act is not substantially similar to the act for which the defendant is being tried, and/or where the past act cannot be demonstrated with sufficient specificity, the propensity inference provided by the past act is weaker, and no presumption in favor of admissibility is warranted." *Id.* at 155, 156.

(Doc. 192, at 6-7).

For purposes of Federal Rules of Evidence 413 and 415,

sexual assault means a crime under federal law or under state law . . . involving:
(1) any conduct prohibited by 18 U.S.C. chapter 109A;
(2) contact, without consent, between any part of the defendant's body – or an object – and another person's genitals or anus; [or]
(3) contact, without consent, between the defendant's genitals or anus and any part of another person's body . . . .

Fed. R. Evid. 413(d)(1)-(3).

18 U.S.C. chapter 109A encompasses several statutes, including of relevance here,

§§ 2242, 2244, and 2246. According to § 2242, a person who knowingly "causes another

person to engage in a sexual act by threatening or placing that other person in fear . . . or

attempts to do so, shall be fined under this title and imprisoned for any term of years or for

life." 18 U.S.C. § 2242. In relevant part, the term "sexual act" is defined as:

(A) contact between . . . the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight;

41

(B) contact between the mouth and the penis . . . or the mouth and the anus;
(C) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person . . . .

18 U.S.C. § 2246(2)(A)-(C).

Section 2244(b), upon which Plaintiffs also now appear to rely on in support of their argument (Doc. 232, at 40, 48)[16] states that "[w]hoever . . . knowingly engages in sexual contact with another person without that other person's permission shall be fined under this title, imprisoned not more than two years, or both." 18 U.S.C. § 2244(b). In relevant part, "sexual contact" "means the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." 18 U.S.C. § 2246(3).

With respect to Pennsylvania state law, 18 Pa.C.S.A. § 3126 (Indecent Assault) is the applicable statute in this action. Pursuant to this statute, in relevant part,

> A person is guilty of indecent assault if the person has indecent contact with the complainant, causes the complainant to have indecent contact with the person or intentionally causes the complainant to come into contact with seminal fluid, urine or feces for the purpose of arousing sexual desire in the person or the complainant and:
>   (1) the person does so without the complainant's consent . . . .

---

[16] The Court notes that despite now briefly raising 18 U.S.C. § 2244 (Doc. 232, at 40, 48) as a basis for their contention that the Court erred in prohibiting certain testimony, Plaintiffs never referenced this statute at trial or directly relied on it during any of the oral arguments regarding Federal Rules of Evidence 413 and 415. Regardless, the inclusion of this argument would not have altered the Court's decision, both because of the equivocal nature of the individuals' testimony and the substantial danger of unfair prejudice.

18 Pa.C.S.A. § 3126(a)(1). Indecent contact is defined as "[a]ny touching of the sexual or other intimate parts of the person for the purpose of arousing or gratifying sexual desire, in any person." 18 Pa.C.S.A. § 3101.

In explaining to the parties both in its Opinion and Order addressing Defendants' Motion in Limine (Doc. 192) and prior to and following the hearings, how the Court would perform its analysis pursuant to Federal Rules of Evidence 413 and 415, the Court relied heavily on the Third Circuit's decision in *Johnson v. Elk Lake School District*. Despite this reliance, Plaintiffs do not discuss *Johnson* in their brief in support of their Rule 59 motion, only citing it once following the definitions of the type of sexual assault included in Chapter 109. Plaintiffs only first address *Johnson* in their reply brief to I. Sanders' brief in opposition to Plaintiffs' Rule 59 motion, describing *Johnson* as "the Third Circuit's unique gloss on rules 415, 413, and . . . 403." (Doc. 252, at 1). Further, in attempting to apply *Johnson* and distinguish it from the current case, Plaintiffs only discuss its application to Dejean Murray, omitting any discussion of Brown and Haskins. Despite Plaintiffs' assertion that the facts and alleged incident presented in *Johnson* differ from those here, the law and analysis set forth in *Johnson* are no less applicable here.

Of note, in *Johnson*, the Third Circuit set forth several rules that governed this Court's analysis, and ultimately, its decisions with respect to Dejean Murray, Brown, and Haskins. The Circuit made clear that while uncharged conduct is admissible, it is "of course" subject to limitations "to ensure that the plaintiff may not 'parade past the jury a

43

litany of potentially prejudicial similar acts that have been established or connected to the

defendant only by unsubstantiated innuendo.'" *Johnson*, 283 F.3d at 152 (quoting

*Huddleston v. United States,* 485 U.S. 681, 689, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988)).

Further relying on *Huddleston*, the Court instructed that "a trial court considering evidence

offered under Rule 415 must decide under Rule 104(b) whether a reasonable jury could find

by a preponderance of the evidence that the past act was an 'offense of sexual assault'

under Rule 413(d)'s definition and that it was committed by the defendant." *Johnson*, 283

F.3d at 154-155.  Nonetheless,

> [e]ven if a trial court is satisfied that the proffered past act evidence
> satisfies Rule 104(b), however, it may still exclude it under Federal Rule of
> Evidence 403, which allows for evidence to "be excluded if its probative value
> is substantially outweighed by the danger of unfair prejudice, confusion of the
> issues, or misleading the jury, or by considerations of undue delay, waste of
> time, or needless presentation of cumulative evidence."

*Id.* at 155; *see also, id.* at 157 ("Under *Huddleston,* the Court needed only to ask itself

whether a jury could reasonably find by a preponderance of the evidence that Stevens

committed the act intentionally, provided that the Court was satisfied that the evidence need

not be excluded under Rule 403."). Therefore, "despite the seemingly absolutist tone of the

'is admissible' language, Congress did not intend for the admission of past sexual offense

evidence to be mandatory; rather, Congress contemplated that Rule 403 would apply

to Rules 413-15." *Id.* at 155. In fact, the questionably absolutist language of Rules 413 and

415 has been amended since *Johnson* to now make clear that "the court *may* admit

evidence that the defendant [or party] committed any other sexual assault." Fed. R. Evid.

413, 415 (emphasis added).

Federal Rules of Evidence 413 and 415 do not limit the consideration of evidence

under any other rule, *see* Fed. R. Evid. 413(c), 415(c), which necessarily includes Rule 403.

Thus, the Court must still apply the Rule 403 balancing test to determine whether otherwise

admissible evidence should be excluded.  In particular, as explained in *Johnson*,

> where the past act is not substantially similar to the act for which the
> defendant is being tried, and/or where the past act cannot be demonstrated
> with sufficient specificity, the propensity inference provided by the past act is
> weaker, and no presumption in favor of admissibility is warranted. Where a
> past act cannot be shown with reasonable certainty, its probative value is
> reduced and it may prejudice the defendant unfairly, confuse the issues,
> mislead the jury, and result in undue delay and wasted time - all reasons for
> excluding evidence under Rule 403.

*Johnson*, 283 F.3d at 156.  This Rule 403 balancing between the probative value of the

evidence sought to be excluded and the prejudicial effect if the evidence is admitted, is "at

its core, an essentially discretionary one that gives the trial court significant latitude to

exclude evidence." *Id*. at 156.  As such, "before an evidentiary ruling may be reversed for

an abuse of discretion, it must be shown that the district court's action was arbitrary, fanciful

or clearly unreasonable.  [The Third Circuit] will not disturb a trial court's exercise of

discretion unless no reasonable person would adopt the district court's view." *Kelley v.

Wegman's Food Mkts., Inc.*, 2003 WL 21091390, *at 6 (E.D. Pa. 2003) (quoting *Stecyk v.

Bell Helicopter Textron, Inc.,* 295 F.3d 408, 412 (3d Cir. 2002)) (internal quotation marks

omitted).

The initial focus in analyzing whether the testimony of Dejean Murray, William Brown, or Bryan Haskins was admissible is thus whether the testimony regarding the past act(s) of sexual offense was clear or instead equivocal, i.e. whether the testimony is capable of being understood in more than one way or is ambiguous in some way. *See, e.g., Oxford English Dictionary, available at* www.oed.com (search "equivocal") (last visited Feb. 3, 2016) ("of words, phrases, etc: Having different significations equally appropriate or plausible; capable of double interpretation; ambiguous."); *Merriam-Webster, available at* www.merriam-webster.com (search "equivocal") (last visited Feb. 3, 2016) ("having two or more possible meanings; not easily understood or explained."). The Court's hearings therefore first focused on whether any of the individual's testimony or deposition provided sufficient evidence that could allow a jury to reasonably conclude by a preponderance of the evidence that one or more of the individual's testimony raised an issue of "sexual assault" with respect to I. Sanders within the legal definition of the word as provided by Rule 413. The Court then continued its analysis to further determine whether the testimony should be permitted pursuant to Federal Rule of Evidence 403.

With respect to Dejean Murray, on direct examination during the hearing held by the Court, he testified that, after graduation he and I. Sanders went to a movie theater together to watch *King Kong*. On the way to the theater, as I. Sanders was driving, he "tapped" on Murray's leg, "around [his] knee." (Trial Tr., Oct. 27, 2014, at 12). Murray then felt I. Sanders' hand "on [his] leg towards – very high on my thigh", and defined this region as

"near [his] crotch area." (Id. at 12-13). However, Murray agreed that while I. Sanders hand was "towards" his crotch, it remained on his thigh. (Id. at 28). After Murray and I. Sanders left the film, Murray drove them back to campus, during which time Murray felt I. Sanders "put his hand on [Murray's] crotch." (Id. at 16-17). Murray admitted that during this incident, I. Sanders did not grab Murray's penis or genitals, but that he "could feel [I. Sanders'] hand through [his] pants." (Id. at 29, 31).[17]

The Court ruled that while there was clearly not consent offered by Dejean Murray, his testimony was too equivocal to meet the requirements of Rule 413. (Trial Tr., Oct. 27, 2014, at 55-56). Due to the equivocal nature of the testimony, which eliminated any presumption in favor of admissibility under Rule 403, while a "close call", the probative value of the testimony was limited, resulting in it being substantially outweighed by the danger of unfair prejudice. (Id. at 56, 58).

Following the Court's ruling on Dejean Murray, Plaintiffs' counsel requested that the Court review the transcript of Dejean Murray's testimony and reconsider its decision on the basis that there was testimony by Dejean Murray that he felt I. Sanders' hand on his penis. (Id. at 57). Despite Plaintiffs' counsel's contention, no such testimony existed, as the Court

---

[17] Plaintiffs' counsel again takes liberties with the truth and misrepresents Dejean Murray's testimony. For example, in describing what Murray testified to, Plaintiffs state that on the way to the movie, I. Sanders "put his hand very high on Murray's thigh and on his crotch and genitals" and that later on the way back from the theater, "I. Sanders leaned over, and for the second time put his hand on Murray's crotch and genitals." (Doc. 232, at 39) (underline in original). Murray never testified that I. Sanders touched his crotch or genitals on the way to the theater, only that I. Sanders' hand was "near [his] crotch area" and specifically that I. Sanders' hand was only on his thigh. (Trial Tr., Oct. 27, 2014, at 12-13, 28). As for the second incident, Murray did state that I. Sanders put his hand on his crotch, but never stated that I. Sanders' hand touched his genitals. (Id. at 16-17, 29, 31).

47

pointed out the following morning when reconsidering its prior decision and denying

Plaintiffs' request. (Trial Tr., Oct. 28, 2014, at 5-10).

Plaintiffs once again raise the argument that Dejean Murray testified that I. Sanders

touched his penis (Doc. 232, at 44-45), citing to the following exchange between Plaintiffs'

counsel and Dejean Murray:

> ATTORNEY MURRAY: You could feel his hand through your pants, and your
> penis is in that general area?
>
> DEJEAN MURRAY: Yes.

(Trial Tr., Oct. 27, 2014, at 31). To assert, as Plaintiffs' counsel did, that the penis is in the

"general area" of the crotch states the obvious, but adds nothing to clarify Dejean Murray's

testimony. The crotch clearly encompasses a larger area than simply the penis and

genitals,[18] a differentiation Dejean Murray seemed to make in admitting that I. Sanders did

not grab his genitals or penis, but that he could feel I. Sanders' hand on his crotch. Further,

the fact that Dejean Murray differentiated between these areas, without further clarification,

rendered his testimony equivocal and therefore outside the ambit of Rules 413 and 415 and

increased its prejudicial effect while decreasing its probative value. Attorney Murray's

question soliciting the witness's agreement that the penis is in the "general area" of where I.

Sanders touched Dejean Murray does not transform Dejean Murray's statement into one

where he stated that I. Sanders touched his penis.

---

[18] *See, e.g., Oxford English Dictionary, available at* www.oed.com (search "crotch") (last visited
Feb. 3, 2016) ("The 'fork' or bifurcation of the human body where the legs join the trunk"); *Merriam-Webster, available at* www.merriam-webster.com (search "crotch") (last visited Feb. 3, 2016) ("The part of
the body where the legs join together").

48

With respect to former Plaintiff William Brown, after Plaintiffs' counsel stated that

they had "made every attempt possible to locate Mr. Brown" and that former Plaintiff Jerry

Salter, a "close" friend of Brown's, was also unable to reach him (Trial Tr., Oct. 27, 2014, at

34-35), Plaintiffs requested that part of Brown's deposition be read to the jury. The only

reference in Brown's deposition which related to an alleged sexual assault or sexual contact

by I. Sanders was on pages 30 and 31 of Brown's deposition[19] and read as follows:

> BROWN: . . . So you know, once we [I. Sanders and Brown] drove past that
> and we were getting back on to the road to get to Jerry [Salter's] house [I.
> Sanders] pulled over. You know, he started saying things like, you know, I
> really care about you. You know, you're a good guy. You know, I'll always be
> there for you. You don't have to worry about nothing. I'm glad that you're
> coming on this trip. Things like that. And you know, as he was --- you know,
> as the conversation was moving along he kind of placed his hand on my leg
> like this (indicating).
>
> ATTORNEY HARVEY: You have your hand on your thigh. Are you talking
> about your thigh?
>
> BROWN: Yeah, because he's driving.
>
> ATTORNEY HARVEY: Okay.
>
> BROWN: So he put his hand on this leg right here (indicating)
>
> ATTORNEY HARVEY: Okay.
>
> BROWN: --- and so as he's talking, kind of like moving it up and moving it up.
> At that time I'm kind of like in a state of shock. Like what's happening, like
> what's going on. So he continues to move it towards my genital area and kind

---

[19] Plaintiffs' counsel agreed that these two pages of Brown's deposition were the only reference to
an alleged sexual assault or sexual contact between Brown and I. Sanders. (Trial Tr., Oct. 29, 2014, at
174).

> of like rubs it a little bit. And then he proceeds to like reach for my zipper and that's when I move his hand away.

(Dep. of William Brown, Nov. 27, 2012, at 30-31). As the Court explained after reviewing Brown's deposition, Brown's statement regarding the incident was equivocal and the probative value of Brown's testimony was substantially outweighed by a danger of unfair prejudice. (Trial Tr., Oct. 29, 2014, at 174-175). A review of Brown's deposition supports this finding. Brown "indicated" during his deposition where I. Sanders touched him during the alleged sexual encounter, but given his absence at trial, a jury would clearly have been deprived of the ability to see to what specific area Brown was referring. Attorney Harvey's clarification that Brown was talking about his thigh is far too unspecific to provide the jury with an understanding of where I. Sanders originally placed his hand. Brown's statement that I. Sanders was "mov[ing his hand] towards my genital area" is somewhat conclusory, showing more about Brown's thoughts than I. Sanders' actions. It does not provide sufficient detail to know how far I. Sanders' hand went on Brown's thigh or the hand's location on Brown's thigh, but rather only that I. Sanders' hand was moving up Brown's thigh. It is further unclear what part of Brown's body he was referencing when he stated that I. Sanders "kind of like rubs it a little bit", and what the nature of the rubbing was, given its characterization as "kind of like". Finally, despite Brown's statement that I. Sanders reached for his zipper, there is no indication that I. Sanders actually touched the zipper or made contact with Brown's penis, genitals, or even crotch area when he reached over. The testimony is therefore both insufficient to satisfy the requirements of Rules 413 and 415 or

to tip the scale in favor of admissibility under Rule 403, while also presenting a clear danger of unfair prejudice with little probative value.

Plaintiffs incorrectly assert that Brown stated that I. Sanders "rubbed his genitals" (Doc. 232, at 50; *see also, id.* at 49, 51). Nowhere in Brown's deposition does he state that. Rather, as previously stated, it is unclear what I. Sanders specifically did, and absent Brown's testimony at trial, it was not possible for Brown to sufficiently clarify this testimony such as to render it unequivocal.

As for Bryan Haskins, in relevant part he testified about a series of incidents which occurred while he was a student at Stillman College. In 1999, Haskins was president of the student government and attended the White House Initiative on Historical Black Colleges and Universities in Washington, D.C. I. Sanders, as vice president of advancement for Stillman College, also attended. (Trial Tr., Oct. 30, 2014, at 7-9). Haskins first testified that as he was getting out of a limousine to enter a cigar bar, he felt I. Sanders' finger "touch [his] buttocks", and that this touch "was near the center of [his] butt cheeks" and "was very close to [his] anal area." (*Id.* at 10-13). Once inside the cigar bar, Haskins testified that, while standing against the wall, he "began to feel Dr. Sanders' arm, his elbow kind of leaning into my side just kind of rubbing up and down", and described the gesture as "kind of just almost like pulsating up and down moving my arm." (*Id.* at 13). Despite Haskins moving over twice, I. Sanders continued to do this until Haskins went to the restroom. (*Id.* at 13-14). Once in the restroom, I. Sanders "just basically stared at [Haskins] while

[Haskins was] using the urinal." (*Id.* at 15). Later that evening, as Haskins ate dinner with I. Sanders and Dr. McNealey, Haskins "felt Dr. Sanders' hand on [his] knee rubbing up [his] thigh towards [his] genitals", which he also described as I. Sanders' hand placed "toward the inside of [his] thigh moving up" "towards [his] penis". (*Id.* at 18-19). That same night, I. Sanders attempted to "embrace" Haskins. (*Id.* at 20). Following the evening in question, as the school year progressed, "Dr. Sanders at many times would make his way through crowds, parents, faculty and staff to try to shake [Haskins'] hand, pull [Haskins] in, take pictures with the campus photographer." (*Id.* at 24).

The Court, in ruling that part of Haskins' testimony was admissible, found that his testimony regarding the touching of his buttocks and anus was unequivocal. (Trial Tr., Oct. 30, 2014, at 32). However, the remainder of Haskins' testimony was precluded because it was sufficiently equivocal that the probative value of the testimony was substantially outweighed by the danger of unfair prejudice. (*Id.* at 33).

With the exception of I. Sanders' purported touching of Haskins' anal area, the rest of Haskins' testimony was too equivocal for the Court to determine that a jury could find by a preponderance of the evidence that a "sexual assault" pursuant to Rule 413 had occurred. With respect to I. Sanders' touching Haskins' arm, not only does this touching not fall within any of the definitions of sexual assault as defined by Rule 413(d), Haskins' testimony is ambiguous as to what I. Sanders actually did. Haskins uses language such as I. Sanders' "elbow *kind of* leaning into my side *just kind of* rubbing up and down", and "*kind of just*

*almost like* pulsating up and down moving my arm." Similarly to Dejean Murray and William

Brown, Haskins' testimony was also too equivocal to determine what happened between I.

Sanders and Haskins at the dinner table. There is no indication how high I. Sanders' hand

moved up on Haskins' thigh, or that I. Sanders' hand even reached Haskins' crotch area, let

alone Haskins' penis or genitals. Also, Haskins' testimony that I. Sanders' hand was

"*toward* the inside of [his] thigh" does nothing to inform the Court as to where I. Sanders

actually placed his hand.[20]  Consequently, due to the equivocal and ambiguous nature of

Haskins' assertions, the majority of Haskins' testimony did not meet the requirements of

Rules 413 and 415, and gave rise to a significant danger of unfair prejudice while rendering

the probative value of the testimony relatively low.

In determining that the probative value of the evidence offered by Dejean Murray,

Brown, and Haskins to show that I. Sanders committed sexual assault on the Plaintiffs was

substantially outweighed by the danger of unfair prejudice to the Defendant, the Court, for

the reasons stated above, found the equivocal and ambiguous nature of Dejean Murray's

testimony, as well as the excluded portion of the testimony of Haskins, produced two

effects: it diluted the relevance of their testimony and increased the danger of unfair

---

[20] Plaintiffs vaguely imply that the Court erred in not allowing Dejean Murray, Brown, and/or Haskins to testify under Fed. R. Evid. 413 and 415 pursuant to 18 U.S.C. § 2244(b) ("Abusive Sexual Contact") and its accompanying definition of "sexual contact" pursuant to 18 U.S.C. § 2246(3) which includes the intentional touching of the "inner thigh" (Doc. 232, at 40)(wherein Plaintiffs underline "inner thigh" in the definition of "sexual contact"), we note that: (1) none of these individuals whose testimony or deposition Plaintiffs argue should have been allowed actually testified that I. Sanders touched their *inner* thigh; (2) Plaintiffs conclusorily claim that I. Sanders touched Murray's inner thigh (Doc. 232, at 52) and Brown's inner thigh (*id.* at 53), but provide no citation to the record or put forth any substantive argument on this issue; and (3) Plaintiffs did not directly raise these statutes prior to, or during, the trial.

prejudice if Plaintiffs were permitted to present it to the jury. The same analysis applies to the deposition testimony of Brown. The testimony of these three individuals, none of whom asserted that I. Sanders actually touched his genitalia, penis, anus (with the exception of Haskins' admitted testimony), or other intimate parts, was not without some relevance, though slight. But that relevance was substantially outweighed by the danger of unfair prejudice to I. Sanders.

For the foregoing reasons, as well as those explained during the trial, the Court did not err in exercising its discretion and "significant latitude to exclude evidence", *Johnson*, 283 F.3d at 156, and thereby excluding the testimony of Dejean Murray, the deposition testimony of William Brown, and portions of Bryan Haskins' testimony.

### 2. The Testimony of Carolyn Bolt

Plaintiffs assert that the Court erred in allowing Carolyn Bolt to testify at trial. (Doc. 232, at 55-57). Plaintiffs seemingly reason that Bolt's testimony was irrelevant, that even if it was relevant, its probative value is outweighed by prejudice to the plaintiffs, and that her testimony somehow allowed Defendant to paint himself as a victim. (*Id.*).[21]

Under the Federal Rules of Evidence, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." Fed. R. Evid. 401. Relevant evidence is

---

[21] Plaintiffs also state, without elaborating, that they "were additionally prejudiced by not being permitted to introduce rebuttal testimony." (Doc. 232, at 56). It is unclear to what Plaintiffs are referring in this statement with relation to Bolt and Plaintiffs fail to explain this assertion.

admissible unless otherwise provided by the Constitution, federal statute, Federal Rules of Evidence, or other rules prescribed by the Supreme Court. Fed. R. Evid. 402. Relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. Even if the Court deems the relevant evidence to be admissible, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602.

Plaintiffs argue that "to permit Bolt to testify, and then to imply that she was looking to take I. Sanders job, or somehow was conspiring against him is irrelevant." (Doc. 232, at 56). This characterization of Bolt's testimony constitutes both Plaintiffs' opinion as to the meaning of her testimony and an overly narrow description of what she said. A large portion of Bolt's testimony focused on a log that she kept while working in the ESU Advancement Office, detailing a number of concerns with how the Office was run and incidents which occurred in the Advancement Office, all involving I. Sanders and Vincent Dent, one of I. Sanders' employees. (Trial Tr., Oct. 30, 2014, at 66-77). Bolt testified that she was asked by the Human Resources Office to take notes on what happened in the Advancement Office. (*Id.* at 77). Bolt's log was so thorough that it even included a notation that Dent's daughter was caught shoplifting at Walmart. (*Id.* at 74). Yet, none of Bolt's log entries placed into evidence at trial contained notations with respect to I. Sanders doing anything inappropriate with students in the office or any concern thereof. Bolt testified that

had she seen or was told of anything occurring in the office between I. Sanders and a student she likely would have noted it in her log. (*Id.* at 79). Thus, her testimony was relevant to the extent that despite her continued vigilance of the daily occurrences in the office, she never observed anything sexually inappropriate between students and I. Sanders. This testimony also served to contrast Homas' claim that he "alluded" to people in the office what I. Sanders was doing to him because "when I would come out of the office, my shirt was messy, and I would be like, look, I'm not going back in there." (Trial Tr., Oct. 28, 2014, at 178-179; *see also*, Trial Tr., Oct. 29, 2014, at 33).

Plaintiffs' assertion that Bolt's testimony hurt them or painted I. Sanders as a victim in some way distorts Bolt's testimony. If anything, Bolt's testimony placed I. Sanders in a negative light. Bolt stated that she was concerned about how I. Sanders had the staff designate certain money; that I. Sanders had inappropriate relations with donors and engaged in questionable hiring practices; and that I. Sanders made sloppy mistakes such as mislabeling a prospective donor's name. Bolt's log, the contents of which were read at trial, also implied that I. Sanders exercised favoritism and engaged in, and condoned, the bullying of his staff, as well as "publicly humiliat[ing]" Bolt. (Trial Tr., Oct. 30, 2014, at 64-77, 87). Further, Bolt offered testimony that could have bolstered Plaintiffs' sexual assault allegations. Bolt testified regarding rumors about I. Sanders, including his sexuality and a possible prostitution ring. (*Id.* at 87). Bolt also stated that I. Sanders hired all of the

graduate assistants, "and they were all young men" and that I. Sanders encouraged office workers to close their blinds. (Id. at 93, 96).[22]

While Plaintiffs do not specifically point to what parts of Bolt's testimony they found irrelevant, rather only asserting that she should not have been allowed to testify at all, to the extent that some of Bolt's testimony may have resulted in irrelevant information for the jury, it was harmless. The Court also notes that, despite telling Attorney Murray several times during a sidebar conference regarding whether Bolt would be allowed to testify that Plaintiffs' counsel should object to any questions throughout Bolt's testimony that he felt were irrelevant (Trial Tr., Oct. 30, 2014, at 53-54), Plaintiffs' counsel failed to do so. Rather, Attorney Murray did not make any objections during Bolt's testimony regarding the substance or relevance of her testimony, with the exception of an objection to Defense counsel's question regarding whether President Dillman asked Bolt if she was the author of an anonymous letter (id. at 80).

Plaintiffs contend that even if Bolt's testimony was relevant, its probative value is outweighed by the prejudice to them. Plaintiffs fail to explain why they believe that Bolt's testimony was so prejudicial as to preclude her from testifying or how Plaintiffs believe they

---

[22] While Plaintiffs did object to Bolt testifying at trial, it is worth noting that up to the time of trial, Plaintiffs did think Bolt had relevant testimony. Plaintiffs listed Bolt on their witness list in their Pre-Trial Memorandum (Doc. 172, at 6), and in their "Memorandum of Law In Support of Plaintiffs' Response to Defendants' Joint Motion in Limine to Prohibit Evidence or Reference to Dismissed Claims, Preclude Witnesses and Evidence and to Compel Offer of Proof", in support of their position that Bolt should be allowed to testify, Plaintiffs stated that they expected Bolt to testify "regarding Defendant I. Sanders' use of ESU Foundation funds and student jobs in the Advancement Office to groom Plaintiffs and other students as well as Defendant I. Sanders' conduct in closing his office door when meeting with Plaintiffs and other male students" (Doc. 174-2, at 4).

were unfairly prejudiced by her testimony. Thus, the Court cannot address this argument as Plaintiffs provide no support for it.

Consequently, Plaintiffs' motion for a new trial on the basis that Bolt should not have been allowed to testify will be denied.

### 3. Preclusion of the Outside Counsel Report[23]

Plaintiffs next argue that "the trial court erred by granting the Joint Motion in Limine to preclude the PASSHE Report." (Doc. 232, at 57).

Plaintiffs raise many of the same arguments previously listed in their Brief in Opposition to Defendants' Motion in Limine to preclude the use and/or reference to the Outside Counsel Reports (Doc. 174-2), namely, that the PASSHE Report[24] consisted of an exception to the rule against hearsay pursuant to Fed. R. Evid. 803 and that the Report is trustworthy because Attorney Miceli interviewed I. Sanders, Plaintiffs, and representatives of ESU. (Doc. 174-2, at 7-9; Doc. 232, at 57-60). The Court has already addressed these arguments and will only briefly do so again here.

Plaintiffs first contend that "the trial court transforms FRE 803(8)(A) language 'a legally authorized investigation' into a requirement that the proponent of the evidence demonstrate a 'statutory duty to investigate. . . .'" (Doc. 232, at 58). In fact, the Court made

---

[23] As originally noted in the Court's Opinion and Order granting in part and reserving in part on Defendants' Motion in Limine to Prohibit Evidence or Reference to Dismissed Claims, Preclude Witnesses and Evidence and to Compel Offer of Proof, Plaintiffs only sought to introduce Attorney Jeffrey Miceli's September 26, 2008 report and not Attorney Miceli's February 26, 2009 report. (Doc. 192, at 8 n.5; Doc. 174-2, at 5).

[24] The PASSHE Report and Outside Counsel Report are the same document, and the Court will use the titles interchangeably.

the aforementioned statement based on Plaintiffs' argument in their brief in opposition to Defendants' motion in limine that "both ESU and PASSHE had a statutory duty to investigate Plaintiffs' complaints of harassment and sexual assault." (Doc. 174-2, at 7). The Court was merely addressing Plaintiffs' statement. Rather, the Court continued on to state that Black & Gerngross "is not a public office or agency itself, and its factual findings did not result from an investigation *made pursuant to authority granted by law*. . . ." (Doc. 192). The Court did not limit its analysis to whether there was a statutory duty, but rather whether there was any legal duty.

Without providing any substantive argument, Plaintiffs declare the Outside Counsel Report to be a record or statement of a public office subject to the exceptions to hearsay in Rule 803(8)(A)(iii). Plaintiffs fail to offer any case law in support of this position or attempt to differentiate between the cases cited by the Court in ruling that the Outside Report does not meet the requirement that it set out factual findings from a legally authorized investigation. The Court is thus not provided with any basis upon which to reconsider its previous position.

The Outside Counsel Report which Plaintiffs state should have been admitted suffers from several additional deficiencies precluding its admissibility, none of which Plaintiffs addressed in their brief. First, the report clearly indicates that the investigation "has not yet been completed" and that the investigation is ongoing and "[t]his Memorandum only contains interim findings." (Outside Counsel Report, at 1, 31). Even Plaintiffs admit that the report was "incomplete in areas." (Doc. 232, at 11). The interim nature of this report is

confirmed by the existence of a second report, dated February 26, 2009, entitled "Isaac Sanders Allegations Investigation Memorandum and Report." The first report is merely titled as "Isaac Sanders Investigation Summary." As such, the first report's purported facts and Miceli's conclusions lack finality and certainty. This interim and incomplete report, and Plaintiffs' specific statement that they were not seeking to introduce the second report, see supra, at 58 n.23, coupled with the fact that no other party requested the admission of the second report, make it difficult to argue that the interim report itself has sufficient probative value to allow its admission, wholly apart from the issues of the hearsay nature of the document and its status as a non-public document.

Furthermore, the first report is replete with hearsay within hearsay, requiring large portions of the report to fall within a separate hearsay exception in order to be admissible, none of which Plaintiffs have ever argued apply. Absent any exception to hearsay, everything Attorney Miceli wrote is hearsay in the absence of Attorney Miceli's live testimony. Because Plaintiffs made no attempt whatsoever to procure the testimony of Miceli or any other author of the first report, the report was properly deemed inadmissible.

Plaintiffs recognize the Court's findings that the Outside Counsel Report does not meet the requirement of a public record and that the Report lacks trustworthiness, but inexplicably fail to address the Court's finding that, "[e]ven if the Court were to find that the outside counsel report is admissible as a public record hearsay exception under Rule 803(8), its admissibility would present a substantial danger of unfair prejudice pursuant to

60

Rule 403" (Doc. 192, at 13). Such a finding is still applicable to this action, and the Court incorporates herein its discussion in the prior Opinion and Order (Doc. 192) regarding the unfair prejudice of the Outside Counsel Report under Fed. R. Evid. 403.

Although Plaintiffs argue that the probative value of the PASSHE Report is substantial (Doc. 232, at 60), they fail to state, either in their brief in opposition to the motion in limine or in their brief in support of their Rule 59 motion, the purpose for which they would have sought its introduction or when during the trial they would have attempted to use it. Further, while Plaintiffs argue that the Court "easily could have redacted" portions of the report which were based on conclusions or recommendations, this is the first time Plaintiffs have suggested this or indicated an interest in attempting to redact significant[25] portions of the PASSHE Report.

For all of the foregoing reasons, the Court will deny Plaintiffs' motion for a new trial on the basis that the trial court erred by granting the motion in limine to preclude the Outside Counsel Report, dated September 26, 2008.

### 4. The Rebuttal Testimony

Next, Plaintiffs argue that the Court "erred in precluding Plaintiffs' rebuttal testimony of [Dejean] Murray, [William] Brown, [Jerry] Salter, and Officer [Randy] Nelson, to impeach I. Sanders' credibility." (Doc. 232, at 60).

---

[25] Given that large portions of the Report consist of conclusions on the part of Attorney Miceli, and there are multiple recommendations made throughout the Report, any redactions would indeed be significant and perhaps eviscerating.

The core of Plaintiffs' argument is based on their assertion that "at trial, I. Sanders testified that he had never touched another man in a sexual way." (*Id.*). This statement is without citation, nor could it be otherwise given that a review of the trial transcript reveals that I. Sanders never made such a broad statement. At best, aside from the three Plaintiffs, I. Sanders denied touching Dejean Murray, William Brown, Bryan Haskins, and LaShawn Pryor. (*See* Trial Tr., Oct. 30, 2014, at 174, 214, 215, 231).

After the defense rested its case, the Court questioned Plaintiffs' counsel regarding whether they intended to call any rebuttal witnesses. Attorney Murray indicated that he "potentially" would call Dejean Murray, and the Court stated that it would not allow the testimony by Dejean Murray that it had previously precluded. In response, Attorney Murray stated that "I think I had said you're correct, Your Honor, and I will not call Dejean Murray nor Will Brown as rebuttal." (*Id.* at 239). First, while the Court did address Attorney Murray's "potential" desire to call Dejean Murray on rebuttal, it was Attorney Murray who decided that Brown would not be called as a rebuttal witness, not the Court. Second, Attorney Murray did not indicate an actual intent to call Dejean Murray, only that he was contemplating this action; he never made a formal request to call this witness. Thus, Plaintiffs' counsel, having stated that he agreed with the Court, cannot now assign error to the Court. Moreover, by agreeing with the Court, Plaintiffs' counsel waived its objection, at minimum, with respect to Dejean Murray's rebuttal testimony. While Fed. R. Civ. P. 46 makes a "formal exception" to a Court's ruling or order unnecessary, at the time the ruling or

order is requested or made, the party must "state the action that it wants the court to take or objects to, along with the grounds for the request or objection." Fed. R. Civ. P. 46. Where "counsel indicates begrudging acceptance of the court's ruling, there has not been a proper objection, and the ruling cannot be assigned as error on appeal." *Defenders of Wildlife, Inc. v. Endangered Species Scientific Auth.*, 659 F.2d 168, 182 (D.C. Cir. 1981); *see also*, *Krienke v. Illinois Cent. R. Co.*, 249 F.2d 840, 845 (7th Cir. 1957) (where Defendant's counsel responded "all right" to the Court's statement that he did not have the right to make a rebuttal argument in closing statements, there was no proper objection to the ruling). *Cf. Waldorf v. Shuta*, 142 F.3d 601, 629 (3d Cir. 1998) ("As the district court correctly noted, it is clear that a party who fails to object to errors at trial waives the right to complain about them following trial. *See Murray v. Fairbanks Morse*, 610 F.2d 149, 152 (3d Cir. 1979) (holding that '[c]ounsel's failure to object precludes him from seeking a new trial on the grounds of the impropriety of opposing counsel's closing remarks.')").

The Court also notes that, to the extent Plaintiffs argue they should have been permitted to call Officer Nelson or Jerry Salter, such objections have been waived. In particular, Plaintiffs' reference to the Court allegedly precluding Officer Nelson's testimony is false. At sidebar at Day 3 of the trial, a day prior to the Court's questioning of Plaintiffs' counsel regarding rebuttal witnesses, Attorney Murray stated that "based upon the Court's – and beyond this on the record – based upon the Court's prior ruling on the [Dejean] Murray matter, I just did it on my own, I felt that Randy Nelson would not be a proper witness and,

therefore, I've instructed him last night not to come. I will not be calling him." (Trial Tr., Oct. 29, 2014, at 104). Attorney Murray reiterated that he would not be calling Officer Nelson several times thereafter (see id. at 107, 108, 166) and did not request that Nelson be called as a rebuttal witness.

With respect to Jerry Salter, in asserting that Salter should have been permitted to testify, Plaintiffs state that "all three dismissed plaintiffs say Sanders touched them sexually" (Doc. 232, at 60). Yet it is undisputed that I. Sanders never sexually touched Salter, and Plaintiffs themselves previously admitted that Salter "was 'not touched'" by I. Sanders (id. at 53 n.11; Trial Tr., Oct. 27, 2014, at 32). Further, while Plaintiffs argue that "the trial court held the testimony of D. Murray, W. Brown, and J. Salter inadmissible to show that I. Sanders engaged in a common plan or scheme of sexual predation" (Doc. 232, at 61), Plaintiffs never attempted to offer the testimony of Salter on rebuttal. Following Dejean Murray's Rule 415 hearing, the Court stated that, while Plaintiffs' counsel could make a further offer of proof, based on counsel's initial representation that Salter was not sexually assaulted, Salter would not be allowed to testify under Rules 413 and 415. (Trial Tr., Oct. 27, 2014, at 33). However, upon questioning by Plaintiffs' counsel, the Court stated that it was not precluding Plaintiffs from attempting to elicit testimony at trial but that Salter's testimony, as stated by Plaintiffs' counsel, was simply not sufficient to allow him to testify about his experiences (id. at 33-34), a logical conclusion given that Salter had no experiences that could even plausibly approach the standard set forth in Rule 413. The

Court did not rule that Salter could not testify at all. A review of the record indicates that Plaintiffs' counsel never attempted to call Salter on direct for any other purpose or requested that he be called on rebuttal. Therefore, to the extent Plaintiffs now argue they should have been permitted to call Salter, such objection has been waived.

Thus, the Court will reject Plaintiffs' assertion that it erred in in precluding the rebuttal testimony of Dejean Murray, William Brown, Jerry Salter, and Randy Nelson to impeach I. Sanders' credibility.

### 5. The Jury Verdict

Finally, Plaintiffs request that the Court grant a new trial due to the "shocking" nature of the jury verdict, arguing that the jury "failed to apply the standards and law to the facts" and that the jury "was clearly confused, and quickly rendered a verdict totally against the weight of the evidence." (Doc. 232, at 62-63).

"A Rule 59(a)(1) motion seeking a new trial on the ground that the judgment is against the weight of the evidence is warranted only when the verdict is so against the evidence as to constitute a miscarriage of justice." 1 Moore's Federal Rules Pamphlet § 59.3[3] (Matthew Bender)(2016). Thus, although a new trial may be granted even if the evidence is legally sufficient to support the verdict, "a district court should grant a new trial on the basis that the verdict was contrary to the weight of the evidence only where a miscarriage of justice would result if the verdict were to stand." *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1076 (3d Cir. 1996) (quoting *Roebuck v. Drexel*

*Univ.,* 852 F.2d 715, 735-36 (3d Cir. 1988); *Williamson,* 926 F.2d at 1352); *see also, Williamson,* 926 F.2d at 1353 ("[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience."). The Third Circuit has characterized this as a "stringent standard" necessary "to ensure that a district court does not substitute its judgment of the facts and the credibility of the witnesses for that of the jury." *Sheridan,* 100 F.3d at 1076 (internal quotation marks omitted).

Despite Plaintiffs' implication to the contrary, it is not to this Court that they may turn because they failed to persuade the jury that the verdict should have been rendered in their favor. As Plaintiffs previously recognized, "when this case finally went to trial, it was a pure credibility battle." (Doc. 232, at 61). While the number of disparities in Plaintiffs' testimony are too numerous to list, and the Court cannot say what the jury specifically chose to believe or disbelieve, there were certainly sufficient ambiguities and inconsistencies to allow a jury to find in favor of Defendant. Among the conflicting testimony that could have prevented a jury from finding that Plaintiffs proved their case by a preponderance of the evidence is the testimony recounted below.

With respect to Plaintiff Frantz Bernard, despite claiming that I. Sanders grabbed his genitalia while driving in I. Sanders' car and told Bernard that he wanted to kiss his penis, (Trial Tr., Oct. 28, 2014, at 23, 26), Bernard also testified that he continued to have contact

66

with I. Sanders, other than in the office. "[W]ithin, like, weeks" of I. Sanders touching him

inappropriately in the car, Bernard called I. Sanders late at night when Maggie Omwenga,

his girlfriend at the time, "kicked him out" of their apartment and asked I. Sanders to help

him. (Id. at 43-44). Bernard also admitted that he was alone in the car with I. Sanders

several times after being touched in the car following the meal at the Thai restaurant. (Id. at

91). A jury could have reasonably wondered why a person would put himself in these

situations following unwanted sexual advances.

Bernard's credibility was further tested many times during his trial testimony.

Bernard testified that he told Omwenga about the incident in the car (Trial Tr., Oct. 28,

2014, at 30, 36) but after initially denying that he and Omwenga broke up because she

would not attest to his version of the events, he later admitted that this "was a major reason"

for the break-up. (Id. at 62-64). The fact that Omwenga would not corroborate Bernard's

story may have led a jury to question Bernard's truthfulness. Additionally, throughout cross-

examination, defense counsel pointed to numerous inconsistencies between Bernard's

deposition testimony and trial testimony (see e.g., id. at 45-46, 47-48, 51-54, 62-64, 74-75,

86-88), even eliciting Bernard to state at one point that "I didn't really know how to go about

answering all the questions [during the deposition] accurately" (id. at 51).

Overall, a jury may also have interpreted Bernard's general demeanor during his

own testimony as well as throughout the trial as combative and hostile. Bernard was unable

to continue testifying during the first day of trial, stopping after only a few minutes. During

his testimony on the second day of trial, Bernard was often argumentative and defensive with I. Sanders' counsel. Bernard also later interrupted I. Sanders' testimony, yelling "Don't lie", visibly startling everyone in the courtroom and causing the Court to order the jury removed from the Courtroom. (Trial Tr., Oct. 30, 2014, at 138). Even Plaintiffs' counsel admitted in arguing against Defendant's counsel's motion for a mistrial that he thought "it hurt [Bernard,] . . . it hurt the credibility of Mr. Bernard. It was very shocking." (*Id.* at 242).

With respect to Plaintiff Anthony Ross, he asserted that I. Sanders touched him several times. Ross testified about an incident in I. Sanders' office, where, as Ross was "talking, [I. Sanders] leans in and he puts his hand on my upper thigh and crotch area" and soon after gave Ross "a hug". Ross testified that at this meeting he was "very emotional", that "it was so quick" and that he was not sure whether the touching was inappropriate. (Trial Tr., Oct. 29, 2014, at 75-78). During the second incident in which I. Sanders allegedly touched Ross, according to Ross, I. Sanders "start[ed] rubbing my upper shoulder, back area" and then leaned in and pressed his genital area up against Ross. In response, Ross went to use the restroom because he "didn't really want to know what was going on." (*Id.* at 79-82). When questioned by his counsel regarding what Ross was thinking "as a result of [I. Sanders] pressing his genitals up against" him, Ross responded:

> ROSS: He overstepped his boundaries. First, one, I'm emotional, like I said, it's cloudy, my vision, everything is cloudy. So I just know that I'm -- the uncomfortable feeling of the touch.
> And then the second time, it was -- really, I really don't know. I didn't receive it like this is something that I wanted, you know, it was, Did he just put his, like, nuts on my shoulder? Or was it -- okay, but see the tough part about that, and

this is why I think the way I think at that time -- I cut hair, so I'm a barber, so I know when someone is sitting down, do you know what I mean, you brush against them and do certain things.

So for the 30 percent that I didn't think -- that's the reason why I gave him the 30 percent, that it wasn't kind of intentional. 70 percent was, Damn, I know when I'm cutting hair and my genital -- I brush up against someone by accident, I feel uncomfortable, you know, I'm pretty sure they may feel like -- whereas, that's the reason why the other 70 was kind of like, It may have been intentional.

The other 30, like I said, I gave him the benefit of the doubt because I cut hair, so.

ATTORNEY MURRAY: Did you think this was intentional?

ROSS: That day, I wasn't 100 percent sure.

(*Id*. at 83-84). Later during cross-examination Ross stated that he "didn't know what [the first touching in the office] was, at the time", whether the touching was intentional, and admitted that he wrote a statement asserting that he "didn't want to jump the gun and make false statements about the situation." With respect to the second incident in the office, Ross stated that he believed "it was a lot more intentional than the first time" but that he "[didn't] know what was really going on." (*Id*. at 120-121, 125). If Ross could not tell the jury with any certainty that he believed that I. Sanders' touching of him was intentional at the time the incidents occurred, it is reasonable that a jury may also have wondered whether I. Sanders' actions were intentional or meant in a sexual manner. It is also possible that a jury believed that a situation in which Ross could not determine whether the touching was intentional could not have been severe enough to constitute a sexual assault.

Even after the incidents of touching and text messages, Ross admitted that at some point when he was driving on campus with his wife, he saw I. Sanders across from the "caf" and "beeped just to wave." (*Id*. at 92). He also stated that he later "ended up reaching out to Isaac and asked him if I could talk to him about [the grad assistantship for Frederick Douglas], just to give a reference." (*Id*. at 93). A jury could reasonably wonder why Ross, who claimed to have realized that I. Sanders wanted to "do something sexual" with him after receiving an inappropriate text message from him (*id*. at 86), would then continue to voluntarily have contact with I. Sanders, putting himself in a position where he may have to physically interact with I. Sanders again, thereby risking being subjected to more inappropriate sexual behavior by I. Sanders.

While Plaintiff Timotheus Homas' allegations against I. Sanders were by far the most serious, Homas' trial testimony was often indecisive, unfocused,[26] and suffered from numerous inconsistencies. Homas was repeatedly unable to remember dates, including years, in which certain events occurred. (*See, e.g.*, Trial Tr., Oct. 28, 2014, at 172, 183, 185, 191-192, 197, 198-199; Trial Tr., Oct. 29, 2014, at 3-8, 9, 15-16, 24, 25, 29). Even Homas' testimony regarding I. Sanders' alleged sexual assaults of him often lacked clarity and certainty. For example, Homas testified that the second time he met I. Sanders, the Defendant drove him home and, on the car ride, touched his leg, penis, and navel area and

---

[26] Throughout his trial testimony, Homas did not answer the questions posed to him by either counsel, often trailing off onto other topics, and causing the Court to tell Plaintiffs' counsel to "focus your witness" and later remind Plaintiff that he must be responsive to the questions asked of him. (*See* Trial Tr., Oct. 28, 2014, at 179; Trial Tr., Oct. 29, 2014, at 15).

then parked, took his penis out, and forced Homas' head down several times. However, Homas stated that he was only "pretty sure" that I. Sanders put his penis in his mouth. (Trial Tr., Oct. 28, 2014, at 144-149). On a subsequent occasion, Homas met I. Sanders at the ESU Advancement Office in the evening. Homas testified that I. Sanders "inserted – or attempted to insert his penis into [Homas'] mouth", and in response to his counsel's questioning, could only state that he "thought" I. Sanders put his penis in his mouth. (*Id*. at 167-169). During this same assault, Homas was unsure if I. Sanders climaxed, but then stated that he did see I. Sanders "clean up" and wipe himself with a handkerchief or towel. (*Id*.). Homas also could not remember whether he immediately left the office after I. Sanders assaulted him. (*Id*. at 171).

Even after the incidents in the car and I. Sanders' office, Homas worked in the Advancement Office, for which I. Sanders was Vice President. During Homas' time in the office, Homas testified that I. Sanders did not put his genitalia or penis in Homas' mouth, but that I. Sanders would touch him, including "grab[bing his] nipples, [his] buttocks and [his] front area when [he] would come to [I. Sanders'] office." (Trial Tr., Oct. 28, 2014, at 180).

Homas' lack of certainty as to the events in question, and in particular what I. Sanders did to him, including whether I. Sanders forced his penis into Homas' mouth, could raise an issue in the jury's mind as to what acts actually occurred and whether Homas' testimony was truthful. The jurors could also wonder why, after two sexual assaults, a person would begin working in an office with his abuser, and continue to do so despite

repeated subsequent unwelcome sexual advances.  A fact finder may also have required a clearer recollection on the part of Homas in order to feel comfortable finding in favor of the Plaintiff due to the gravity of the allegations.

Further convincing a jury may have been Homas' description that I. Sanders, by "trickery and chicanery" forced him to perform oral sex.[27]  As Homas explained, he used these terms because he "was being manipulated into coming into the office under ambiguous pretense, I did not know what I was doing." (Trial Tr., Oct. 29, 2014, at 28). Homas further stated that I. Sanders "tricked me into places where he forced himself on me . . ." (Id.). A jury could question why a competent adult male would continually return to the office of a man who allegedly repeatedly sexually assaulted him, and yet claim that each new assault was the result of "trickery".

Homas himself also had difficulty characterizing I. Sanders' actions as sexual, requiring his attorney to ask follow-up questions in order to elicit testimony by Homas that he did believe I. Sanders' actions were sexual.  For example, Homas first stated that he "personally didn't see [the incident in the Advancement Office] as sexual" but then decided

---

[27] During trial, Attorney Coleman , referring to Plaintiff Homas' prior deposition testimony, engaged in the following exchange:

ATTORNEY COLEMAN: . . . Now, you said, did you not, that Dr. Sanders, by trickery and chicanery, forced you or had you perform oral sex?
HOMAS: Yes.
ATTORNEY COLEMAN: Okay, that's your term?
HOMAS: Yes.

(Trial Tr., Oct. 29, 2014, at 28).

that he "guess[ed] that still would be sex." (Trial Tr., Oct. 28, 2014, at 177). And with

respect to the repeated touching in I. Sanders' office during the time Homas worked in the

Advancement Office, the following exchange took place between Attorney Murray and

Homas:

> ATTORNEY MURRAY: How many times did this occur over the – could you give us a time frame? That's all I'm asking, how many times? Daily, during a month, how many times? 5, 10, 15?
>
> HOMAS: Well, it was very sporadic, I can't really give an exact number. I know I said it was a high amount of time when he was there. He was not there all the time, I said 85 percent of the time, or I think -- I know it was a lot, there was some type of advancing, it was not to the point -- I just want to make that clear -- it was not to the point where he actually -- I would not consider it -- I personally would not consider it – him sexually abusing or assaulting me, it was, you know, like, a football player would grab somebody, but it was unwelcomed and I told him it was unwelcomed, like, patting me on the rear end or touching my chest or something of that nature.
>
> ATTORNEY MURRAY: There was some times he did that that you didn't think it was of a sexual nature that he touched you?
>
> HOMAS: In my brain, I didn't want it to be a sexual nature, but yes, it was -- I mean, he got gratification from it. What I'm saying is just how you would see a guy pat -- because of the precedence that was set, before, of him doing that, you know. To another guy, guys play sports like that, but it was not in that type of way, that's what I'm trying to explain.
>
> ATTORNEY MURRAY: What type of way was it, as far as you knew?
>
> HOMAS: Of course, it was sexual, I was trying to block it out of my brain. I was just happy where it was not to the point where it was in the past.
>
> ATTORNEY COLEMAN: Note my objection, Your Honor. The question was, what type was it?
>
> HOMAS: It was sexual, it was all sexual.

(Trial Tr., Oct. 28, 2014, at 181-182). Even after admitting to his attorney that the interactions between himself and I. Sanders were sexual, on cross-examination, Homas clarified that he "didn't consider anything that happened between Dr. Sanders and I sex – well it was sexual. . . ." (Trial Tr., Oct. 29, 2014, at 35). Furthermore, given that one of the key issues before the jury was whether I. Sanders sexually assaulted one or more of the Plaintiffs, Homas own testimony that he "would not consider it -- I personally would not consider it – him sexually abusing or assaulting me" (Trial Tr., Oct. 28, 2014, at 181) may have been viewed by the jury as severely damaging to his cause of action.

Homas also may have hurt his own credibility and caused the fact finders to question I. Sanders' motives by stating that, even following all of the alleged assaults, he continues to respect I. Sanders. (See id. at 150 ("I had great admiration for Dr. Sanders, and in some sense, I still do, oddly"). Following the alleged assaults in the car and I. Sanders' office in the evening, Homas also testified that he continued to speak with I. Sanders, including asking him about research and doctoral programs, and that he was able to "confide" in I. Sanders about personal problems such as "some bad issues with my child's mother." (Id. at 174-176). Homas also told I. Sanders about, among other things, his "tumultuous childhood" and "being molested" by family members. (Trial Tr., Oct. 29, 2014, at 39). Even after I. Sanders was terminated from ESU, Homas admitted that he "returned [I. Sanders'] phone calls." (Id. at 36). Testimony that Homas still respects I. Sanders, trusted I. Sanders enough to discuss very personal issues with him, and continued speaking with him even

74

after the assaults ended, indicates a level of trust and comfort by Homas with I. Sanders that a jury may have found incompatible with a victim of a sexual assault and his attacker.

With respect to all three Plaintiffs, the defense introduced several themes throughout the case. One of the defense's recurring points was that this lawsuit was not about justice, but rather money. Defendant's counsel questioned each of the Plaintiffs as to their motives, possibly creating doubt in the minds of the jurors regarding why two of the three Plaintiffs never reported the alleged assaults to the University or police, but rather decided to begin a civil action against I. Sanders. (See e.g., Trial Tr., Def.'s Opening Statement, Oct. 27, 2014, at 97; Trial Tr., Oct. 29, 2014, Test. of A. Ross, at 108-109, 129-131, 135-136). Even Bernard, who did file a complaint with the University, admitted on cross-examination that he called Attorney Murray "a good friend" (Trial Tr., Oct. 28, 2014, at 95), potentially creating an issue as to Bernard's motives for filing this lawsuit. With respect to Homas, he testified that he became a plaintiff in this action after receiving "a phone call from an anonymous number" telling him to seek counsel. (Id. at 185). As Defense counsel noted during Homas' cross-examination:

ATTORNEY COLEMAN: . . . [W]hen Dr. Sanders violated you not once, not twice, but about 10 times, maybe more, you never filled out any official paperwork through the University, through the channels at the Diversity Office, can we agree on that, yes or no?

HOMAS: That is correct.

ATTORNEY COLEMAN: The only time you bring forward these allegations is after you get the anonymous call telling you -- your testimony yesterday -- to go seek out counsel. Correct?

75

HOMAS: Yes, but that's not exactly how that happened.

ATTORNEY COLEMAN: Well, we're going to ask you that. But we can agree that no complaint with any University official, an anonymous call, which we're going to talk about, and then this lawsuit for money, correct?

HOMAS: Correct.

(Trial Tr., Oct. 29, 2014, at 13-14). Homas later was unable to answer a critical question when Defense counsel asked "if you didn't tell anybody about these events, do you know how this anonymous caller would know how to call you or would know to call you?" (Id. at 16). Homas' inability to adequately explain how he heard about Attorney Murray and decided to join this lawsuit may have caused a fact-finder to question whether Homas was hiding something, not providing the full story, and ultimately, what Homas' motives were for participating in this lawsuit.

Additionally, as the defense repeatedly established, there were no records to support the majority of the Plaintiffs' claims. Despite Homas' testimony that I. Sanders swiped an identification card to enter the building on one of the nights Homas claimed I. Sanders sexually assaulted him, there were no records to support this claim. (Trial Tr., Oct. 28, 2014, at 163, 200-201). Homas was also unable to provide any phone records showing the day, or even occurrence, of an anonymous call directing him to Attorney Murray. (Trial Tr., Oct. 29, 2014, at 18). With respect the Bernard, there was no evidence, including any pictures, that I. Sanders gave him male briefs as he claimed. (Trial Tr., Oct. 28, 2014, at 61). The only paperwork that Bernard entered into evidence to support his allegations was

76

the mass email from I. Sanders of a stick-figure with a gas pump up his rectum. (Pls.' Ex. 5). With respect to Ross, he claimed that I. Sanders texted him that "I'm on the balcony in my hotel in my towel thinking of you", but did not have copies of the texts and was unable to obtain them from his cell phone provider. (Trial Tr., Oct. 29, 2014, at 85, 87, 127-128). Ultimately, a jury may have found that there was nothing to support the Plaintiffs' stories and, absent any other evidence, did not believe that any Plaintiff had established his case by a preponderance of the evidence.

In contrast to the Plaintiffs, when speaking of the allegations against him, I. Sanders kept his answers short and largely limited to "yes", "no", and "absolutely not." (See e.g. Trial Tr., Oct. 30, 2014, at 113-114, 126, 140, 144, 147, 148, 157, 158, 165, 170, 173, 174, 195-196, 198, 207, 209, 210, 211, 216, 237).

I. Sanders' testimony confirmed many of the basic facts and dates testified to by the Plaintiffs. With respect to Bernard, I. Sanders' testimony mirrored Bernard's in many ways, including when he first met Bernard and when Bernard began working at the office, that he took Bernard to a meal at a Thai restaurant and that they stopped at the Water Gap afterwards. (Trial Tr., Oct. 30, 2014, at 134). I. Sanders admitted that he had sent a group email, which included Bernard, and that this was probably in poor judgment. (Id. at 140). I. Sanders confirmed Homas' story that he had been urged by Dr. Graham to call I. Sanders to discuss a job position, and that both he and Homas were at the diversity conference. (Id. at 142, 143-144, 220). I. Sanders also confirmed that Homas worked at the Advancement

Office and spoke with him about problems with his fiancé and child. (Id. at 146). While I. Sanders alleged that Homas called him, he agreed with Homas that the two had spoken following his termination from ESU. (Id. at 152). As to Ross, I. Sanders confirmed that Ross came to him regarding graduate schools and that he wrote Ross several letters of recommendation. (Trial Tr., Oct. 30, 2014, at 156-157). I. Sanders also admitted that "[i]t's possible" he gave Ross a hug at graduation and that he did put money in Ross' University account. (Id. at 157, 158-159, 182-183).

However, I. Sanders disputed Plaintiffs' key allegations. I. Sanders denied each of the incidents alleged by Bernard. He denied ever giving Homas a ride home on the night of the diversity conference, and in contrast to Homas' testimony, stated that alcohol was never served at President Dillman's house prior to the diversity conference. (Id. at 144, 220). I. Sanders also denied ever meeting Homas at night in the alumni building where Homas alleges he was sexually assaulted or ever talking to Homas about his childhood molestation. (Id. at 144, 217-218). The defendant denied ever rubbing his genitals on Ross in his office, putting his hand on Ross' thigh, bumping against him, or sending an inappropriate text message. (Id. at 158, 170; see also, id. at 195-196).

With respect to the termination letter that Plaintiffs argue constitutes part of the evidence that weighs in favor of this Court finding the jury's verdict "shocking" (Doc. 232, at 62), the letter's contents do not necessarily support a finding that I. Sanders sexually assaulted students. The termination letter, which was entered into evidence in redacted

form (Pls.' Ex. 7; Def.'s Ex. 7), lists three reasons for I. Sanders' termination, namely, "allegations by" ESU and graduate students who "assert that you made sexual advances toward them or engaged in sexual conduct with them on various occasions between 2004 and 2007"; "financial matters"; and "violat[ion of] [Dillman's] directive . . . when you were placed on administrative leave by contacting ESU employees, donors and former students." The letter further states that each of these grounds "independently established a sufficient for cause basis for your termination." Notably absent with respect to the sexual allegations is any reference to sexual *assault* or any non-consensual activity between I. Sanders and the unnamed students. Thus, the letter offers no support for any argument by Plaintiffs that I. Sanders was terminated for actually committing a sexual assault. Rather, the University's letter bases I. Sanders' termination in part on "*allegations*" of "sexual advances" and "sexual conduct". The reasons given by the University for I. Sanders' discharge, in that they do not suggest sexually assaultive conduct of a criminal nature by I. Sanders, do not show that the jury's verdict that no such sexual assault occurred is in any sense "shocking."

Ultimately, this action required the jury to make a credibility determination as to each Plaintiff and the Defendant. While there was testimony which could have supported a verdict in favor of the Plaintiffs, there was also sufficient testimony and evidence which would justify a jury's finding that Plaintiffs did not meet their burden by a preponderance of the evidence. It is entirely possible that the jury believed one of more Plaintiffs to the extent that they claimed I. Sanders touched them, but simply not the full extent of the allegations or

79

that any touching that the jury did believe occurred rose to the level of sexual contact or sexual acts as explained by the Court in the instructions to the jury.[28] The jury had the benefit of seeing and hearing each witness's testimony, as well as observing their body language and general demeanor in assessing the credibility of each witness. Based on this, they found in favor of I. Sanders. In light of the conflicting testimony and lack of documentary evidence to support Plaintiffs' claims, this Court cannot find that the verdict rendered by the jury was so against the evidence as to constitute a "miscarriage of justice" or as shocking the conscience.

## V.   CONCLUSION

For the foregoing reasons, the Court will deny "Plaintiffs' Rule 59 Motion for a New Trial or Amending a Judgment" (Doc. 220). A separate Order follows.

Robert D. Mariani
United States District Judge

---

[28] There were no objections to the jury instructions. (See Doc. 232, at 62).